*MHK*

**FILED**

In The United States District Court
For The Northern District Of Illinois
Eastern Division

DEC 1 3 2007
12-13-2007
JUDGE JOAN H. LEFKOW
UNITED STATES DISTRICT COURT

| | |
|---|---|
| **Commodity Futures Trading Commission**, <br><br> Plaintiff, <br><br> v. <br><br> **One World Capital Group, LLC** and **John Edward Walsh**, <br><br> Defendants. | 07CV 7002 <br> JUDGE LEFKOW <br> MAGISTRATE JUDGE KEYS |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR AN *EX PARTE* STATUTORY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

The Commodity Futures Trading Commission (the "Commission" or "CFTC") brings this action against One World Capital Group, LLC ("One World") a futures commission merchant ("FCM") registered with the Commission that also acted as a forex dealer member ("FDM") of the National Futures Association ("NFA"), and One World's President, John Edward Walsh, because they are unable to demonstrate compliance with the minimum adjusted net capital requirement of $1,000,000 applicable to FCMs that act as FDMs, and because they failed to provide required books and records to the NFA and Commission staff, in violation of Sections 4f(a) and (b) of the Act, 7 U.S.C. §§ 6f(a)& (b) (2002), and Commission Regulations ("Regulations") 1.17(a)(4) and 1.18, 17 C.F.R. §§ 1.17(a)(4) and 1.18 (2007). More specifically, the NFA has been unable to verify that One World possesses any net assets, while at the same time, the NFA has received communications from One World customers claiming an aggregate amount outstanding to customers of at least $4,000,000. Unless restrained and enjoined by this Court, the Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and in similar acts and practices, as more fully described below. Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), the Commission has brought this action

to enjoin such acts and practices, prevent the dissipation of assets, and compel compliance with the provisions of the Act.

To preserve the records of Defendants' activities, the Commission also seeks an ex parte statutory restraining order, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1, to prohibit Defendants, or any other person or entity from (1) withdrawing, transferring, removing, dissipating or disposing of One World's funds, assets or other property; (2) destroying, altering or disposing of One World's books, records or documents; and (3) denying authorized representatives of the Commission immediate access to books, records, documents, electronically stored data, tape records or other property of One World.

The motion for the ex parte statutory restraining order is fully supported by this brief, the complaint filed herewith, and the Declarations of Joy McCormack, Senior Futures Trading Investigator, H. Frank Zimmerle, Branch Chief with the Commission's Division of Clearing and Intermediary Oversight ("DCIO"), Sharon Pendleton, Direct of Audits at the NFA, and certified documents from the NFA, submitted as Appendix of exhibits 1-5 to the motion.

Immediate action, including but not limited to an asset freeze, is needed to maintain the status quo, prevent the dissipation of assets, and prevent further violations of the Act and Regulations. Because of the emergency nature of the situation, the Commission has also filed a Motion for Expedited Discovery.

## II.    THE PARTIES

Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 et seq. (2002), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq*. (2007).

Defendant **One World Capital Group, LLP** is a New York Limited Liability Company formed on August 31, 2005. (McCormack Decl. ¶ 4). Its principal place of business is 818 Elm Street in Winnetka, Illinois 60093.[1]  (Ex. 4). One World has been registered with the Commission as a FCM since December 6, 2005 and as Commodity Trading Advisor ("CTA")

---

[1] One World lists its principal place of business as 525 Chestnut Street, Winnetka, Illinois in its filings with the Illinois Secretary of State and on its websites. (*See* McCormack Decl. ¶¶ 5, 9 Exs. B, C). This is the same building, but a different entrance than the 818 Elm Street address.

since May 17, 2007. (*Id.;* Pendleton Decl. ¶ 4). One World is also an FDM of the NFA. (Pendleton Decl. ¶ 4).

Defendant **John Edward Walsh** is 59 years old and resides in Lake Forest, Illinois. (McCormack Decl. ¶ 6). Walsh has been registered with the Commission in various capacities since 1997. (Ex. 5). From December 2005 to November 30, 2007, Walsh was registered an Associated Person ("AP") of One World and was listed with NFA as Principal and managing member of One World. (Pendleton Decl. ¶ 5; Ex. 5). Walsh is the President and main contact for One World. (Pendleton Decl. ¶ 7; Ex. 4). He signs management reports on behalf of One World, is the sole signatory of One World's bank accounts, and supervises One World's employees. (Pendleton Decl. ¶ 7).

### III.    THE FACTS

#### A.    The National Futures Association

The NFA is a registered futures association pursuant to Section 17 of the Act, 7 U.S.C. § 21. It is the industry wide, independent, self-regulatory organization for the U.S. futures industry. Its mission is to develop rules, programs and services that safeguard market integrity, protect investors and help its Members meet their regulatory responsibilities. (Pendleton Decl. ¶ 2). Among other things, NFA conducts audits of registered members to ensure compliance with the rules and regulations. As such, One World has been subject to several audits by the NFA.

#### B.    One World's Business Background

Since December 2005, One World has acted as a FDM in that it was the counterparty or offered to be the counterparty to off-exchange forex transactions with domestic and foreign retail customers. *Id.* at ¶¶ 4, 6, 8, Exs. A & B. One World also provides services to customers in connection with off-exchange forex trading, including managed accounts. *Id.* Walsh has represented to the NFA that One World currently carries in excess of 2000 customer accounts trading forex through Metatrader, an electronic trading platform licensed to One World by Moneytec. *Id.* at ¶ 8.

Since at least December 2005, One World also carried accounts for retail customers that traded exchange-traded futures contracts. *Id.* at ¶ 4. Since at least December 11, 2007, One

World appears to continue to hold the funds of some customers who traded exchange-traded futures contracts. (McCormack Decl. ¶ 3).

One World has maintained at least five forex related internet websites at various times during its registration as an FCM and CTA in which it provided information about the entity and solicited potential customers. (McCormack Decl. ¶ 7; Pendleton Decl. ¶ 4). These websites include www.1worldfcm.com, www.1world-forex.com, www.1wfx.com, www.1worldchina.com and www.owforex.com. (McCormack Decl. ¶ 7; Pendleton Decl. ¶ 4). At least two of the One World websites, 1worldfcm.com and 1world-forex.com, have touted One World's registration status with the NFA and oversight by the CFTC. (McCormack Decl. ¶¶ 9, 10, Exs. C, D). As of December 6, 2007, the 1world-forex.com website stated:

> A registered Futures Commission Merchant (FCM), One World Capital Group LLC is a member of the National Futures Association (NFA) and is regulated by the Commodity Futures Trading Commission (CFTC). Interested parties can visit the NFA web site at any time to review One World Capital Group's unblemished record as an NFA member. NFA ID #0359973. (*Id.* at ¶ 9, Ex. C).

Since December 4, 2007, the 1worldfcm.com website removed its content and only directs the reader to contact Walsh with questions, listing the One World office number. *Id.* at ¶ 11, Ex. E. The customer account application is currently still publicly available on the internet. *Id.* at ¶ 12, Ex. F. The other three websites do not appear to be currently available. *Id.* at ¶ 13.

### C.    One World and Walsh's Disciplinary Background

As a registered FCM that is also a FDM, One World must maintain a minimum adjusted net capital of $1,000,000 and be able to demonstrate compliance with net capital requirements. *See* Section 4f(b) of the Act, 7 U.S.C. § 6f(b), and Regulation 1.17(a)(1)(C), 17 C.F.R. § 1.17(a)(1)(C). Pursuant to Regulation 1.17(a)(4), 17 C.F.R. § 1.17(a)(4), an FCM that is not in compliance with Regulation 1.17, or is unable to demonstrate such compliance, must transfer all customer accounts and immediately cease doing business as a FCM until such time as it can demonstrate such compliance.

One World and Walsh have been formally disciplined by the NFA at least twice since One World registered with the Commission on December 5, 2005. The disciplinary actions demonstrate a general inability by One World to satisfy applicable net capital and record keeping requirements.

### 1.    NFA Business Conduct Committee Action

On June 4, 2007, the NFA filed a Business Conduct Committee ("BCC") Complaint against One World and Walsh alleging, among other things, that one month after One World became registered, it had failed to meet its minimum net capital requirements as of January 31, 2006 and failed to maintain required books and records. (Pendleton Decl. ¶ 6, Ex. A). Specifically, the NFA asserted that One World failed to include customer liabilities in its financial statements, and failed to maintain adequate ledgers and financial statements. *Id.* The BCC complaint stated that NFA's audit determined that "…One World lacked an understanding of, or was inattentive to, regulatory requirements and was ill prepared to accept customer business as either an FDM or an FCM…." (*Id.* at ¶ 6. Ex. A, p. 2).

On November 14, 2007, the NFA issued a Decision on the BCC complaint in which it accepted Walsh's and One World's offer of settlement. (*Id.* at ¶ 6, Ex. B). The Decision recites that One World and Walsh consented to findings that they committed the violations alleged against them in the BCC complaint. *Id.* As noted in the Decision, the acceptance of the settlement did not relieve One World of its obligation to comply with all NFA requirements, including net capital requirements for FCMs that are also FDMs. (*Id.* at ¶ 6, Ex. B, p.4).

### 2.    NFA Member Responsibility Action

On November 28, 2007, the NFA commenced an audit of One World. Pursuant to the audit, NFA sent staff to One World's Winnetka office. (Pendleton Decl. ¶ 9). During the course of this audit, Walsh has denied audit staff's access to the office and to customer account files. *Id.* at ¶¶ 12-14 . Walsh also has failed to provide NFA staff copies of, or access to, bank records and forex trading account statements. *Id.* at ¶ 13.

As a result of the above actions, on November 30, 2007, the NFA filed a Notice of Member Responsibility Action ("MRA") against One World alleging that One World and Walsh have failed to cooperate promptly and fully with the NFA in an NFA audit, and that One World failed to produce adequate and complete support for certain material asset and liability balances. *Id.* at ¶ 16, Ex. C. NFA filed the MRA to protect customers because it is unable to verify that One World is in full compliance with the NFA's capital and other financial requirements. *Id.* at ¶ 17. The MRA notified One World and Walsh that, inasmuch as One World was unable to demonstrate compliance with the minimum capitalization requirements, One World is required to cease doing business, including the solicitation or acceptance of any additional customer funds,

and can only accept or place trades for liquidation purposes until such time as it has demonstrated it has in place the required capitalization, pursuant to Commission Regulation 1.17(a)(4). *Id.* at ¶ 16.

### D.    Defendants Have Failed to Provide Books and Records

Since at least November 28, 2007, NFA staff has attempted to obtain supporting financial records from One World relating to their net capital computation to aid in determining their current net capital and customer liabilities. *Id.* at ¶¶ 9, 11-14. To date, Walsh has failed to cooperate with NFA staff and has failed to provide books and records to the NFA. *Id.* at ¶¶ 16, 17. Walsh also has prohibited One World employees from providing books and records to the NFA, including information relating to One World's financial condition, in particular forex liabilities. *Id.* at ¶ 12.

On December 3, 2007, CFTC staff sent a letter to Walsh and One World requesting, among other things, that One World provide a current net capital computation. (Zimmerle Decl. ¶¶ 5-8, Ex. A). To date, One World and Walsh have failed to provide all of the requested information. *Id.* at ¶ 9-10.

Despite the NFA's and CFTC's attempts to obtain records and capital computations, Walsh has failed to produce the requested books and records and actively prevented the release of books and records. Since December 3, 2007, Walsh has also failed to provide required net capital computations in violation of the Act and Regulations. (Pendleton Decl. ¶ 13; Zimmerle Decl. ¶ 10). In so doing, Walsh has knowingly induced, directly or indirectly, One World's violation of the Act and Commission Regulations or has failed to act in good faith with respect to these violations.

### E.    One World Has Failed to Demonstrate Compliance With the Minimum Adjusted Net Capital Requirements of the Act and Regulations and Failed to Maintain Required Books and Records

As a registered FCM, One World is required pursuant to Commission Regulation 1.10(a)-(d) to submit a monthly report to the CFTC and NFA that includes a statement of financial condition and a statement of the computation of the minimal adjusted net capital requirements on a form designated as a 1-FR-FCM ("1-FR"). 17 C.F.R. §§ 1.10(a)-(d) (2007). One World's most recently filed 1-FR report purports to show that as of October 31, 2007, One World had $357,053 in liabilities to forex customers. (Zimmerle Decl. ¶ 15, Ex. B). NFA staff asked for

support for that number and, to date, has not received any supporting information from One World or its principal, John Walsh. (Pendleton Decl. ¶ 13). Additionally, Walsh informed both NFA staff and CFTC staff that he is unable to identify One World's customers and cannot determine the liabilities to the customers. (Pendleton Decl. ¶ 12; Zimmerle Decl. ¶¶ 12-13). Walsh told CFTC staff that he cannot "…say whether he has sufficient funds with which to pay those forex customers." (Zimmerle Decl. ¶¶ 12-13).

As part of the NFA audit, as of December 5, 2007, the NFA was able to credibly demonstrate that One World has assets in the amount of $554,422 (Pendleton Decl. ¶ 17). This number does not include liabilities, and is still short the $1 million net capital requirement. *Id.* Since November 2, 2007, the NFA has received numerous complaints from customers stating that One World has not satisfied customer withdrawal requests. *Id.* at ¶ 9, 15, 16, Ex. C. The aggregate amounts claimed by these customers exceed $4,000,000. *Id.* at ¶ 9.

During the pendency of the NFA's current audit and the CFTC's information requests, Walsh has admitted that One World has not maintained records of its forex liabilities. (Pendleton Decl. ¶ 12; Zimmerle Decl. ¶ 13). Walsh has claimed and continues to claim that he does not have access to forex customer information, contending that Moneytec will not allow Walsh access to the information. (Pendleton Decl. ¶ 12). However, a representative of Moneytec has denied Walsh's claim and asserted that Walsh and One World employees have access to the records that could provide customers names, account numbers and account balances. *Id.* Furthermore, on December 5, 2007, in response to an NFA staff request for a list of One World's forex customers and account balances, a member of One World's staff stated that One World did have access to that information, but that he could not provide it because Walsh specifically instructed him not to disclose it. *Id.* Walsh instructed One World Staff not to provide records to the NFA staff. *Id.* The NFA has not seen Walsh at the One World office since December 4, 2007, and none of his staff have been in the office since December 10, 2007. *Id.* at ¶ 14.

## IV.    ARGUMENT

An *ex parte* statutory restraining order is necessary to (1) preserve the books and records of Defendants; (2) locate and freeze assets of Defendants, so as to preserve customer funds; (3) require Defendants to cease operations to preserve customer funds; and (4) ensure that Commission representatives have immediate and complete access to the books and records of

Defendants before they are dissipated in order to determine the full extent of Defendants' wrongdoing, and to identify customer funds and other assets of Defendants.

### A. The Act Empowers the Court to Issue a Restraining Order, *Ex Parte*

Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2002),[2] empowers the Court to issue an *ex parte* restraining order freezing assets and prohibiting any person from destroying records or denying Commission officials access thereto, and appointing a temporary receiver to administer such restraining order[3] whenever it shall appear that a person has engaged or is engaging in an act or practice that violates the CEA or Commission regulations.[4] *See, e.g., CFTC v. Clothier,*

---

[2] Section 6c(a), 7 U.S.C. § 13a-1, provides:

> Whenever it shall appear to the CFTC that any . . . person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act . . . the CFTC may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this Act . . . and said courts shall have jurisdiction to entertain such actions: *Provided*, That no restraining order (other than a restraining order which prohibits any person from destroying, altering or disposing of, or refusing to permit authorized representatives of the CFTC to inspect, when and as requested, any books and records or other documents or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property, and other than an order appointing a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate) or injunction for violation of the provisions of this Act shall be issued ex parte by said Court. (Emphasis added.)

[3] The Commission is not now seeking the appointment of an equity receiver because the Commission is not fully apprised of the assets possessed by the Defendants or any open positions in any customer trading accounts that would require attention in order to prevent further losses. If it should appear upon discovery that such ancillary relief is necessary to collect assets or prevent diversion or dissipation of customer funds, or to help ensure that the Defendants will not violate the preliminary and permanent injunctions sought by the proposed complaint, the Commission will request the Court to appoint a receiver and set appropriate limits on the receiver's duties. Whether a receiver shall be appointed is a matter within the discretion of the district court, and is appropriate when it is necessary to protect the public interest. *See generally, CFTC v. Co Petro Marketing Group,* 680 F.2d 573, 583 (9th Cir. 1982); *CFTC v. Morgan, Harris & Scott Ltd.,* 484 F. Supp. 669, 677 (S.D.N.Y. 1979).

[4] Numerous courts in this district have issued such *ex parte* restraining orders in recent years. *See, e.g., CFTC v. Lake Shore Asset Mgmt. Ltd, et al.,* No. 07C 3598 (Nov. 20, 2007) (Manning J.), *vacated on other grounds,* 496 F.3d 769, 771 (7th Cir. 2007) (An *ex parte* statutory restraining order pursuant to the (Footnote continued)

788 F. Supp. 490, 492 (D. Kan. 1992). As described above, One World and Walsh are in violation of Section 4f(b) of the CEA and Commission Regulation 1.17(a)(4).

Mindful that notice may "result in the destruction of books and records and the dissipation of customer funds," Congress authorized courts to issue such relief in order "to prevent possible removal or destruction of potential evidence or other impediments to legitimate law enforcement activities and to prohibit movement or disposal of funds, assets and other property which may be subject to lawful claims of customers." H.R. Rep. No. 97-565, at 53-54, 93 (1982), *reprinted* in 1982 U.S.C.C.A.N. 3871, 3902-03, 3942. For the reasons discussed below, an *ex parte* statutory restraining order is necessary in this case.

### B.     Preliminary Injunctive Relief is Necessary and Appropriate

Unlike private actions for equitable relief, a Commission action for injunctive relief is a creature of statute. The injunctive relief contemplated in Section 6c of the Act is remedial in nature and designed to prevent injury to the public, afford redress to aggrieved persons, and deter future violations. Therefore, restrictions ordinarily associated with private litigation, such as proof of irreparable injury or inadequacy of other remedies, are inapplicable. *See CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979), *cert. denied*, 442 U.S. 921 (1979); *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978); *SEC v. Princeton Economic Int'l.*, 73 F. Supp. 2d 420, 422 (S.D.N.Y. 1999) (court's analysis applied to SEC and CFTC, co-plaintiffs that were simultaneously moving for injunctions). The Commission is entitled to injunctive relief upon a showing that a violation has occurred and is likely to continue unless enjoined. *Hunt*, 591 F.2d at 1220; *Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991); *Muller*, 570 F.2d at 1300; *CFTC*

---

CEA is subject to the time limitations of Rule 65); *CFTC v. Demasi et al.*, No. 07C 2256 (N.D. Ill. April 26, 2007) (Gettleman, J); *CFTC v. Hoffman*, No. 06C 6473 (N.D. Ill. Nov. 29, 2006) (Lefkow, J); *CFTC v. Krysinski*, No. 03C 8571 (N.D. Ill. Nov. 26, 2003) (St. Eve, J); *CFTC v. Duncan, et al.*, No. 01C 6802 (N.D. Ill. Aug. 30, 2001) (Coar, J); *CFTC v. Swartz*, No. 98 C 7505 (N.D. Ill. Nov. 23, 1998) (Castillo, J.); *CFTC v. Besner*, No. 96-C-76 (N.D. Ill. Jan 4, 1996) (Nordberg, J.); *CFTC v. Gary B. Anderson*, No. 95 C 5422 (N.D. Ill. September 22, 1995) (Shadur, J.); *CFTC v. Frangia Intern.. Inc.*, No. 91-C-3262 (N.D. Ill. May 28, 1991) (Norgle, J.); *CFTC v. John M. Tobin*, No. 89-C-8576 (N.D. Ill. Nov. 17, 1989) (Grady, J.)

*v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2nd Cir. 1977). The Court has "broad discretion" to grant such statutory relief, including an asset freeze and temporary receivership, when presented with "[a] *prima facie* case of illegality." *Muller*, 570 F.2d at 1300; *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981).

Here, the record of failure to demonstrate compliance with the net capital requirements, coupled with the failure to produce important books, records and other information, provides ample evidence demonstrating a *prima facie* case warranting preliminary injunctive relief against future violations.[5] One World has failed to provide documentation to support compliance with their net capital requirements, and Walsh is deliberately obstructing the NFA's ability to conduct an audit and review books and records that may support compliance with net capital requirements.

## C.    Defendants Violated the Commodity Exchange Act and Commission's Regulations

### 1.    Violation of Section 4f(b) of the Act and Regulation 1.17(a)(4): Failure to Comply with the Commission's Minimum Financial Requirements.

The NFA has only been able to support $554,422 in company assets. (Pendleton Decl. ¶ 17). Since at least November 27, 2007, One World has been unable to demonstrate compliance with the $1,000,000 minimum adjusted net capital requirement applicable to a FCM acting as a FDM, in violation of Section 4f(b) of the Act, 7 U.S.C. § 6f(b), and Regulation 1.17(a)(4), 17 C.F.R. § 1.17(a)(4). (Pendleton Decl. ¶ 17; Zimmerle Decl. ¶ 14). The NFA and CFTC have requested the net capital computation from One World, and specifically Walsh. (Pendleton Decl. ¶¶ 12,13; Zimmerle Decl. ¶¶ 5-7,10, 14). To date, One World has failed to provide a net capital computation, and has failed to provide documents to support a net capital of over $1,000,000, as required by Commission regulations. Additionally, since at least November 27, 2007, One

---

[5] A District Court may rely on hearsay evidence, including declarations containing hearsay, at the preliminary injunction stage as some leniency is allowed at this stage. *Federal Savings and Loan Corp. v. Dixon et al,* 835 F.2d 554, 558 (7th Cir. 1987). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and on evidence that is less complete than a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing." *University of Texas v. Comenisch,* 451 U.S. 390, 395 (1981).

World has failed to transfer all customer accounts and immediately cease doing business as a FCM until such time as it can demonstrate compliance the adjusted net capital requirements of Regulation 1.17(a)(1), in violation of Section 4f(b) of the Act, 7 U.S.C. § 6f(b), and Regulation 1.17(a)(4), 17 C.F.R. § 1.17(a)(4).  (McCormack Decl. ¶ 3).

> ## 2.    Violation of Section 4f(a)(1) of the Act and Regulation 1.18:  Failure to Maintain Required Books and Records

As a registered FCM, One World is required to maintain certain books and records. Pursuant to Section 4f(a)(1) of the Act, 7 U.S.C. § 6f(a)(1), and Regulation 1.18, 17 C.F.R. § 1.18, One World is required to maintain records that currently reflect its assets, liabilities and capital.  Since November 27, 2007, the NFA has repeatedly requested financial records, including bank statements, customer account documents, and trading statements to support any computation of One World's net assets.  (Pendleton Decl. ¶¶ 12, 13).  Additionally, the CFTC has requested books and records that would reflect One World's assets, liabilities, and net capital.  (Zimmerle Decl. ¶¶ 5-7).  One World has failed to provide these records and Walsh has claimed not to have access to certain records, specifically, records that would show liabilities to forex customers.  (Pendleton Decl. ¶ 12, 13; Zimmerle Decl. ¶ 10, 12-13).  Moreover, Walsh has provided inconsistent excuses as to why he can not provide these records, and has instructed One World staff not to provide records to the NFA.  (Pendleton Decl. ¶ 12).  Because One World failed to maintain such records, it violated Section 4f(a)(1) of the Act and Regulation 1.18, 17 C.F.R. § 1.18.

> ## 3.    Defendant Walsh is a Controlling Person of One World and is Liable for One World's Violations

Walsh is liable as a controlling person for the violations by One World.  To establish controlling person liability under Section 13(b) of the Act, 7 U.S.C. § 13c(b), the Commission must show both (1) control and (2) a lack of good faith or knowing inducement of the acts constituting the violation. *R.J. Fitzgerald & Co.*, 310 F.3d at 1334; *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995).  A "fundamental purpose" of control person liability "is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *R.J. Fitzgerald* at 1334; *JCC, Inc*, 63 F.3d at 1567.

A defendant need only possess general control over the operation of the entity principally liable. *R.J. Fitzgerald & Co.*, 310 F.3d at 1334. It is sufficient if the defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993). Whether a defendant had such control depends on all the facts and circumstances. The knowing inducement element is satisfied by showing that "the controlling person had actual or constructive knowledge of the core activities that make up the violation and allowed them to continue." *R.J. Fitzgerald & Co.*, 310 F.3d at 1334; *CFTC v. Sidoti*, 178 F.3d 1132, 1137 (11th Cir. 1999) (holding that "the element of knowledge may be inferred from deliberate acts amounting to willful blindness to the existence of fact or acts constituting conscious purpose to avoid enlightenment.") Similarly, lack of good faith can be established by showing that the controlling person failed to maintain a reasonably adequate system of internal supervision and control, or did not enforce such system with reasonable diligence. *Monieson*, 996 F.2d at 860.

Walsh possesses and exercises the power to control One World. Walsh is the president of One World and signatory on the One World bank accounts. (Pendleton Decl. ¶ 7). Walsh is identified as the managing member in One World's submissions to the NFA. (Pendleton Decl. ¶ 7). He is the main contact for the NFA, has responded to recent CFTC inquiries, and employees of One World direct the NFA's questions to Walsh. (Pendleton Decl. ¶¶ 7,12; Zimmerle Decl. ¶ 12). Walsh holds ultimate supervisory authority over One World employees, and made all major decisions for the New York branch office. Since December 4, 2007, the 1worldfcm.com website states to contact Walsh for information. Walsh has also instructed One World staff to withhold books and records from the NFA staff.

Walsh also either knowingly induced or did not act in good faith respecting the acts and practices of One World that constitute violations of Sections 4f(a) and 4f(b) of the Act, 7 U.S.C. §§ 6f(a) and 6f(b), and Regulations 1.17(a)(4) and 1.18, 17 C.F.R. §§ 1.17(a)(4) and 1.18. Walsh did this by informing CFTC staff that he did not have information relating to forex customer liabilities, actively preventing NFA staff access to the books and records of One World, providing inconsistent excuses as to why he would not provide the books and records, and failing to provide the net capital computation for One World to the NFA and CFTC. (Pendleton

Decl. ¶¶ 7, 12; Zimmerle Decl. ¶¶ 12-13).  Defendant Walsh therefore is liable as a controlling person for those violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

## V.    RELIEF SOUGHT

### A.    The Evidence Justifies Entry of an Ex Parte Statutory Restraining Order and Preliminary Injunction

As set forth above, the record filed in support of the CFTC's motion provides ample evidence that Defendants have failed to demonstrate compliance with the minimum net capital compliance requirements and failed to maintain books and records as required by Sections 4f(a)(1) and (b) of the Act, 7 U.S.C. §§ 6f(a)& (b) (2002), and Commission Regulations ("Regulations"), 1.17(a)(4), and 1.18, 17 C.F.R. §§ 1.17(a)(4), and 1.18 (2007).

One World's failure to demonstrate compliance with net capital requirements and failure to comply with record keeping requirements endangers customer funds and company books and records.  CFTC regulations require FCMs to maintain minimum financial holdings in order to make funds available to customers when demanded.  Failure to maintain the minimum amount results in the potential inability of the FCM to pay when a large number of customers demand their money simultaneously.  Failure to maintain required books and records can lead to the inability to determine accurate customer liabilities, among other things.  In this case, not only did One World fail to demonstrate that it meets the sufficient financial requirements, it is reportedly failing to meet customer demands for money.  Such conduct further supports the Commission's request for the *ex parte* relief requested.

Although there are no reported CFTC cases in this district addressing this particular issue, the CFTC has previously sought a preliminary injunction and an asset freeze where a registered entity has failed to meet its net capital requirements.  *See, CFTC v. FX First, Inc. et al.,* No. SACV 03-1454JVS (MLGx) (C.D. Ca. Oct. 6, 2003) (Selna J); *CFTC v. Forefront Investments Corp.,* No. 3:07-CV-0274 (E.D. Va. Mar. 20, 2007) (Payne J); *CFTC v. Nations Investments, LLC, et al.,* No. 07-61058-CIV COOKE/BROWN (S.D. Fla. July 30, 2007) (Cooke J).  All of these CFTC cases are similar to the matter before this court in that the entities were all registered FCMs, and also conducted retail forex business.  In *CFTC v. FX First,* the Court issued an *ex parte* restraining order freezing the assets and preventing the destruction of the books and records of Defendant FCM and its principals, and required an accounting of defendants' assets where customer requests for a return of their funds were refused by the defendants and the firm

was alleged to be at least $2 million undercapitalized.[6] In *CFTC v. Forefront Investments Corp.*, the Court issued an *ex parte* statutory restraining order freezing the assets of a FCM undercapitalized by over $2 million, prohibiting the defendant from destroying documents or denying CFTC staff access to books and records, and appointing a receiver. In *CFTC v. Nations Investments,* the Court issued an *ex parte* restraining order freezing the assets of a FCM and prohibiting the destruction of documents or denying CFTC staff access to books and records. Shortly thereafter, the Court appointed a receiver. In *CFTC v. Comvest Trading, et al.*, 481 F. Supp. 438 (D. Mass 1979), the Court entered a temporary restraining order at the CFTC's request whereby the entity and its principals were enjoined from soliciting or accepting funds from clients during such time as it continued to be undercapitalized and under-segregated. A protective order was entered prohibiting the dissipation of assets and destruction of records.

The reason for One World's failure to provide compliance with its net capital requirements and failure to comply with record keeping requirements is unknown at this time. It is clear that many customers are requesting a return of their funds, and have been for quite some time, but have been denied by One World and Walsh. Based on those customer complaints, it would appear that One World may be undercapitalized by at least $4 million. Not only has Walsh failed to provide books and records to the NFA and CFTC that could determine compliance with the net capital requirements, Walsh has actively prevented the NFA from access to the books and records of One World. His behaviors demonstrate a complete lack of regard for customer's funds. Such conduct further supports the Commission's request for the *ex parte* relief requested.

The ability to demonstrate compliance with net capital and reporting requirements are designed to both avert customer harm as well as protect market integrity. These requirements represent "critical check points in the Commission's maintenance of safety and soundness of customer funds and the market." *In re First Financial Commercial Group, et al.*, 1999 WL 325338, * 7 (CFTC May 20, 1999) (Attached hereto as Attach. A). The Commission has found that "the general gravity of this type of violation is very severe." In re Premex, [1987-1990

---

[6] The Commission also alleged misappropriation in *CFTC v. FX First*. That count was dismissed for lack of jurisdiction. *See* Docket Entry 114, *CFTC v. FX First, Inc. et al.*, No. SACV 03-1454JVS (MLGx) (C.D. Ca. Oct. 6, 2003) (Selna J).

Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,892-93 (CFTC Feb. 17, 1988); *see also In re Incomco, Inc.* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,198 at 38,536 (CFTC Dec. 30, 1991) ("we have ... recognized as quite serious ... violations [that include] deliberate conduct intended to circumvent Commission reporting requirements ... [such as] filing inaccurate financial reports and assisting an FCM to continue operations while undercapitalized") (citations and footnotes omitted)"minimum capital requirements are of central importance because they are the primary financial protection for public customers .... If customers cannot commit their funds to the market with confidence, the liquidity of the market will be irreparably harmed." *Premex,* ¶ 24, 165 at 34,891.

The *ex parte* statutory relief sought in this application is also necessary to protect evidence of the Defendants' wrongdoing from alteration or destruction until formal discovery can begin. Moreover, immediate *ex parte* statutory relief is required to: (1) locate, identify, and freeze assets of One World so that they can be preserved for restitution, (2) preserve One World's books and records and provide the CFTC with access to them so that the extent of Defendants' misconduct can be determined. A Preliminary Injunction is also warranted to prevent Defendant from committing further violations of the Act.

## VI. CONCLUSION

For the reasons set forth in this Brief and other accompanying documents filed in support of this Motion and the Commission's Complaint for Injunctive Relief, the Commission respectfully requests that this Court grant the requested statutory restraining order.

Date:  December 13, 2007

Attorneys for Plaintiff

Jennifer S. Diamond, Trial Attorney
Elizabeth M. Streit, Trial Team Leader
Scott R. Williamson, Deputy Regional Counsel
Rosemary Hollinger, Associate Director
Commodity Futures Trading Commission
525 W. Monroe St., Suite 1100
Chicago, IL  60661
(312) 596-0549 (Diamond)
(312) 596-0714 facsimile
jdiamond@cftc.gov

**Attachment A**
*In re First Financial Commercial Group, et al.*

Westlaw.

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

*1 IN THE MATTER OF
FIRST COMMERCIAL FINANCIAL GROUP, INC., MARK REHN, AND JOHN A. HERMANSON
RESPONDENTS

May 20, 1999

Opinion and Order

The Division of Enforcement ("Division") and respondent Mark Rehn ("Rehn") cross-appeal from an initial decision of an Administrative Law Judge ("ALJ") finding respondents First Commercial Financial Group, Inc. ("FCFG"), Rehn and John Hermanson ("Hermanson") liable for various net capital and reporting requirements under the Commodity Exchange Act ("Act") and Commission Regulations.[FN1] The ALJ found Rehn liable as a controlling person for FCFG's violations and found Hermanson liable as an aider and abettor. The ALJ revoked the respondents' registrations and ordered them to cease and desist from further violations of the Act. He imposed a $200,000 civil penalty upon each of FCFG and Rehn and a $50,000 penalty on Hermanson.

Rehn asks that the Commission reverse all adverse findings against himself or, in the alternative, that it impose a minimal sanction. The Division's sole issue on appeal is the asserted insufficiency of the civil monetary penalties imposed below. For the reasons that follow, we affirm the findings and conclusions of the initial decision except that we increase the monetary penalties assessed against the respondents.

**BACKGROUND**

I. The Complaint

On May 2, 1995, the Division issued a four-count complaint against FCFG, an Illinois corporation registered as an FCM;[FN2] Rehn, FCFG's president and chief executive officer; and Hermanson, who was registered as an associated person ("AP") of FCFG from May 1991 to May 1994.

Count I of the complaint alleged that, between June 1993 and August 1994, FCFG failed to maintain the minimum amount of adjusted net capital prescribed in Section 4f(b) of the Act, 7 U.S.C. § 6f(b), and Commission Regulation 1.17(a)(1).[FN3] Count I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Attachment A
*In re First Financial
Commercial Group, et al.*

also charged that, during the period when FCFG was undercapitalized, it failed to transfer its customer accounts and immediately to cease doing business as required by Section 4f(b) of the Act and Commission Regulation 1.17(a)(4). Count I further alleged that Rehn should be held liable as a controlling person for FCFG's violations and that Hermanson was liable as an aider and abettor.

Count II charged that FCFG and Rehn violated Section 6(c) of the Act and Commission Regulation 1.10(d)(1) by willfully making false and misleading statements in periodic financial reports ("1-FRs") filed with the Commission.[FN4] Count II named Hermanson as an aider and abettor.

Count III alleged that FCFG did not comply with Commission Regulations 1.12(a)(1)-(2), which require an FCM to notify the Commission and to provide certain financial information when the FCM knows or should know that it is undercapitalized.[FN5] Count IV claimed that FCFG violated Commission Regulation 1.12(b) by failing to notify the Commission when it knew or should have known that it was in an "early warning net capital position."[FN6] Counts III and IV maintained that Rehn controlled FCFG and was therefore liable as a controlling person.

*2 The allegations in the complaint stemmed from financial arrangements that FCFG entered into with Hermanson and another individual, Robert Schillaci, and with two financial entities, Burling Bank and Dearborn Financial Corporation. The complaint challenged the manner in which FCFG accounted for these financial arrangements when it computed its monthly net capital position in financial statements filed with the Commission for reporting periods concluding between June 30, 1993, and August 31, 1994.

II. The Hearing

A six-day hearing was held on December 16-19, 1996, and March 19-20, 1997, in Chicago, Illinois. At the hearing, the Division presented its case through submission of FCFG's 1-FRs and other financial audit reports, loan documents, and transaction records such as wire transfers, bank statements and check receipts. To determine FCFG's actual capital position from June 30, 1993, to August 1994, the Division had its expert witness, Walter Maksymec, make certain adjustments to the adjusted net capital that FCFG reported in its 1-FRs or showed on its monthly capital computations. (Div. Exh. Nos. 1-2; FCFG Exh. No. 89.) According to the adjustments made by Maksymec, FCFG fell below its early warning threshold in June 1993 and operated below the required minimum net capital for twelve consecutive months, from September 1993 through August 31, 1994. Based on Maksymec's calculations, the amounts below excess early warning ranged from $294,394 to $3,267,890 during this time. The amounts below net capital ranged from $83,479 to $2,630,286. Id.

Rehn testified that he has a law degree, a CPA license and a bachelor's degree in accounting. (Tr. at 30.) He supervised FCFG's financial and compliance activities during 1993 and 1994. (Id.) Prior to Rehn's tenure as FCFG's president in 1993, the FCM had a history of losing money and required repeated capital infusions from its investors. (Tr. at 10, 177-179.)

Hermanson testified that he headed First Trading Group ("First Trading"), a guaranteed introducing broker that in 1991 became a subdivision of FCFG. (Tr. at 368-369; 388.) According to Hermanson, First Trading and FCFG had an understanding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

that, after First Trading deducted its clearance fee to FCFG, expenses and revenues were to be divided equally between them. (Tr. at 744.) During his employment as an AP at FCFG, Hermanson contributed substantially to FCFG's overall profits. (Tr. at 195-196, 793, 836.)

Hermanson testified that he saw his relationship with Mark Rehn as an informal joint venture: "[I do] him a favor, he [does] me a favor, whatever. It was a partnership." (Tr. at 370-373.) Hermanson admitted to having a pattern, beginning in 1992, of taking large "advances" from FCFG that remained unpaid for several months. (Tr. at 392-395; Div. App. Br. at 6.) Hermanson argued that these advances were offset against his commissions and that it was not entirely clear whether he had unpaid debts to FCFG or FCFG owed him money. (Tr. at 372-373; 390.)

*3 Rehn testified that he acted on FCFG's behalf and extended several loans to Hermanson because he was under pressure at FCFG to retain a "large producer" such as Hermanson. (Tr. at 46; Resp. App. Br. at 10.) Rehn admitted that at one point he executed a letter to Hermanson's debtors guaranteeing that FCFG would repay Hermanson's debt in the event of the latter's default. (Div. Exh. No. 123;Tr. at 53.)

In June 1993, Rehn asked Mike Rohlfs, FCFG's managing director, for a capital infusion of $1,000,000 to avoid a violation of the "early warning" requirement caused by the NFA's reclassification of two of FCFG's loans from current to non-current status. (Div. Exh. No. 121; FCFG Exh. No. 89.) Rehn received only $300,000 from Rohlfs. (Tr. at 41.) FCFG then notified the Commission that it fell below the early warning threshold. (Div. Exh. No. 95; FCFG Exh. No. 89.)

a. The Month-End Transactions. At this time Rehn and Hermanson began a pattern of transactions that continued through December 1993. On or about the last business day of each month, from June 1993 to December 1993, Hermanson would write large checks to FCFG drawn on accounts under his control, with amounts ranging from $275,000 to $1,300,0000. (Div. Exh. No. 2; Tr. at 48-50; 64-66; 200-209.) These month-end checks were written against insufficient funds. (Div. Exh. Nos. 8, 16, 25; Tr. at 204-206; 355-361.)

FCFG deposited the checks in its operating bank account, thereby increasing its operating bank account balance and decreasing Hermanson's loan receivable. (Tr. at 141.) FCFG admitted that it classified the monthly balance in its operating bank account as a current asset and the remainder of Hermanson's alleged unpaid debt as a non-current asset.[FN7] (Div. Exh. No. 1 (w/ attached Maksymec Test. at 9); Tr. at 141.) Accordingly, the effect of these notations was to increase FCFG's adjusted net capital by the amount of the Hermanson checks received at month end. (Id.; Tr. at 59-60; 637, 639-640.)

On the first business day of the following month, FCFG would wire the same amount of funds back to Hermanson. (Div. Exh. Nos. 1-2; Tr. at 47-50.) These transfers from FCFG prevented Hermanson's checks from being returned for insufficient funds. When FCFG transferred the funds back to Hermanson's accounts it decreased its operating bank account balance and increased Hermanson's alleged loan receivable. (Tr. at 141.) However, FCFG included Hermanson's checks in computing its adjusted net capital on its 1-FRs and its monthly capital computations, thereby representing to the Commission that it was operating above the early warning threshold and the regulatory capital requirements during these months. (Div. Exh. No. 1 (Maksymec

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

Test. at 9); (Tr. at 60; 141-142, 144-146.)[FN8]

Rehn and Hermanson gave conflicting testimony concerning these transactions. Rehn testified that Hermanson's checks were intended as payments on his alleged loan receivable and that they occurred at the end of the month by Hermanson's choice. (Tr. at 63-66.) According to Rehn, Hermanson always approached FCFG on the first of the following month claiming he had insufficient funds in his accounts to cover the checks and requesting that FCFG transfer the funds back to his accounts. Id. Rehn testified that, even though FCFG returned the funds to Hermanson at the beginning of the next month, Rehn believed FCFG could include the checks in its current assets as short-term loan receivables for that month because Hermanson promised to repay FCFG by the end of the month. (Tr. at 59.) However, at one point Rehn admitted that the month-end transactions "didn't look too good" from the standpoint of FCFG's auditors. (Tr. at 804.)

**\*4** Hermanson testified that the month-end checks were loans that he made to FCFG at Rehn's request and that FCFG's wire transfers at the beginning of each month represented its repayments of the loans to him. (Tr. at 375-378.)

b. The Burling Bank Loan. On July 30, 1993, FCFG and Hermanson signed a promissory note for $650,000 with Burling Bank.[FN9] Hermanson signed the note as "borrower," while Rehn signed the note as FCFG's president and "co-signer." (Div. Exh. No. 92.) Hermanson instructed Burling Bank to disburse the loan proceeds to FCFG, which subsequently deposited the proceeds into its operating bank account. (Div. Exh. No. 119; FCFG. Exh. No. 5.)

FCFG did not count the loan as a liability in its capital computations or in its 1-FRs. If FCFG had treated the Burling Bank loan as a liability and excluded Hermanson's month-end checks from its calculation of current assets, then its net capital computations would have revealed that it was in early warning status for the periods ending July 31, 1993, and August 31, 1993, and was undercapitalized for the periods ending September 30, 1993, through December 31, 1993. (Div. Exh. No. 1.)

Rehn and Hermanson again gave conflicting testimony regarding the Burling Bank loan. Rehn testified that Hermanson owed approximately $650,000 to FCFG by July 1993 and therefore gave FCFG the Burling Bank loan proceeds as a repayment on his debts to FCFG. (Tr. at 753, 757-758, 763.) Rehn also testified that he believed that FCFG was a guarantor-not a joint obligor-on the loan. Therefore, according to Rehn, FCFG had no liability on the loan "whatsoever" because loan payments made by FCFG to Burling Bank would be derived from Hermanson's commission income. (Tr. at 84, 86-87, 754-757.) FCFG paid approximately $225,000 on the loan, including certain payments after Hermanson had left FCFG. (Div. Exh. No. 1 (Maksymec Test. at 14); Tr. at 572.) Burling Bank treated FCFG as a joint obligor. In December 1994, Burling Bank seized $40,000 from a FCFG account at the bank and applied that sum toward the remaining balance of the loan. (Tr. at 573, 652.)

Hermanson, on the other hand, testified that he signed the note as another "favor" to Rehn because FCFG needed money for its legal bills and could not obtain a loan in its own name. (Tr. at 371-373.)

c. The Hermanson and Schillaci Unsecured Notes. In January 1994, Hermanson signed a blank promissory note and a stock pledge agreement by which he purportedly agreed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to pay FCFG $1,300,000 and pledge his interest in a Chicago fast food restaurant to
secure the note. (Tr. at 150, 154-155; 249-251.) The date and amount on the
promissory note allegedly were filled in later by someone at FCFG. (Div. Exh. No.
99; Div. Exh. 122; Tr. at 150-151, 249.) At the time Hermanson signed the
promissory note, FCFG learned that the stock was not available and therefore could
not be delivered. The stock was not listed on any exchange.[FN10] (Tr. at 501, 723.)
FCFG never attempted to obtain control of the stock or perfected an interest in it.
(Tr. at 155; 249.) FCFG admitted that it improperly treated Hermanson's note as a
secured loan receivable-i.e., a current asset-in its net capital computations and
the 1-FRs. (Tr. at 155.) FCFG also admitted that the promissory note signed by
Hermanson replaced the month-end checks. (Tr. at 151-152.)

*5 In February 1994, FCFG loaned Robert Schillaci $250,000, for which Schillaci
used his seat on the Chicago Mercantile Exchange as collateral.[FN11] FCFG treated the
loan as a secured receivable and thus a current asset, despite the fact that
Commission Regulation 1.17 and instructions on the 1-FR specifically provide that
FCMs should not treat exchange seats as current assets. (Div. Exh. No. 132
containing 1-FR instructions at 2-4; Tr. at 493-494). See also Commission Rule
1.17(c)(2)(x).

FCFG retained the accounting firm of Deloitte & Touche ("Deloitte") to prepare a
financial audit for the time period ending December 31, 1993. On March 28, 1994,
Deloitte issued its report, noting under the heading "subsequent event" that FCFG
"extended unsecured demand loans to [Hermanson and Schilacci] totaling $1,615,000."
(Div. Exh. Nos. 102, 115.) Rehn realized that, if the notes were treated as
unsecured loan receivables and thus excluded from its current assets computation,
then FCFG was undercapitalized for the "as of" periods ending January 31, 1994
through March 31, 1994. (Tr. at 91-92, 788-789.) Nevertheless, FCFG continued to
reflect the notes as current assets in its 1-FRs until April 1994 when the NFA
ordered it to reclassify the notes as non-current assets. (Tr. at 92-93; 157.)

d. The Dearborn Loan. In April 1994, following the reclassification of the
Hermanson and Schillaci notes, Rehn notified the Commission and the NFA that FCFG
fell approximately $964,000 below the minimum net capital requirements. (Div. Exh.
No. 96.) Dearborn, a shareholder of FCFG, transferred stock and cash to FCFG's
operating account. (Div. Exh. No. 105.) FCFG represented to the Commission and NFA
and in its 1-FRs that the infusion was additional paid-in capital. (Div. Exh. Nos.
106-107.) NFA repeatedly demanded that FCFG submit supporting documents to certify
that the infusion was permanent capital and not a loan from Dearborn. (Div. Exh.
Nos 106, 109; Tr. at 423-426.) Three months later, at the end of July 1994, FCFG
delivered draft subordination agreements to the NFA to certify that the infusion
was indeed a loan and not permanent capital.[FN12] (Div. Exh. No. 108; Tr. at 427-
427.) The loan subordination agreements did not conform with NFA rules and were not
approved by the NFA until September 1994. (Div. Exh. No. 111.) The NFA, however,
found that these agreements contained conditions that excluded them from being
considered as secured loan receivables or current assets in FCFG's capital
computation. Id.

If FCFG had accounted properly for the Dearborn loan, its net capital computations
would have revealed that it was undercapitalized for the "as of" periods ending
April 30, 1994, through August 31, 1994. (Div. Exh. No. 1.)

III. The Initial Decision

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In October 1997, the ALJ issued an initial decision concluding that the Division had proven by sufficient evidence that respondents violated net capital and reporting requirements substantially as alleged in the Complaint.[FN13] The ALJ also found that respondents' conduct was conscious, willful and tantamount to "a fraud on the investing public." (I.D. at 45-48.) In addition, the ALJ characterized FCFG's and Rehn's testimony variously as "revisionist," "feeble," "foolhardy" and "lacking in good faith," noting that FCFG's and Rehn's conduct at the hearing exhibited little appreciation for the gravity of their actions. (I.D. at 37-38, 48.) The ALJ imposed registration revocations and cease and desist orders on all three respondents. (I.D. at 50-51.) He imposed $200,000 in civil monetary penalties on each of FCFG and Rehn and $50,000 on Hermanson.

IV. The Appeals

*6 In November 1997, the Division, Rehn and Hermanson filed timely notices of appeal. FCFG filed a tardy notice of appeal beyond the 15-day rule prescribed by Commission Regulation 10.102(a), 17 C.F.R. § 10.102(a) (1998). The Division filed a motion to dismiss FCFG's appeal for failure to show excusable neglect, and in December 1997, the Commission granted the Division's motion on that ground. The Division and Rehn subsequently filed appeal briefs. Hermanson did not file a brief and therefore failed to perfect his appeal.

On appeal, Rehn challenges the ALJ's findings and conclusions with respect to the various transactions and contends that he acted reasonably and in good faith at all times. Rehn argues that FCFG's and his alleged violations, if any, were technical in nature and were committed in good faith or were caused largely by Hermanson's conduct. (Rehn App. Br. at 40-45.) In addition, he argues that he was not the controlling person with respect to the capital contribution provided to FCFG in April 1994 by its owners and played no part in structuring the transaction. (Id. at 45-47.) Finally, Rehn contends that the sanctions imposed were too severe because any misconduct that occurred did not cause "a remote threat of harm to the public" or result in customer losses. (Id. at 48-50.)

The Division, in its appeal, argues that the ALJ's sanctions analysis is flawed to the extent it is based on theories of customer loss. The Division contends that, as with trade practice cases and speculative position limit cases, respondents' violations are sufficiently grave to warrant severe sanctions in the absence of significant customer loss, because these kinds of misconduct put customer funds at risk, undermine consumer confidence, and undercut market integrity. (Div. App. Br. at 23.) The Division seeks a civil penalty of $3,800,000 against FCFG, a $533,000 civil penalty against Rehn, and a $200,000 civil penalty against Hermanson for his role as an aider and abettor. (Div. App. Br. at 27-28.)[FN14] Rehn and FCFG opposed the Division's appeal.

## DISCUSSION

Rehn's Appeal. In seeking appellate relief, Rehn reiterates the version of events that he presented before the ALJ and the ALJ rejected. Our review of the record and the parties' appellate submissions establish that the findings and conclusions of the ALJ with respect to Rehn's liability are supported by the weight of the evidence; we therefore adopt them and affirm his findings as to Rehn's misconduct without extended discussion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

The Division's Appeal. The sole issue raised by the Division is the proper assessment of civil money penalties against the respondents. Section 6(c) of the Act, 7 U.S.C. § 9, provides in pertinent part that the Commission may assess civil penalties of "not more than the higher of $100,000 or triple the money gain" of violators "for each … violation." In assessing monetary penalties, we are not bound by the ALJ's previous assessments but instead review de novo "the total 'facts and circumstances' of each case" as they relate to the gravity of a respondent's particular misconduct. In re Grossfeld, [1996-1998 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467 (CFTC Dec. 10, 1996). Factors we have considered relevant to the gravity of particular misconduct include: (1) the relationship of the violation at issue to the regulatory purposes of the Act; (2) respondent's state of mind; (3) the consequences flowing from the violative conduct; and (4) respondent's post-violation conduct. Grossfeld, ¶ 26,921 at 44,467-68. We also have held that civil money penalties should be sufficiently high to deter future violations, that is, to "make it beneficial financially [for a respondent] to comply with the requirements of the Act and Commission regulations rather than risk violations." Id. at 44,468 (quoting In re Premex, [1987-1990 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,892-93 (CFTC Feb. 17, 1988)).

*7 Our independent assessment of the record establishes that significant civil money penalties are warranted for respondents FCFG, Rehn and Hermanson. We find that respondents' misconduct posed a grave danger to customers and the market and, as the ALJ stated, was "tantamount to a fraud on the investing public." The ALJ's civil penalties-$200,000 each for FCFG and Rehn and $50,000 for Hermanson-do not fully reflect the gravity of their violations.

As the record shows, respondents' net capital and reporting violations are part of a calculated, long-term scheme to evade Commission regulatory requirements. While net capital and reporting requirements are designed to avert harm, they represent critical check points in the Commission's maintenance of safety and soundness of customer funds and the market. In the past, we have raised the dual concerns of customer protection and market integrity, finding that "minimum capital requirements are of central importance because they are the primary financial protection for public customers .... If customers cannot commit their funds to the market with confidence, the liquidity of the market will be irreparably harmed." Premex, ¶ 24, 165 at 34,891. Accordingly, we have held that "the general gravity of this type of violation is very severe." Id.; see also In re Incomco, Inc. [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,198 at 38,536 (CFTC Dec. 30, 1991) ("we have … recognized as quite serious … violations [that include] deliberate conduct intended to circumvent Commission reporting requirements … [such as] filing inaccurate financial reports and assisting an FCM to continue operations while undercapitalized") (citations and footnotes omitted). In this case, for eight consecutive months, from September 1993 to April 1994, FCFG actively concealed from the Commission that it failed to meet the Commission's minimum capital requirements by substantial deficits ranging from over $83,000 to $2,630,000.

State of mind is another crucial factor in assessing the gravity of a respondent's violative conduct. Grossfeld, ¶ 26,921 at 44,467; In re Rousso [[Current Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 27,133 at 45,310 (CFTC Aug. 20, 1997). This factor addresses "the context of violations, specifically the intentional or willful nature of a violation." See A Study of CFTC and Futures Self-Regulatory Organization Penalties, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

26,264 at 42,220 (CFTC November 1994) ("Penalty Study"). As we have held in Grossfeld, "[a] respondent who makes a mistake in the face of an ambiguous statutory duty is less culpable than a respondent who knowingly and repeatedly violates the same statutory provision in an effort to gain a competitive advantage." Grossfeld, ¶ 26,921 at 44,467 n.29. This is not a case of statutory ambiguity. Respondents' improper intent is apparent from incriminating evidence in this case and from the utter implausibility of their explanations. For example, in an effort to explain away the pattern of the month-end transactions, FCFG and Rehn offered a variety of strained, often ludicrous explanations of how Hermanson's "loan payments" were properly classified as current assets and therefore appropriately treated as part of FCFG's capital. Respondents would have us believe that in a six-month period 31 matching wire transfer and check receipt sequences occurred between FCFG's and Hermanson's bank accounts as a matter of happenstance and coincidence.

**\*8** Nor did the month-end transactions take place in isolation. FCFG's accounting treatments of the Burling loan, the Hermanson and Schillaci notes and the Dearborn loan, seen in the aggregate with the month-end transactions, demonstrate a systematic scheme to deceive the Commission and the NFA. Such deceit practiced upon the entities charged with oversight of the futures industry poses a grave threat to the integrity and effectiveness of the regulatory scheme put in place by Congress.

The third factor that bears on the gravity of respondents' misconduct is the "consequences flowing from the violative conduct." Rousso, ¶ 27,133 at 45,310. In his initial decision, the ALJ noted that FCFG and Rehn's conduct "did not have disastrous consequences" in that FCFG's customers "did not lose any funds." I.D. at 49-50. However, as noted in the Penalty Study in a similar context, we have held that, "even in the absence of fraud, deceit or direct injury to customers, trade practice violations are more than 'mere technicalities' and have been determined by Congress to be '_malum in se_.'" Penalty Study, ¶ 26,264 at 42,220. Similarly, in this case, respondents' misconduct constitutes a serious threat to the security of customer funds and the financial stability of the market regardless of whether customer loss occurred. As discussed above, respondents' net capital and reporting violations are sufficiently grave to warrant severe penalties because such violations put customer funds at risk, undermine public confidence, and undercut market integrity.

Despite telling evidence that demonstrates the deliberate nature of their misconduct, respondents FCFG and Rehn have shown little or no appreciation for the gravity of their actions, either claiming that their multiple violations were the results of Hermanson's attempt to defraud FCFG or maintaining that accounting errors were created through "good faith" carelessness. (Rehn App. Br. at 40-45; FCFG Ans. Br. at 61-62.) Their attitude constitutes an aggravating factor. At the hearing, Hermanson, while admitting that he was doing "something wrong" with the series of month-end transactions, stated that he does not know exactly what was wrong "in doing a favor for somebody." (Tr. at 375-76, 379.) Hermanson's token admission of the wrongfulness of his action does not constitute mitigating evidence.

Accordingly, to reflect properly the gravity of respondents' misconduct, we conclude that FCFG and Rehn each should be individually assessed a civil penalty of $400,000. Hermanson is assessed a civil penalty of $200,000.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

We affirm the ALJ's imposition of cease and desist orders against respondents and the revocation of their registrations and impose civil monetary penalties in the amounts set forth herein.

IT IS SO ORDERED. [FN15]

By the Commission (Chairperson BORN and Commissioners HOLUM, SPEARS, and NEWSOME).

Jean A. Webb
Secretary of the Commission Commodity Futures Trading Commission
*9 Dated: May 20, 1999

FN1. Commission regulations cited herein are codified at 17 C.F.R. Part 1 (1998). When a rule has been amended recently, the text of the opinion summarizes the substantive provisions of the rule in force at the relevant time.

FN2. FCFG had transferred all of its customer accounts to other FCMs at the end of 1994 and is currently inactive. (Tr. at 857.)

FN3. An FCM's adjusted net capital is calculated in two steps: first, by deducting total liabilities from total current assets to arrive at net capital and then by deducting certain charges as a cushion against potential decreases in market value to arrive at adjusted net capital. See Commission Regulation 1.17(c)(1)(i)-(iv).

Commission Rule 170.15 requires all entities registered as FCMs to become and remain members of a self regulatory organization, in this case the National Futures Association ("NFA"). At the time of the violations, Commission Regulation 1.17(a) established $50,000 as the minimum dollar amount of adjusted net capital for all registered FCMs. The NFA, since December 1990, has established $250,000 as the minimum dollar amount of adjusted net capital for member FCMs who carry customer funds. In 1996 the Commission revised Regulation 1.17 to increase the amount from $50,000 to $250,000 for all registered FCMs to harmonize its minimum financial requirements with the prevailing standards established by the NFA.

FN4. At the time of the violations, Commission Regulation 1.10(b) required an FCM to file quarterly unaudited financial reports with the Commission on a Form 1-FR-FCM ("1-FR") by no later than 45 days after the "as of" date (i.e., the date for which the report is made) and to file an audited report, certified by an independent public accountant, within 90 days after the close of its fiscal year.

FN5. At the time of the violations, Commission Regulation 1.12(a) required an FCM to give telegraphic notice to the Commission within 24 hours of the FCM's determination that its adjusted net capital is less than the minimum required by the Commission, followed by the filing of a statement of financial condition and other financial reports.

FN6. Commission Regulation 1.12(b) requires a written notice to the Commission and the NFA within five days of the FCM's determination that its adjusted net capital has fallen below the early warning level, i.e., when its adjusted net capital is less than the greater of (a) 150% of the minimum amount specified in Commission Regulation 1.17(a)(1)(i) or (b) 6% of customer funds required to be held in segregated accounts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

Page 10

FN7. FCFG's accounting treatment of the month-end transactions, in effect, circumvented the requirements of Commission Regulation 1.17. Commission Regulation 1.17(c)(2) defines current assets to include cash and other resources commonly identified as those which are reasonably expected to be realized in cash or sold during the next 12 months, excluding all unsecured receivables, advances and loans.

FN8. The amounts of checks written by Hermanson and deposited into FCFG's account totaled $650,000 for June 1993. This amount, plus the $300,000 capital infusion that FCFG received from Rohlfs, brought it into compliance with the Commission's net capital requirements for June 1993.

FN9. The July 30, 1993 note had a maturity date of September 30, 1993. On that date, Hermanson signed a second promissory note for $685,000 with a maturity date of June 30, 1994. Rehn did not sign the second promissory note until February 1994. As with the first note, Hermanson was listed as the "borrower" and Rehn as the "co-signer." (Div. Exh. No. 93; Tr. at 759-761.) On June 30, 1994, Hermanson signed a third promissory note in the amount of $510,000 with a maturity date of March 1995. Although the designation "Co-signer: First Commercial Group, Inc." is typed at the bottom of the document, Rehn did not sign the third promissory note. (Div. Exh. No. 94.)

FN10. Commission Regulation 1.17 expressly incorporates the definition of "readily marketable" found in SEC Rule 240.15c3-1(c)(11). A "ready market" includes a "recognized established securities market in which there exist independent bona-fide offers to buy and sell." See Commission Regulation 1.17(c)(2)(iv)(B). Hermanson's stock pledge agreement offers collateral that is not readily marketable and therefore cannot be treated as a secured loan receivable-i.e., a current asset-pursuant to Commission Rule 1.17.

FN11. When Schillaci pledged his CME seat as collateral for the FCFG loan, the seat already was encumbered by a prior loan. In June 1993, Schillaci had pledged it as a security for a $300,000 loan from Burling Bank to Schillaci and Hermanson. (Div. Exh. No. 110; Tr. at 80-84; 665.)

FN12. Commission Regulations 1.17(c)(4)(i) and 1.17(h)(3)(vi) provide that an FCM may exclude a loan from its liabilities computation if the loan is subordinated to the claims of its general creditors-i.e., if the loan is secondary to all other loans listed on its books-and if the subordination agreement is approved by the NFA. A subordination agreement may be in the form of a secured demand note agreement. If it is a proper secured demand note agreement, then it can be treated as a current asset in an FCM's net capital computation.

FN13. The ALJ in effect incorporated the Division's allegations into his initial decision, except for two "technical" findings that do not change respondents' overall liability as alleged in the four-count Complaint. Under Count I, the ALJ found that Hermanson was liable as an aider and abettor for FCFG's violations under Section 4f(b) of the Act and Commission Regulation 1.17(a)(4) (operating while undercapitalized), but not for FCFG's violations under Commission Regulation 1.17(a)(1) (falling below the minimum capital requirements). (I.D. at 44.) Under Count IV, the ALJ found that FCFG violated Commission Rule 1.12(b), and that Rehn was liable as a controlling person, for failing to notify the Commission of FCFG's early warning position in two instances only, in July and August 1993, instead of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)

14 instances-monthly from July 1993 to August 1994-as alleged by the Division's complaint and demonstrated by Maksymec's testimony. (I.D. at 46; Div. Exh. 1.)

FN14. The Division calculated its penalty request against FCFG as follows: under Count I, FCFG was found liable for operating while undercapitalized during 12 months, giving rise to 12 violations of the Act and Commission rules; under Count II, FCFG filed 13 false and misleading 1-FRs with the Commission, giving rise to 13 violations; under Court III, FCFG failed to provide the Commission with notice of its undercapitalization on 11 occasions, giving rise to 11 violations; and under Court IV, FCFG failed to provide the Commission with notice of its early warning position in each of the two months when such notice was required. The Division asks the Commission to impose a $100,000 penalty for each of the foregoing 38 violations.

With respect to Rehn, the Division asks the Commission to impose a $100,000 penalty for allowing FCFG to operate while undercapitalized plus $433,000 for signing false 1-FRs on 13 separate occasions. FCFG filed only 13 1-FRs for the "as of" periods ending June 1993 through August 1994, omitting the October and November 1993 filings. Generally, an FCM is required to file quarterly 1-FRs with the Commission unless its adjusted net capital falls below the early warning threshold during a given month, at which time the FCM is required to file a monthly 1-FR at the end of that month and each month thereafter until three successive months have elapsed during which the FCM's adjusted net capital has been shown to equal or exceed the early warning level. (Commission Rule 1.12(b); see also I.D. at 5-6.) FCFG notified the Commission of its early warning position in June 1993. (FCFG Exh. No. 89.) It filed monthly 1-FRs for the "as of" periods ending June 30, 1993, through September 30, 1993. FCFG did not file 1-FRs for the "as of" periods ending October 30, 1993, through November 30, 1993, representing that its adjusted net capital was above the early warning level. FCFG subsequently filed a quarterly 1-FR for December 1993.

FN15. A motion to stay the effect of the decision pending reconsideration by the Commission or notice of appeal seeking review by the relevant United States Court of Appeals must be filed within 15 days of the date this order is served. See Section 6(c) of the Act, 7 U.S.C. § 9 (1994) and Commission Regulation 10.106, 17 C.F.R. §10.106 (1998).

Commodity Futures Trading Commission (C.F.T.C.)

CFTC No. 95-10, 1999 WL 325338 (C.F.T.C.)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.