*ʃ1ʃ1ɴ*

**FILED**

DEC 13 2007
12-13-2007
JUDGE JOAN H. LEFKOW
UNITED STATES DISTRICT COURT

# In The United States District Court
## For The Northern District Of Illinois
### Eastern Division

Commodity Futures Trading

Commission,

     Plaintiff,

    v.

One World Capital Group, LLC **and**

John Edward Walsh,

     Defendants.

07CV 7002
JUDGE LEFKOW
MAGISTRATE JUDGE KEYS

---

**Appendix of Exhibits and Declarations in Support of Plaintiff's Motion for
*Ex Parte* Statutory Restraining Order and Preliminary Injunction**

| Exhibit | Description |
|---|---|
| 1 | Declaration of Joy H. McCormack, a Senior Futures Trading Investigator with the Commission's Division of Enforcement |
| 2 | Declaration of Sharon Pendleton, Direct of Audits at the National Futures Association |
| 3 | Declaration of H. Frank Zimmerle, Branch Chief with the Commission's Division of Clearing and Intermediary Oversight ("DCIO") |
| 4 | National Futures Association Certification of Registration Status of One World Capital Group, LLC |
| 5 | National Futures Association Certification of Registration Status of John E. Walsh |

# Exhibit 1
# Declaration of Joy H. McCormack

**Declaration under penalty of perjury of**
**Joy McCormack pursuant to 28 U.S.C. § 1746**

I, Joy McCormack, based upon my personal knowledge, hereby make the following declaration in support of CFTC's Motion for an Ex Parte Statutory Restraining Order and Preliminary Injunction:

1.    I am a Senior Futures Trading Investigator with the United States Commodity Futures Trading Commission's ("Commission" or "CFTC") Division of Enforcement ("Division"). I have been continuously employed with the Division since 1999.

2.    I have been the responsible investigator for the investigation conducted by the Division into John Edward Walsh ("Walsh") and One World Capital Group, LLC ("One World").

2.    As part of my duties in this investigation, I have collected information and records from the National Futures Association ("NFA"), requested and obtained records from the Secretary of State for New York and Illinois, conducted background research, and captured and reviewed various websites operated by One World.

3.    Based upon my communications with the NFA, from at least December 11, 2007 One World appears to continue to hold the funds of at least three customers who had exchange-traded futures accounts at One World. The three customers have not yet confirmed repayment of funds by One World to the NFA.

4.    According to my research with the Secretary of State of New York, One World was formed on August 31, 2005 as an active Limited Liability Company. A copy of One World's Articles of Organization are attached as Exhibit A.

Ex. 1
McCormack Decl.

1

5.    According to my research with the Secretary of State of Illinois, One World is also registered in Illinois as a foreign Limited Liability Company. A copy of One World's applications for admission to transact business in Illinois are attached as Group Exhibit B.

6.    My research of public records databases for Illinois Deed Records indicates that John E. Walsh resides at 608 Wharton Dr., Lake Forest, IL 60045.

7.    At various times the following One World webpages have been publicly available: www.1worldfcm.com, www.1world-forex.com, www.1worldforex.com, oneworldcaptialgroup.com, www.1worldchina.com, and www.owforex.com.

8.    On December 3 and 6, 2007, using Adobe Acrobat $^{\circledR}$ v.6, a document processing software, I opened the 1worldfcm.com, 1world-forex.com and oneworldcaptialgroup.com websites, and saved them entirely in Portable Document Format ("PDF"). PDF is a file format developed by Adobe Systems. PDF captures the integrity of documents with formatting information, making it possible to take a picture image of a document as it was intended to be read.

9.    As of December 6, 2007, the website 1world-forex.com, under the subtitle "Why do Professional Traders Choose Us," stated:

> "A registered Futures Commission Merchant (FCM), One World Capital Group
> LLC is a member of the National Futures Association (NFA) and is regulated by
> the Commodity Futures Trading Commission (CFTC). Interested parties can visit
> the NFA web site at any time to review One World Capital Group's unblemished
> record as an NFA member. NFA ID #0359973."

A copy of that portion of the 1world-forex.com website is attached as Exhibit C.

10.    As of December 3 and 6, 2007, the websites 1world-forex.com, 1worldcapitalgroup.com and 1worldfcm.com contained links for customers to obtain copies of account opening documents for One World, including a customer agreement. The One World customer agreement states at paragraph 12:

"Government and Exchange Rule All transactions under this Agreement shall be subject to the applicable constitution, rules, regulations, customs, usages, rulings and interpretations of the exchanges, clearing house or markets on which such transactions are executed by FCM for Customer's account, the National Futures Associates ("NFA") and, where applicable, to the provisions of the Commodity Exchange Act, as amended, and the rules and regulations promulgated thereunder and to any other applicable government statutes, rules and regulations. FCM shall not be liable to Customer as a result of any action taken by FCM or its agents in compliance with any of the foregoing rules or laws. This paragraph is solely for the protection and benefit of FCM, and any failure by FCM or its agents to comply with any of the foregoing rules or laws does not relieve Customer of any obligations under this agreement nor be construed to create rights under this agreement in favor of Customer against FCM. If any statute, rule, or regulation shall hereafter be adopted by any governmental authority, exchange, board of trade, clearing house, or self regulatory organization, including but not limited to the NF A which shall be binding upon FCM or any exchange clearing member firm selected by FCM and shall affect in any manner or be inconsistent with any of the provisions hereof, the affected provisions of this agreement shall be deemed modified or superseded, as the case may be, by the applicable provisions of such statute, rule, or regulation, and all other provisions of this agreement and provisions so modified shall in all respects continue in full force and effect"

A copy of the One World customer agreement is attached as Exhibit D.

11.    Since at least December 6, 2007, the oneworldcapitalgroup.com website has removed its content and only directs the reader to contact Walsh with questions, listing the One World office number. Attached as Exhibit E is a copy of the oneworldcapitalgroup.com website as of December 11, 2007.

12.    At www.1worldfcm.com/pdfs/individual_joint.pdf, copies of One World's customer account application and agreement are still publicly available on the internet. A copy of the documents currently available at the 1worldfcm.com website are attached as Exhibit F.

13.    Currently, 1worldforex.com, 1worldchina.com, and owforex.com are no longer accessible.

I declare under penalty of perjury that the foregoing and that it is true and correct.

Executed on this 13TH day of December 2007.

John H. McCormack
Investigator

# Exhibit A to the Declaration of Joy H. McCormack

P.03/04

F 0508310006262

# ARTICLES OF ORGANIZATION
## OF
### One World Capital Group LLC

Under Section 203 of the Limited Liability Company Law:

FIRST:  The name of the limited liability company is: **One World Capital Group LLC**

SECOND:  The office of the limited liability company is to be located in the county of New York, state of New York.

THIRD:  The latest date on which the limited liability company is to dissolve is: 12/31/2045.

FOURTH:  The secretary of state is designated as the agent of the limited liability Company upon whom process against it may be served. The post office Address within or without of this state to which the secretary of state shall mail a copy of any process against the limited liability company served upon him or her is: c/o Business Filings Incorporated, 187 Wolf Road, Suite 101, Albany, New York 12205.

FIFTH.  The name and street address within this state of the registered agent of the limited liability company upon whom and at which process against the limited liability company can be served is: Business Filings Incorporated, 187 Wolf Road, Suite 101, Albany, New York 12205. Located in the county of Albany.

SIXTH.  The limited liability company is to be managed by 1 or more Members.

IN WITNESS WHEREOF, this certificate has been subscribed this 31st day of August, 2005 by the undersigned who affirms that the statements made herein are true under the penalties of perjury.

Mark Schiff, AVP, Organizer
Business Filings Incorporated
8025 Excelsior Dr. Suite 200
Madison, WI 53717

McCormack Decl.
Ex. A

AUG-31-2005  10:38                                          P.04/04

F 050831000 626

# ARTICLES OF ORGANIZATION

## OF
## One World Capital Group LLC

*I CC*

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED  AUG 3 1 2005
TAX $ _____ 0
BY: _____

NAME AND ADDRESS OF FILER
Drawdown Acct. - #M9
Business Filings Incorporated
8025 Excelsior Dr., Suite 200
Madison WI 53717

2005 AUG 31  PM 4: 38

*2*  050831000 669

TOTAL P.04

# Exhibit B to the Declaration of Joy H. McCormack

*File Number*    0170318-8



## To all to whom these Presents Shall Come, Greeting:

*I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that*
ATTACHED HERETO IS A TRUE AND CORRECT COPY, CONSISTING OF 2 PAGE(S), AS TAKEN FROM THE ORIGINAL ON FILE IN THIS OFFICE FOR ONE WORLD CAPITAL GROUP LLC.

### *In Testimony Whereof,* I hereto set

*my hand and cause to be affixed the Great Seal of the State of Illinois, this* 10TH *day of* DECEMBER *A.D.* 2007 .



SECRETARY OF STATE

McCormack Decl.
Ex. B

Authentication #: 0734401491
Authenticate at: http://www.cyberdriveillinois.com

OWCG-10-01-00003

LC0680300

Form **LLC-45.5**

December 2004

**Illinois**
**Limited Liability Company Act**
Application for Admission to Transact Business

FILE # **0170318-8**

Secretary of State Jesse White
Department of Business Services
Limited Liability Division
Room 351 Howlett Building
501 S. Second St.
Springfield, IL 62756
www.cyberdriveillinois.com

Payment must be made by certified
check, cashier's check, Illinois
attorney's C.P.A.'s check or money
order payable to Secretary of State.

**SUBMIT IN DUPLICATE**
Must be typewritten

This space for use by Secretary of State.

Filing Fee:      $ 500
Penalty:         $ —
Approved:

This space for use by Secretary of State.

# FILED

**DEC 07 2005**

**JESSE WHITE**
**SECRETARY OF STATE**

1.  Limited Liability Company name: One World Capital Group LLC    /OK    DEC - 9 2005
    Must comply with Section 1-10 of ILLCA or item 2 below applies.

2.  Assumed name, other than the true company name, under which the company proposes to transact business in Illinois:

    If applicable, form LLC-1.20, Application to Adopt an Assumed Name, must be completed and attached to this application.

3.  Jurisdiction of organization: New York

4.  Date of organization: August 31, 2005

5.  Period of duration: 12/31/2045

6.  Address, including county, of the office required to be maintained in the jurisdiction of its organization or, if not required,
    of the principal place of business (P.O. Box alone or c/o is unacceptable):

    525 Chestnut Street 2-South
    Number                          Street                                    Suite #

    Winnetka, Illinois          60093                                   Cook
    City/State                       ZIP Code                               County

7.  Registered agent: National Registered Agents, Inc.
                       First Name                  Middle Name                    Last Name

    Registered office: 200 West Adams Street
    (P.O. Box alone or    Number          Street                                  Suite #
    c/o is unacceptable.)  Chicago,    County of Cook                 Illinois   60606
                          City              County                              ZIP Code

8.  If applicable, date on which the company first did business in Illinois:

    (continued on back page)

Printed by authority of the State of Illinois. February 2005 –10M – LLC-17.6

0170-318-8
12/07/05

**LLC-45.5**

9. Purpose or purposes for which the company is organized and proposes to conduct business in Illinois: (Include the Business Code # from IRS Form 1065.)

   To engage in foreign exchange trading and activities related thereto.

10. The Limited Liability Company:
    ☐ is managed by a manager or managers
    ☒ has management vested in the member or members

11. The Illinois Secretary of State is, hereby, appointed the agent of the Limited Liability Company for service of process under the circumstances set forth in subsection (b) of Section 1-50 of the Illinois Limited Liability Company Act.

12. **This application is accompanied by a Certificate of Good Standing or Existence, as well as a copy of the Articles of Organization, as amended, duly authenticated within the last 60 days, by the officer of the state or country wherein the LLC is formed.**

13. **If the period of duration is a date certain and is not stated in the Articles of Organization from the domestic state, a copy of that page from the Operating Agreement stating the date also must be submitted.**

14. The undersigned affirms, under penalties of perjury, having authority to sign hereto, that this application for admission to transact business is to the best of my knowledge and belief, true, correct and complete.

Dated    November                          3∂            , 2005    .
                          Month/Day                              Year

_John E. Walsh (signature)_
Signature (Must comply with Section 5-45 of ILLCA.)

John E. Walsh, *Member*
Name and Title (type or print)

If applicant is a company or other entity, state name of company and indicate whether it is a member or manager of the LLC. Please refer to Sections 178.20(d) of the Administrative Rules.

Printed by authority of the State of Illinois. February 2005 –10M – LLC-17.6

OWCG-10-01-00005

*File Number*     0170318-8



# To all to whom these Presents Shall Come, Greeting:

*I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that*

ATTACHED HERETO IS A TRUE AND CORRECT COPY, CONSISTING OF 1 PAGE(S), AS TAKEN FROM THE ORIGINAL ON FILE IN THIS OFFICE FOR ONE WORLD CAPITAL GROUP LLC.



**In Testimony Whereof,** *I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, this* 10TH *day of* DECEMBER *A.D.* 2007 .

*Jesse White*

SECRETARY OF STATE

Authentication #: 0734401497
Authenticate at: http://www.cyberdriveillinois.com

OWCG-10-01-00007

LLC. File #: _01 70 3/88_

Filing Deadline is Prior to: _12-01-00_

This report must be RECEIVED by the Office of the Secretary of State prior to the anniversary date to avoid late filing penalties and eventual administrative dissolution or revocation.

Form **LLC-50.1**                    May 2007

LC0143764

Filing Fee: $250
Penalty: _300_
Total: _550.00_

**PAID**

SEP 19 2007

FILE THIS REPORT ONLINE:
www.cyberdriveillinois.com

OFFICE USE ONLY

1. Limited Liability Company Name: Registered Agent, Registered Office, City, IL, ZIP Code

_One World Capital Group LLC_
_National Registered Agents, Inc_
_200 w. Adams St_
_Chicago IL 60606          Cook_

2. State or Country of Organization: _New York_          Date Organized in or Admitted to Illinois: _____

3. Address of Principal Place of Business: (A P.O. Box is unacceptable.)

_525 Chestnut St._
    Number          Street

_Winnetka     IL     60093_                    _Cook_
    City, State          ZIP Code                    County
          Suite

JESSE WHITE
SECRETARY OF STATE

4. Names and Addresses of Managers or, if none, the Members:

| Name | Number & Street | City, State | ZIP Code | Select One |
|------|-----------------|-------------|----------|------------|
| _John E. Walsh_ | _608 Mansion Dr._ | _Lake Forest IL_ | _60045_ | MBR |

5. The managers/members who are entities affirm the evidence of existence on file with the Illinois Secretary of State is still intact.

6. Changes to the registered agent or address in Item 1 above require the filing of Form LLC-1.36/1.37.

7. I affirm, under penalties of perjury, having authority to sign thereto, that this Annual Report is to the best of my knowledge and belief, true, correct and complete.

A $300 LATE FILING PENALTY WILL APPLY IF THIS REPORT IS NOT FILED ON TIME.

Dated: _September     12, 2007_
          Month/Day          Year

          _John E. Walsh_
                    Signature
_John E. Walsh          mbr_
Name and Title of Manager or Member (type or print)

SECRETARY OF STATE JESSE WHITE
Department of Business Services
Limited Liability Company Division
501 S. Second St., Rm. 351
217-524-8008
Springfield, IL 62756

If applicant is a company or other entity, state name of company and indicate whether it is a member or manager of the LLC.

Printed by authority of the State of Illinois. May 2007 — 8M — LLC 23.6

OWCG-10-01-00008

# Exhibit C to the Declaration of Joy H. McCormack

why forex trading,One world forex,global forex trading,online forex trading,foreign exchange market,managed forex account

FOREX

| Home | Software | About Us | Trading Room | Managed Accounts | Demo | Index | Apply |

Institutional Client Services ()

24 Hour Service Line by calling

1-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

Local 1-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

Forex Trading ▶ Why one world capital group

-------- WHY DO PROFESSIONAL TRADERS CHOOSE US

AND WHY SHOULD YOU?--------

**MANAGEMENT TEAM AND REGULATION**

With over 100 years of financial markets experience, the management team of One World Capital Group offers expertise in both forex trading and internet technologies and proven track records managing large, global trading and brokerage operations. This in-depth experience, along with a demonstrated ability to successfully manage a 24x6 business with solid operating procedures and risk management, instills in our clients a high level of trust and confidence.

OWCG-752-01-00045

McCormack Decl.
Ex. C

OWCG-752-01-00046

why forex trading,One world forex,global forex trading,online forex trading,foreign exchange market,managed forex account



why forex trading,One world forex,global forex trading,online forex trading,foreign exchange market,managed forex account

trading systems

| Home | Software | Contact | About | Managed | Demo | Learn | Apply | Site Map | Link To Us | Risk Disclosure | Links |

- About Us
- Contact Us

Forex Trading Articles | Privacy Statement | Forex Glossary | Forex Trading News | Forex Blog Articles | Forex Faqs

Forex Platform | Forex Demo | Forex Guide | Managed Forex Account | Forex History | Forex Operation | Forex Capital Market

Forex Market | 1 Pip Spread | Pivot Calculator | Pip Value Calculator | Fibonacci Retracement Calculator | Forex Funds | Forex Apply | Understanding Forex

**Forex Trading** : Alabama  Alaska  Arizona  Arkansas  California  Colorado  Connecticut  Delaware  District of Columbia  Florida  Georgia  Hawaii  Idaho  Illinois  Indiana  Iowa  Kansas  Kentucky  Louisiana  Maine  Maryland  Massachusetts  Michigan  Minnesota  Mississippi  Missouri  Montana  Nebraska  Nevada  New Hampshire  New Jersey  New Mexico  New York  North Carolina  North Dakota  Ohio  Oklahoma  Oregon  Pennsylvania  Rhode Island  South  Carolina  South Dakota  Tennessee  Texas  Utah  Vermont  Virginia  Washington  West Virginia  Wisconsin  Wyoming

OWCG-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

why forex trading,One world forex, global forex trading,online forex trading,foreign exchange market,managed forex account

www.1world-forex.com/software.htm

OWCG-752-01-00048

**Exhibit D to the Declaration of Joy H. McCormack**

# ONE WORLD CAPITAL GROUP, LLC

READ THIS ENTIRE AGREEMENT BEFORE SIGNING. A signed copy must be returned to One World Capital Group, LLC and one copy should be kept by the customers. This Agreement is for a Non-Discretionary account unless additional documents are signed, submitted and approved by One World Capital Group, LLC, a Futures Commission Merchant ("FCM"). This is an agreement for One World Capital Group, LLC to act as FCM for the Undersigned in the purchase and sale of commodities futures contracts, commodity option contracts, cash commodities forward contracts, spot and foreign exchange transactions, EFP's, foreign currency denominated financial instruments, and all other transactions related thereto (hereinafter "Commodity Interests"). This agreement shall be continuous and shall cover, individually and collectively, all accounts of Customer at any time opened and/or accounts from time to time closed and then reopened with FCM, irrespective of any change or changes at any time in the personnel of FCM or its successors, assigns, or affiliates, for any cause whatsoever; shall inure to the benefit of FCM and its successors and assigns, whether by merger, consolidation or otherwise; and shall be binding upon Customer and the estate, executors, administrators, legal representatives, successors and assigns of Customer. Customer hereby ratifies all transactions with FCM effected prior to the date of this agreement, and agrees that the rights and obligations of Customer in respect thereto shall be governed by the terms of this agreement, which superseded all other customer agreements between FCM and Customers. The Undersigned agrees as follows:

1. *Agency.* Customer authorized FCM to purchase and sell Commodity Interests for Customer's account in accordance with Customers' oral or written instructions, or from a third party in the case of "managed or discretionary" accounts, as given to FCM by Customer's Introducing Broker ("IB") or Associated Person ("AP"). Customer authorizes FCM, for the accounts of Customer to make such advances and expend such monies and, whenever possible to borrow and deliver such monies or securities or properties as may be required with respect to such transactions. FCM shall be under no duty or obligation to inquire into the purpose or propriety of any instruction given by any Customer in the case of a joint account and shall be under no obligation to oversee the application of any funds delivered to any Customer or third party in accordance with customers' instructions. All orders to buy or sell Commodity Interests must be complete and contain the following information: (a) Whether such order is a buy or sell order; (b) Customer's Identity and account number; (c) Commodity Interest; (d) Quantity; (e) Price, if applicable; (f) Contract delivery month; (g) Any special instructions.

2. *Risk-reducing orders or strategies.* The placing of certain orders (e.g. 'stop-loss' orders, where permitted under local law, or "stop-limit" orders) which are intended to limit losses to certain amounts may not be effective because market conditions may make it impossible to execute such orders. Strategies using combinations of positions, such as 'spread' and 'straddle' positions may be risky as taking simple long' or 'short' positions.

3. *Margins.* Customer shall deposit with FCM sufficient funds to meet the applicable initial and maintenance margin requirements. FCM may reject any order if Customer does not have sufficient margin on deposit and may delay the processing of any order while determining the correct margin status of Customer's account Customer shall, without notice or demand maintain adequate margins at all times so as to continuously meet the margin requirements established by FCM. FCM may establish margin requirements and from time to time, change such margin requirements in its sole and absolute discretion and said requirements may exceed the margin requirements set by any commodity exchange or other regulatory authority. Customer agrees, when requested by FCM, to immediately wire transfer funds to adequately maintain margins and to furnish FCM with the names of bank officers for Immediate confirmation of such transfers. Choosing not to demand Wire transfer of funds or the acceptance of funds by marl shall not constitute a waiver of the right of FCM to demand wire transfer of funds at any time. If at any time Customer's account does not contain the amount of margin required, FCM may, in its sole and absolute discretion, without notice or demand to Customer, close out Customer's open position(s) in whole or in part or take any other action it deems necessary to satisfy such margin requirements. Failure of FCM to close out open position(s) in whole or in part in such circumstances shall not constitute a waiver of its rights to do so at any time thereafter, nor shall FCM be subject to any liability to Customer for its acts or its failure to so act FCM shall not be liable to Customer for the loss of any margin deposits which is the direct or indirect result of the bankruptcy insolvency, liquidation, receivership, custodianship, or assignment for the benefit of any bank, other clearing broker, exchange, clearing organization, or similar entity. Notwithstanding the above, FCM may, in its discretion, refuse to accept an order From the Customer.

4. *Treatment of Funds.* Customer opens at least two accounts (2) on the books of the FCM. One designated Regulated where all transactions designated as regulated by the Commodity Futures Trading Commission ("CFTC") will be carried, and the other designated Non-regulated where deliveries and/or transactions on foreign exchanges, if any, will be carried. FCM is hereby authorized to transfer funds as it deems necessary between these accounts. Further, if the Customer has more than one Regulated and/or Non-regulated account or has a joint account, from time to time, FCM, in its sole discretion and without prior notice to Customer, may apply or transfer (including segregated funds or other property) interchangeably between any of the Customer accounts at FCM or an affiliate of FCM as may be necessary for margin or to satisfy or reduce any deficit or debit balance in any Customer account

5. *Indemnification.* Customer agrees to indemnify FCM and hold FCM harmless from and against any and all liabilities, losses, damages, costs and expenses, including accountants' and attorneys' fees, incurred directly or indirectly, by FCM because the Customer's representations and warranties shall not be true and correct in any material respect or the agreements made herein by Customer shall not be fully and timely performed, from any action or omission by Customer with respect to the account(s), including but not limited to, any debit and deficit balances which may occur in Customer's account, interest on any debit and deficit balances calculated from the date hereof at a fluctuating rate per annum equal to the som of one percent plus the rate of interest then most



McCormack Decl.
Ex. D

# ONE WORLD CAPITAL GROUP, LLC

recently published in *The Wall Street Journal* as the prime rate, taxes that FCM may be required to pay on any commodity interest or other property held in the accounts of the Customer or fine or penalty that FCM may be required to pay because Customer caused FCM to violate any statute, regulation or rule of any exchange or regulatory body. Customer also agrees to pay promptly to FCM all damages, costs and expenses, including attorneys' fees, incurred by FCM in the endorsement of any of the provisions of this agreement

6. *Acknowledgement of Risk* Customer acknowledges that Commodity Interests trading is a highly speculative activity involving highly leveraged and rapidly fluctuating markets and may result in significant losses, which losses may substantially exceed Customer's margin deposits. Despite such risks, Customer is willing and able to assume the financial risks and other hazards of Commodity Interests trading and agrees that Customer will in no manner hold FCM responsible for losses incurred through following IB's or FCM's trading recommendations or suggestions and expressly hereby waives any claims therefore. FCM is not responsible for delays in transmission, delivery or execution of Customer's orders due to malfunctions of communication facilities or other causes. Customer has read and understands the Risk Disclosure Statement

7. *Commission Fee* Customer agrees to pay to FCM commission charges in effect from time to time and any other costs to FCM occasioned by carrying the account of Customer. Customer agrees that FCM may debit Customer's account for customary brokerage and commission charges and for charges for any other services rendered by FCM, including all payments made on behalf of Customer, which charges may vary from time to time, without notice to Customer. Customer agrees to pay any additional fees or commissions charged for taking and/or making deliveries, interest, fees levied by the Regulatory authorities and commissions and fees charged for the transfer of the Customer's account to another FCM.

8. *Interest*. In accordance with Commodity Futures Trading Commission Regulation 1.29, the FCM may receive and retain as its own any increment or interest resulting from the proper investment of the funds held in the Customer's account

9. *Security Interest*. Customer grants FCM a security interest in all monies, securities, negotiable instruments, open positions in Commodity Interests and all receipts of other documents representing underlying commodities, including without limitation warehouse receipts, and all commodities represented by such receipts or other documents or other property now or at any future time held in Customer's account or which may be in FCM's possession for any purpose, including safekeeping, to secure payment of all obligations of Customer to FCM irrespective of the number of accounts Customer may have with FCM. All funds, securities, commodities, futures contracts, and other Property of the Customer which FCM may, at any time, be carrying for Customer (either individually, jointly with others or as a guarantor of the account of another person) or which at any time may be in FCM's possession or control or carried on its books for any purpose including safekeeping, are to be held by FCM as security and subject to the general lien and right of set-off for all liabilities of Customer to FCM or any affiliate of FCM. FCM may at any time, in its sole and absolute discretion, liquidate any of the above-mentioned items in order to satisfy any margin or account deficiencies including but not limited to debit or deficit balances resulting From transactions executed by the FCM for the Customer, interest charges, service charges, expenses incurred by FCM, including court costs and attorney's fees incurred in collecting debit or deficit balances of Customer in any account and may transfer said property or assets to the general ledger account of FCM or pledge, transfer, or lend such items, all without liability on the part of FCM to Customer or any third party. Furthermore, FCM, is also granted a security interest on all proceeds which now or at any time may come into the Customer's account, and the Customer agrees to execute any and all documents including Uniform Commercial Code financing statements, deemed necessary or advisable by FCM to evidence or perfect such security interest FCM shall also have full authority to set off, in addition to other rights set forth in this Agreement, all debts owing to the FCM by the Customer against any and all claims which the Customer may have against the FCM. Customer agrees that all demands for debits owing FCM shall be met within twenty-four (24) hoOfs following either of (i) Customer's receipt of FCM's oral request for payment or (11) FCM's delivery to Customer of FCM's written request for payment (except as payment modified with respect to wire and telephone requests for margin funds as herein set forth).

10. *Failure to Deliver*. Customer agrees to deliver to FCM, at least two business days prior to the delivery date, any security, commodity or property, or documents representing ownership of same (including but not limited to warehouse receipts), previously sold by FCM on Customer's behalf, which FCM in its sole and absolute discretion deems necessary to effect a good delivery pursuant to the rules and delivery procedures of the contract market on which the delivery is contemplated. If at any time Customer shall be unable to deliver to FCM any security, commodity or other property previously sold by FCM on Customer's behalf, Customer authorizes FCM, in FCM's sole discretion, to borrow or buy and deliver the same, and Customer shall immediately pay and indemnify FCM for any costs, interest, losses and damages (including consequential costs, losses and damages) which FCM may sustain from its inability to borrow or buy any such security, commodity or other property. In the event FCM takes delivery of any security, other property or commodity for Customer's account, Customer agrees to indemnify and hold FCM harmless From and against any loss it may suffer resulting, directly or indirectly, From any decline in value of said security, commodity or other property.

# ONE WORLD CAPITAL GROUP, LLC

11. *Market Information.* Customer acknowledges that (a) any market recommendations or information communicated to Customer do not constitute an offer to sell or the solicitation of an offer to buy any Commodity Interest; (b) such recommendations and information, although based upon information obtained from sources believed to be reliable, may be incomplete and unverified; and (c) FCM and the IB make no representation, warranty, or guarantee as to, and shall not be responsible for the accuracy or completeness of, any information or trading recommendation furnished to Customer. Customer understands that FCM, its affiliates or representatives, and/or the IB may have a position in and may intend to buy or sell Commodity Interests which are the subject of market recommendations furnished to Customer, and that the market position of FCM or any such affiliate or representative and/or the IB mayor may not be consistent with the recommendations furnished to Customer by FCM and/or the IB.

12. *Government and Exchange Rule* All transactions under this Agreement shall be subject to the applicable constitution, rules, regulations, customs, usages, rulings and interpretations of the exchanges, clearing house or markets on which such transactions are executed by FCM for Customer's account, the National Futures Associates ("NFA") and, where applicable, to the provisions of the Commodity Exchange Act, as amended, and the rules and regulations promulgated thereunder and to any other applicable government statutes, rules and regulations. FCM shall not be liable to Customer as a result of any action taken by FCM or its agents in compliance with any of the foregoing rules or laws. This paragraph is solely for the protection and benefit of FCM, and any failure by FCM or its agents to comply with any of the foregoing rules or laws does not relieve Customer of any obligations under this agreement nor be construed to create rights under this agreement in favor of Customer against FCM. If any statute, rule, or regulation shall hereafter be adopted by any governmental authority, exchange, board of trade, clearing house, or self regulatory organization, including but not limited to the NFA which shall be binding upon FCM or any exchange clearing member firm selected by FCM and shall affect in any manner or be inconsistent with any of the provisions hereof, the affected provisions of this agreement shall be deemed modified or superseded, as the case may be, by the applicable provisions of such statute, rule, or regulation, and all other provisions of this agreement and provisions so modified shall in all respects continue in full force and effect

13. Clearing. Unless otherwise specified, FCM is authorized to execute such orders upon any exchange or other place which may be deemed by FCM, in its sole discretion, to be most desirable, including another exchange clearing member firm and/or floor broker selected by FCM, in its sole discretion, either on an omnibus clearing arrangement or on a fully disclosed clearing arrangement All rights and obligations extended to FCM pursuant to this agreement, and all other provision of this agreement shall also become those of such exchange clearing member firm

14. Liquidation of Account& In the event (a) of Customer's death or, in the case of a joint account, the death of the last survivor thereof; (b) of a decision to dissolve and/or liquidate by a corporate Customer, which decision shall be immediately communicated to FCM; (c) of the filing of a petition of Bankruptcy by or against Customer; (d) of the institution of any similar state, federal or other insolvency proceedings by or against Customer; (e) of the appointment of a receiver for Customer or for any of the assets of Customer; (f) an attachment is levied against Customer's account (or any of them); (g) a notice of levy with respect to Customer's account (or any of them) is served on FCM by any competent taxing authority; (h) Customer fails to timely meet any margin calls; or (i) FCM, for any reason whatsoever, deems itself insecure or if necessary for FCM's protection, then FCM is hereby authorized, in its sole discretion, to sell any or all of the Commodity Interest or other property of Customer which may be in FCM's possession, or which FCM may be carrying for Customer, or to buy in any Commodity Interests or other property of which the account or accounts of Customer may be short, or cancel any outstanding orders, in order to close out the account or account of Customer in whole or in part or in order to close out any commitment made on behalf of Customer, all without any liability on the part of FCM to Customer, or any thrid party. Such sale, purchase or cancellation may be made according to FCM's judgment and may be made at its sole discretion, on the exchange or other market where such business is usually transacted, including an Exchange for Physicals (EFP) transaction, without notice to Customer or the legal representative of Customer, and FCM may purchase the whole or any part thereof ITee from any right of redemption, and Customer shall remain liable for any deficiency, it being understood that a prior tender, demand or call of any kind, From FCM, or prior notice From FCM, of the time or place of such sale or purchase shall not be considered a waiver of Brokers rights to sell or buy any Commodity Interests or other property held by FCM or owned by Customer, at any time as hereinbefore provided or to be deemed to require any such tender, demand, call or notice on any subsequent transaction. Further, FCM may, at its option, cause a whole or partial liquidation of Customer's account or the straddling of existing open positions in the event they cannot be satisfactorily liquidated because the market is up or down the limit Any of the above actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice or advertisement to Customer, his personal representatives, heirs, executors, administrators, legatees, or assigns, and regardless of whether the ownership interest shall be solely Customer's account or lield jointly with others.

15. Assignment. The FCM may assign the Customer's account or accounts to another registered FCM by notifying the Customer of the date and name of the intended assignee FCM ten (10) days prior to the assignment Unless the Customer objects to the assignment in writing prior to the scheduled date for the assignment, the assignment will be binding on the Customer.

16. Events Beyond Control of FCM. FCM shall not be responsible for any loss or damage caused directly or indirectly.

# ONE WORLD CAPITAL GROUP, LLC

by any events, actions or omissions beyond the control of FCM, including without limitation, loss or damage resulting, directly or indirectly. From any delays or inaccuracies in the transmission of orders or other information due to a breakdown in or failure of any transmission or communication facilities.

17. *Notice and Report* All communications, reports, statements, monies, securities, negotiable instruments, and other property, whether by mail, telex, courier, telephone, telegraph, messenger, facsimile, or otherwise (in the case of mailed notices), or communicated (in the case of telephone notices), sent to Customer at Customer's address (or telephone number) as given to FCM from time to time shall constitute personal delivery to Customer whether or not actually received by Customer, and Customer hereby waives all claims resulting from failure to receive such communications. Customer shall make all payments, except with regard to wire transfers discussed above, and deliver all notices and communications to FCM's ADMINISTRATIVE OFFICE LOCATED AT 2-SOUTH, 525 CHESTNUT STREET, WINNETKA, IL 60093 ATTN: COMPLIANCE DEPT. Customer agrees to immediately open, read and act on all communications sent to Customer by FCM.

Confirmations of trades, statements of account, margin calls, and any other written notices shall be binding on Customer for all purposes. Reports of executions and all statements of account rendered by FCM From time to time to Customer shall be conclusively deemed correct and final, unless Customer calls any error therein to FCM's attention in writing (a) prior to the start of business on the next business day following notification, in the case of margin calls and reports of executions and (b) within 5 days of delivery to Customer, in the case of statements of account and any written notices (other than trade confirmations or margin calls) or demands. FAILURE TO SO NOTIFY FCM SHALL BE DEEMED RATIFICATION OF ALL ACTIONS TAKEN BY FCM OR FCM'S AGENT PRIOR TO SAID INFORMATION BEING FURNISHED TO CUSTOMER. Customer agrees that in the event of a discrepancy in the status of Customer's account, Customer will take reasonable measures to rectify such discrepancies, including but not limited to buying or selling contracts, as appropriate at the best available price within a reasonable time From the discovery of such discrepancy. In the event that a discrepancy is due solely to FCM's error, FCM agrees to credit Customer's account for the discrepancy; provided, however, that Customer has taken reasonable measures to correct such discrepancy as set forth above. FCM shall not be responsible for any amount unrealized or any loss to Customer's account due to Customer's failure to take reasonable measures to correct any account discrepancy. Customer further agrees to contact FCM by telephone to verify the account status within two (2) business days after placing any order if Customer has not been advised by telephone of the status of such order by FCM within twenty-four (24) hours after said order(s) was/were placed. CUSTOMER AGREES THAT FAILURE TO CONTACT FCM AS PROVIDED ABOVE SHALL RELIEVE FCM OF ANY RESPONSIBILITY ARISING FROM THE LACK OF EXECUTION OF SUCH ORDER(S). CUSTOMER FURTHER ACKNOWLEDGES THAT ALL ORDERS SHALL BE GOOD FOR THE DAY SUCH ORDERS ARE PLACED ONLY, UNLESS SPECIFIED BY THE CUSTOMER TO BE OPEN ORDERS. None of these provisions, however, will prevent FCM, upon discovery of any error or omission, from correcting it. The parties agree that such errors, whether resulting in profit or loss, will be corrected in Customer's account, will be credited or debited so that it is in the same position it would have been in if the error had not occurred. Whenever a correction is made, FCM will promptly make written notification to Customer.

18. *Modification*. This Agreement may be altered, modified or amended by FCM from time to time by written notice to Customer unless Customer shall object within three (3) business days of receipt thereof to such modification, alteration or amendment No other modification, amendment or addition to this Agreement shall be effective unless reduced to writing and signed by both Customer and an Executive Officer of the FCM. This instrument embodies the entire Agreement of the parties, superseding any and all prior agreements and there are no terms, conditions or obligations other than those contained herein. Customer represents that Customer has not altered, modified or changed this Agreement

19. *Trading Representations*. The Customer understands that on certain trading days, trading in certain commodities, commodity options, leverage contracts and underlying commodities or futures contracts may cease or expire and that, will respect to commodity options and underlying commodities or futures contracts traded outside the United States, trading days and hours may not coincide with domestic trading days or hours and that these may result in financial disadvantage to Customer. The Customer hereby agrees to hold FCM, FCM's officers, partners, and agents including the IB harmless against such loss.

20. *Further Representations*. The Customer represents, warrants and agrees that (a) All of the information contained on the Customer Fact Sheet is true, correct and complete as of the date hereof and since FCM is relying thereon the undersigned will promptly notify the FCM of any changes herein; (b) The trading in Commodity Interests is within the power of the Customer and such activity will in no matter contravene the provisions of any statutes, rules or regulations, Judgments, orders or decrees or agreements to which the Customer is bound or subject; (c) If Customer IS a corporation, It is duly organized and in good standing under the laws of the state of its incorporation and every state in which it does business; (d) the actions of the authorized person designated on the Customer Fact Sheet to act for the Customer has been authorized by all necessary or appropriate corporate action if applicable, such person has full authority to execute this Customer Agreement and all related documents on behalf of the Customer and to act for Customer in all matters regarding Customer's account(s) and FCM may at all times rely on the fact of such authority without any duty to investigate into either the authenticity or extent thereof; (e) If applicable, Customer will confirm the matters contained in paragraph 22(d) by supplying FCM, within a reasonable time, prior to the commencement of trading with an executed copy of resolutions of the Board of Directors of Customer in a form prescribed by FCM; (f) If Customer is a partnership, the partnership has express authority to speculate in Commodity Interests; and (g) Customer has never been suspended or barred from trading by the Commodity Futures Trading

OWCG-752-01-00166

# ONE WORLD CAPITAL GROUP, LLC

Commission or any predecessor agency or any other federal or state regulatory agency or any exchange or trade association, and Customer undertakes to notify FCM of any change in such status within two (2) business days of any such change. Customer further represents that he is of legal age and sound mind and that, except as disclosed in writing to FCM, no one except Customer has any interest in any account or accounts carried for Customer by FCM. CUSTOMER FURTHER REPRESENTS THAT HE IS NOT AN EMPLOYEE OF ANY EXCHANGE, ANY CORPORATION IN WHICH ANY EXCHANGE OWNS A MAJORITY OF THE CAPITAL STOCK, ANY MEMBER OF AN EXCHANGE, ANY FIRM REGISTERED ON ANY EXCHANGE, ANY FUTURES COMMISSION MERCHANT, AND INTRODUCING BROKER, OR ANY BANK, TRUST, OR INSURANCE COMPANY. IN THE EVENT THAT CUSTOMER BECOMES SO EMPLOYED, HE WILL PROMPTLY NOTIFY FCM IN WRITING OF SUCH EMPLOYMENT.

21. *Verification*. Customer authorizes FCM to contact such banks, financial institutions and credit agencies as FCM shall deem appropriate from time to time to verify the reformation regarding Customer which may be provided by Customer from time to time. Customer understands that an Investigation may be made pertaining to his personal and business credit standing and that Customer may make written request within a reasonable period of time for disclosure of such investigation's nature and scope.

22. *Conversion Rate Risk*. In the event that FCM is directed to enter into any Commodity Interest contract in any exchange or board of trade involving transactions effected in a foreign currency: (a) any profit or loss arising as a result of a fluctuation in the rate of exchange affecting such cogency will be entirely for the Customer's account and risk; (b) be made in U.S. Dollars in such amounts as FCM may, in its sole discretion require, and (c) FCM has the sole discretion to convert funds in Customer's account into and From such foreign currency at a rate of exchange determined by FCM as it deems necessary and proper and on the basis of then prevailing money markets.

23. *Telephone Recording*. Customer acknowledges, authorizes and consents to the recording of Customer's telephone conversations with FCM or any of its agents or associated persons by means of electronic recording devices with or without the use of an automatic tone warning device. Customer understands, authorizes and consents to the use of such recordings, and/or transcripts thereof, as evidence by either party in any action arising out of this Agreement FCM may, but shall not be required, in its normal course of business, to erase such recordings following their production.

24. *Construction and Controversies*. Customer hereby expressly acknowledges that this Agreement is made in the State of New York (upon acceptance by FCM), and further, that by virtue of trading commodity futures or options in the account established hereby, Customer is transacting business in the State of New York; accordingly, Customer hereby submits and consents to jurisdiction of his person in the Courts of the State of New York and, shall be amenable to service of summons and other legal process of, and emanating From, the State of New York. This Agreement's validity, construction and enforcement shall be governed by the laws of the State of New York. Customer hereby submits to the exclusive jurisdiction of such State, and expressly waives the right to the adjudication or enforcement of such controversies by any court or any other tribunal sitting in any other jurisdiction, and further expressly waives the provisions of any statute or administrative ruling defining a commodity or commodity contract to be a security. Wherever possible, each portion of this Agreement shall be interpreted in a manner to be valid and effective under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provisions or the remaining provisions of this Agreement This Agreement shall inure to the benefit of your present organization, and any successor organization, irrespective of any change or changes at any time in the personnel thereof for any cause whatsoever, and the assigns of your present organization. This Agreement shall be binding upon the Customer and/or successors, estates, executors, administrators, and assigns of the Customer. CUSTOMER AGREES THAT ANY CONTROVERSY BETWEEN BROKER AND CUSTOMER ARISING OUT OF THIS AGREEMENT, REGARDLESS OF THE MANNER OF RESOLUTION, SHALL BE ARBITRATED, LITIGATED (TRIED IN A COURT OF LAW), OR OTHERWISE RESOLVED BY A TRIBUNAL LOCATED IN CHICAGO, ILLINOIS. IN ADDITION, CUSTOMER HEREBY WAIVES TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING Customer agrees to pay all expenses, including attorney's fees, incurred by Broker: (a) to defend any unsuccessful claim Customer brings against Broker or; (b) to collect any debit balances Customer account(s). No legal or administrative action arising out of this contract may be commenced by anyone more than ONE (1) year after any claim arises. The headings and titles herein are inserted for the convenience of reference only and are to be ignored in the construction of the provisions hereof

25. *Agreement To Shorten Statutes Of Limitation.* FCM and Customer agree that no action in law, equity, arbitration or administrative proceeding, arising out of this agreement, any transactions effected pursuant to this agreement or the relationship of Customer with FCM, may be commenced more than ONE (1) year after the aggrieved party knew or should have known a cause of action existed. Customer acknowledges that he/she is expressly agreeing to waive the two year statute of limitations provided by the Commodity Exchange Act, including the two year time period for commencing a Commodity Futures Trading Commission reparation proceeding, and any and all other applicable statutes of limitations exceeding one year, including but not limited to, any statutory or common law state or federal

# ONE WORLD CAPITAL GROUP, LLC

statue of limitations, the statute of limitations provided by the National Futures Association for commencing an arbitration action, and the statute of limitations for initiating arbitrations before registered contract markets. Customer understands that the agreement with this paragraph is not necessary to open an account with FCM.

26. *Joint Account*. If this is a joint account, the Customers agree, jointly and severally, that the foregoing Agreement and all matters contained herein are the joint and several rights and obligations of the Customer. Each of the Customers has the authority to act on behalf of the joint account as if (s)he alone were interested therein all without notice to the others interested in said account, including but not limited to conferral or revocation of authority hereunder. All property of anyone or more of the Customers held or carried by FCM shall be as collateral security and with a general lien thereon for the payment of all debits, losses or expenses incurred in the joint account and vice versa, however arising. In the event of death or legal incapacity of any of the customers, the survivor(s) immediately shall give FCM notice and FCM may, before or after receiving such notice, take such action, require such documents, retain such assets and/or restrict transactions as FCM deems advisable to protect FCM. Liability of the Customer hereunder shall pass to any estate or personal representative of the Customer. This joint account can be with or without the right of survivorship. "Without rights of survivorship" means upon death of any of the Customers the FCM will divide the joint account into separate, equal accounts in each of the Customers' respective names, but Customers shall continue to be liable on the joint account hereunder until FCM has received actual notice of such death or incapacity. "With full rights of survivorship" means upon death of any of the Customers, the survivor(s) shall be vested with this joint account_ subject to notice and ability as aforesaid. If no instruction is given on Page 7(b) of this Agreement, the Customers shall be deemed Joint Tenants with Full Rights of Survivorship.

27. *Purpose of Lending Agreement and Lending Agreement*. Should Customer take delivery of commodities through futures contracts, FCM is obligated to make full payment for the delivery on 24 hours notice. If the balance in Customer's account is not adequate to pay for the delivery, the warehouse receipts representing the delivery become property carried on margin in Customer's account, since they are not fully paid for by Customer. The purpose of the lending agreement is to allow FCM to use the warehouse receipts as collateral for a bank loan, the proceeds of which are used to pay for the warehouse receipts until re-delivery of the commodity and/or payment in full by Customer. Customer hereby authorizes FCM From time to time to lend, separately or together with the property of others, either to itself or to others, any property which FCM may be carrying for the undersigned on margin. This authorization shall apply to all accounts carried by FCM for the undersigned and shall remain in full force until written notice of revocation is received by FCM at FCM's principal office.

28. *Trading Limitation* FCM, at any time, in its sole discretion may limit the number of contracts of positions and/or the margin in use which the Customer may maintain or acquire through FCM. Customer agrees not to exceed the positions limits established by the CFTC or any contract market and/or limits of the number of contracts or positions and/or the margin in use set by FCM, whether acting alone or with others.

29. *Binding Effect*. This Agreement, including all authorizations, shall inure to the benefit of FCM, its successors and assigns and shall be binding upon Customer and Customer's personal representatives, executors, trustees, administrators, successors and assigns.

30. *Printed Media Storage*. Customer acknowledges and agrees that FCM may reduce all documentation evidencing Customer's account, including the original signed documents executed by Customer in the opening of such Customer's account with FCM, utilizing a printed media storage device such as micro-fiche or optical disc imaging. Customer agrees to permit the records stored by such printed media storage method to serve as a complete, true and genuine record of such Customer's account documents and signatures.

31. *Options Trading*. Customer understands that some exchanges and clearing houses have established cut-off times for the tender of exercise instructions and that an option will become worthless if instructions are not delivered before such expiration time. Customer also understands that certain exchanges and clearing houses automatically will exercise some "in-the-money" options unless instructed otherwise. Customer acknowledges full responsibility for taking action either to exercise or to prevent the exercise of an option contract, as the case may be, and FCM is not required to take any action with respect to an option contract, including without limitation any action to exercise a valuable option prior to its expiration date or to prevent the automatic exercise option, except upon Customer's express instructions. Customer further understands the FCM has established exercise cut-off times which may be different from the times established by exchanges and clearing houses. Further, Customer understands that (i) all short option positions are subject to assignment anytime including positions established on the same day that exercises are assigned, and (ii) exercise assignment notices are allocated randomly from among all FCM Customers' short options positions which are subject to exercise. A more detailed description of FCM's allocation procedure is available upon request

32. *Terms and Headings*. The term "FCM" shall be deemed to include One World Capital Group, LLC its successors and assigns; the term "Customer" shall be deemed to refer to the party or parties executing this agreement All pronouns shall be deemed to refer to the feminine or the masculine as the gender of Customer requires. If this is a joint account, the singular shall mean, where appropriate, all owners of an account and the statements, agreements, representations and warranties set forth herein shall be deemed to have been made by each owner of the account The paragraph headings in this agreement are inserted for convenience of reference only and not intended to limit the applicability of

# ONE WORLD CAPITAL GROUP, LLC

affect the meaning of any of its provisions.

33. *Disclosure Statement for Non-Cash Margin*. This statement is furnished to you because rule 190.1O(C) of the Commodity Futures Trading Commission requires it for reasons of fair notice unrelated to this Company's current financial condition.

    1.   You should know that in the unlikely event of this Company's bankruptcy, property, including property specifically traceable to you, will be returned, transferred or distributed to you, or on your behalf, only to the extent of your pro rata share of all property available for distribution to customers.

    2.   Notice concerning the terms for the return of specifically identifiable property will be by publication in the newspaper of general circulation.

    3.   The commission's regulations concerning bankruptcies of commodity brokers can be found at 17 Code of Federal Regulations Part 190.

34. Electronic Trading and Order Routing Systems. Customer acknowledges that electronic trading and order routing systems differ from traditional open outcry pit trading and manual order routing methods. Transactions using an electronic system are subject to the rules and regulations of the exchange(s) offering the system and/or listing the contract that may change From time to time. Customer further acknowledges that trading or routing orders through electronic systems varies widely among the different electronic systems which may present different risk factors with respect to trading on or using a particular system including, but not limited to, system access, varying response times, and security. In the case of Internet-based systems, there may be additional types of risks related to system access, varying response times, security, as well as risks related to service providers and the receipt and monitoring of electronic mail. CUSTOMER AGREES TO INDEMNIFY FCM AND HOLD FCM HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, COSTS AND EXPENSES, INCURRED DIRECTLY OR INDIRECTLY, BY CUSTOMER BECAUSE OF FAILURE OF SYSTEM ACCESS, VARYING RESPONSE TIMES, SECURITY, SYSTEM OR COMPONENT FAILURE, THE INABILITY TO ENTER NEW ORDERS, EXECUTE EXISTING ORDERS, OR MODIFY OR CANCEL ORDERS THAT WERE PREVIOUSLY ENTERED *AND/OR* LOSS OF ORDERS OR ORDER PRIORITY.

ACCOUNT AUTHORIZATION AND TREATMENT OF FUNDS

Customer authorizes at least two accounts (2) on the books of the FCM. One designated Regulated where all transactions designated as regulated by the Commodity Futures Trading Commission ("CFTC") will be carried, and the other designated Non-regulated where deliveries and/or transactions on foreign exchanges, if any, will be carried. FCM is hereby authorized to transfer funds as it deems necessary between these accounts. Father, if the Customer has more than one Regulated and/or Nonregulated account or has a Joint account, from time to time, FCM, in its sole discretion and without prior notice to Customer, may apply or transfer (including segregated funds or other property) interchangeably between any of the Customer accounts at FCM or an affiliate of FCM as may be necessary for margin or to satisfy or reduce any deficit or debit balance in any Customer account

---

Name of Corporation

By                                                    Title

Signature                                              Date

By                                                    Title

Signature                                              Date

OWCG-752-01-00169

# Exhibit E to the Declaration of Joy H. McCormack

OWCG-750-02-00001

ONE WORLD
CAPITAL GROUP

525 Chestnut St.
Winnetka, IL 60093
office: 847.446.8100
fax: 847.446.8136

Please contact Jack Walsh at 847.446.8100 with any questions.

McCormack Decl.
Ex. E

**Exhibit F to the Declaration of Joy H. McCormack**

# Document Checklist

To expedite the approval process, the following information should be provided:

**Customer Name:** _____

**Sales Rep/Referral:-** _____  **Date:** _____

**Phone:** _____  **Email:** _____

**Type of Account:**
- ☐ Individual/Joint Acct
- ☐ LLC Account – Articles of Incorporation
- ☐ Corporation – Articles of Incorporation
- ☐ Trust Account
- ☐ Partnership – Articles of Partnership
- ☐ IRA

**The following documents must be completed and faxed to: 212-313-9406.**

1. Online Account Application Complete      Yes     No
   **IF NOT ONLINE,** Send Account Appl. (4 pages)

**In addition to the "Account Application," we also need the following:**

2. Customer Brokerage Account Agreement    Yes    No

3. Risk Disclosure Acknowledgement (1 page)    Yes    No

4. Individual Forms: (3 pages for ind/joint, 4 for company)

    Electronic Document Delivery    Yes    No

    Electronic Platform Disclosure    Yes    No

    Arbitration Agreement    Yes    No

    Disc. for Non-Cash Margin (not ind/joint)    Yes    No

5. IRS Form (i.e. W9 or W8BEN) (1 page)    Yes    No

6. Form of Identification (scan & email, if possible)    DL  Passport _____ State/Country
       Other _____

**Possible Additional Documents:**

7. Limited Power of Attorney (2 pages, managed acct)    Yes    No

8. If over 65, add'l risk acknowledgement (1 page)    Yes    No

9. Articles of Incorporation (company account only)    Yes    No

10. IRA stamped paperwork (IRA account only)    Yes    No

McCormack Decl. Ex. F

# One World Capital Group

## 477 Madison Ave 24th Floor-New York, NY 10022

## ACCOUNT APPLICATION

### SECTION 1

#### Type of Account: choose one

| _____Individual | _____Joint Account | _____IRA Account | _____Trust Account |
|---|---|---|---|
| _____Corporate Account | _____Partnership Account | _____Limited Liability Company | |

## Primary Account Holder /Business Owner
## Personal Information (Required for All Accounts)

| First Name: | Middle Name: | Last Name: | | | | Phone Number: | |
|---|---|---|---|---|---|---|---|
| Home Address (P.O. Box not acceptable) | | | | | | | |
| Mailing Address(if different): | | | | | | | |
| City: | | State/Province: | | Postal/Zip Code: | | Country: | |
| * Date of Birth(mm/dd/yyyy): | | _____Male _____Female | _____Married _____Single | US Citizen: _____Yes _____No | Number of Dependents | Social Security Number(if USA) | |
| Citizenship (country if not USA): | | Passport or Driver's license number (if not USA): | | | | Initial Margin (in USD): | |

| Type of account : Forex _____ standard (100k lot)____Mini (10K lot)* Futures _____ | Leverage: _____50:1 _____100:1 |
|---|---|

## Employment Information (Individual/Joint accounts)

| Check One: | _____Employed | _____Self Employed | _____Unemployed | _____Retired* | _____Other |
|---|---|---|---|---|---|
| Employers Name: | | | Employers Address: | | |
| City: | | State/Province: | | Postal/Zip Code: | Country: |
| Business Phone: | | Email: | | Position held: | |
| Nature of Business (required if self employed): | | | | | |

*If you are 65 years old or above please complete "Additional High Risk Form"

## Financial Information (Individual/Joint Accounts)

| Annual Income(USD): please circle one **Below $25,000** **$25,000-$50,000** **$50,000-$75,000** **$75,000-$100,000** **Over $100,000** | Net Worth (USD): | | Liquid Net Worth (USD): |
|---|---|---|---|
| **Have you ever declared bankruptcy?** | _____Yes _____No | If yes, please provide the date and details below: | |



ACCOUNT APPLICATION    (Page 2)

## SECTION 1 (CONTINUED)

### TRADING AND INVESTMENT EXPERIENCE (Individual/Joint Accounts)

Indicate the years of experience the account owner has in the following investment types:

Stocks_____   Equity Options_____   Bonds_____   Mutual Funds_____   Mutual Funds_____

Futures_____   Futures Options_____   CPOs_____   FOREX_____   Managed Futures_____

Indicate the highest level of education achieved

_____High School   ____College   _____Masters   _____Doctorate

### BANK REFERENCE INFORMATION (Individual/Joint Accounts)

| Bank Name: | Bank Address: | | |
|---|---|---|---|
| Account Number: | Account Holder Name: | | |
| City: | State/Province: | Postal Code: | Country: |
| ABA Number: | SWIFT/IBAN Code: | | |
| Bank Contact Name: | Phone Number: | | |

### SECTION 2   (Joint Accounts only)

### JOINT ACCOUNT HOLDER (SECOND INDIVIDUAL) PERSONAL INFORMATION

| First Name: | Middle Name: | | | | Last Name: |
|---|---|---|---|---|---|
| Home Address (P.O. Box not acceptable) | | | | | |
| Mailing Address(if different): | | | | | |
| City: | State/Province: | | Postal/Zip Code: | | Country: |
| * Date of Birth(mm/dd/yyyy): | ____ Male<br>____ Female | ____ Married<br>____ Single | US Citizen:<br>____Yes<br>____ No | | Social Security Number (if USA) |
| Citizenship (country if not USA): | Passport or Driver's license number (if not USA): | | | | Initial Margin (in USD): |

*If you are 65 years old or above please complete "Additional High Risk Form"

# ⊕ One World Capital Group

ACCOUNT APPLICATION    (Page 3)

## *SECTION 3*   **BUSINESS ACCOUNTS**

### Business Contact Information (Business Accounts Only)

| Business Name: | | State/Country of Incorporation: | Type of Business: |
|---|---|---|---|
| Street Address (P.O. Box not acceptable) | | | |
| Mailing Address(if different): | | | |
| City: | State/Province: | Postal/Zip Code: | Country: |
| Tax ID # | Business EMAIL: | | Business Phone: |

### Financial Information (Business Accounts Only)

Annual Income of Business _____     Net Worth of Business_____

| Bank Name: | Bank Address: |
|---|---|
| Bank Phone # | Bank Contact Name: |

### Authorized Individuals to Act on Behalf of Business (Business Accounts Only)

| Name: | Position/Title: |
|---|---|
| Social Security Number (if US resident): | Passport/Driver's License Number (if non-US resident): |

| Name: | Position/Title: |
|---|---|
| Social Security Number (if US resident): | Passport/Driver's License Number (if non-US resident): |

### Miscellaneous Information (Business Accounts Only)

**Has this entity ever been registered with any of the following?**
Securities and Exchange Commission (SEC)          _____Yes _____No
Commodity Futures Trading Commission (CFTC)     _____Yes _____No
National Association of Securities Dealers (NASD)    _____Yes _____No
**If yes, provide ID numbers** _____

**Purpose of Trading Account** (one or both)          _____Speculation _____Hedging
   If "Hedging" please identify pertinent instruments _____

**What is the source of funds for this account?** _____

**Will Third Party Funds be used in this Account?**          _____Yes _____No
If Yes, please provide detailed explanation:

# One World Capital Group

ACCOUNT APPLICATION    (Page 4)

## SECTION 4

### MISCELLANEOUS INFORMATION (required for ALL accounts)

Is there currently or has there ever been any litigation, disputed accounts or other matters between commodity or securities brokers, exchanges, or federal, state or regulatory bodies and you?

_____YES _____ NO

If yes, Which one?_____ Please attach a summary description of the matter and its present status and/or disposition.

---

Will another entity or person trade the funds in this account? _____Yes _____No

*If Yes, You must include a Limited Power of Attorney Form with your Application*

If Yes, is this entity or person registered? _____YES _____NO

With which regulatory authority?_____ ID# _____

**NOTICE: Be advised that information pertaining to the firm, its principals, associated persons, and actions and complaints against the firm can be found by logging on to the NFA BASIC website at www.nfa.futures.org. It is recommended that you do this prior to opening an account and periodically, at least annually, thereafter.**

## SECTION 5

### CUSTOMER SIGNATURE (required for ALL accounts)

*By signing below, you acknowledge that you have read the entire Account Application, including all relevant Risk Disclosures, Trading Rules, Customer Agreements, and that you certify, represent, and warrant that the information you have provided is accurate and complete.*

_____        _____
Customer Signature                      Date

_____
Print Name

### Joint Account Holder or Second Officer Signature, if Corporation (if needed)

_____        _____
Customer Signature                      Date

_____
Print Name

### *Please note:* (All business Accounts)

*If the applicant is a corporation, it must submit a copy of the current year Board of Directors resolution authorizing the use of derivatives and the titles (or individuals) and periods they are authorized to commit the firm to the obligations and liabilities associated with the use of these markets.*

*If the applicant is an LLC, it must submit a copy of the Operating Agreement authorizing the use of derivatives markets and identifying the individuals authorized to commit the organization to the obligations and liabilities associated with such trading.*

# *One World Capital Group, LLC*

# Customer Brokerage Account Agreement

**This document is meant to be either downloaded or otherwise obtained from One World Capital Group, LLC, a New York State Limited Liability Company (hereinafter referred to as "OWCG") and read by the Client as signified by Client's signature. If after consideration of the terms and conditions contained herein, and other terms applicable to opening futures trading and foreign currency trading accounts with OWCG such as the Risk Disclosure Statement for OWCG ("Disclosure Statement") and OWCG's Trading Regulations ("Trading Regulations"), the Client will complete the required account documentation and sign and mail the enclosed agreement to OWCG. Nevertheless, notwithstanding the signed return of this Agreement, Client's use of OWCG's services will indicate unqualified acceptance of all of the terms of this Agreement. If this Agreement, OWCG's Trading Regulations or any information in the Disclosure Statement is unacceptable, do not open the account or utilize OWCG's services. Certain terms used in this Agreement are set forth in paragraph 33 below.**

In consideration of OWCG carrying one or more accounts for the undersigned ("Client") as its broker for the execution of orders for establishment, further maintenance, offset or delivery of transactions in futures contracts and options on futures contracts traded on a regulated exchange (hereinafter referred to in the collective as "Futures"), and spot foreign currency contracts (hereinafter referred to as, "FX"), Client hereby agrees that:

1.  **TRANSACTION AUTHORIZATION.** The Client herein constitutes and appoints OWCG to act as agent for Futures and/or counterparty for FX, as appropriate, for all transactions for the Client in accordance with this Agreement, the Disclosure Statement, the Trading Regulations and the Client's specific instructions, whether written or oral, concerning specific trades. OWCG is under no obligation to accept any order sought by the Client and reserves the right to refuse to accept any order at any time.

2.  **TRANSACTION STATUS.** Positions to purchase or sell Futures contracts and/or FX taken through the facilities of OWCG may remain open until the Client instructs OWCG to deliver or close out those positions. OWCG, may, at its sole discretion, for any reason or for no reason whatsoever close out, at the prevailing market price, any or all open Futures or FX positions, unless the Client has previous to that time elected physical delivery. OWCG intends to close out all Futures or FX positions not supported by the applicable margin amounts required by OWCG in accordance with this Agreement, although it is under no obligation to do so, and if it does not, the liability of the Client to OWCG remains as otherwise described herein. Such election by OWCG will be made at OWCG's sole discretion when it deems circumstances require a close out of Client's positions in either Futures or FX.

3.  **FUTURES TRANSACTION CHARACTERISTICS.** Any Futures trade executed through the facilities of OWCG is made for settlement to occur in strict accordance with the requirements of the contract exchange and/or regulator with authority over the instrument traded. The term "Round Turn" means the establishment and offset by a counterbalancing trade, contract expiration or delivery against the established position. Transaction costs are often, but not always, priced per Round Turn. When the Round Turn transaction is offset by delivery, such Round Turn costs will not necessarily constitute all transaction costs.

4.  **FX TRANSACTION CHARACTERISTICS.** The clearance of FX transactions executed through the facilities of OWCG is (are) to occur by 15:00 hours (3:00 p.m.) E.S.T. no later than two (2) U.S. business days from the date of the completed Round Turn trade. FX positions which are not subject to delivery instructions, and are properly margined, but which have not been closed out by the execution of an offsetting trade, by 15:00 hours (3:00 p.m.) E.S.T. will be rolled over into a sequential next day trade or at OWCG's sole discretion, closed out. Where trades are not settled by delivery, the trade will be settled either by payment to or withdrawal from Client's account in United States Dollars. Where delivery is instructed, the designated currency will be delivered to Client's designated depository. The term, "Round Turn" means the establishment and offset by a counterbalancing trade, expiration or delivery against the established position. Transaction costs are often, but not always, priced per Round Turn. When the Round Turn transaction is offset by delivery, such Round Turn costs will not necessarily constitute all transaction costs. OWCG will rarely charge a commission and, if a commission is charged, will not do so without explicit Client approval. OWCG will participate in the bid-offer spread (with rare exceptions) to derive its income from facilitating FX transactions. The term "Lot" shall mean either a trade of one-hundred thousand (100,000) United States Dollars versus some foreign currency or one hundred thousand (100,000) units of some foreign currency versus United States Dollars. The order of reference of United States Dollars being first in order is customary in foreign exchange. For non-United States Dollar transactions the trade "lot" shall mean the trade of one hundred thousand (100,000) of a non-United States based currency listed first in order for the equivalent of another foreign currency at the given exchange rate listed second in order. OWCG reserves the right to set further definitional requirements on United States Dollar and non-United States Dollar transactions for which it deems the market as being unique.

5. **DELIVERY.** Where a Client instructs delivery, notice of such intent must be made by 15:00 hours (3:00 p.m.) E.S.T. on the day prior to the day before the Value Date and must be appropriately noticed on the forms or on-line apparatus for such communication as required by OWCG and supported by monies on deposit with OWCG to fund the full transaction.

6. **CURRENCY FLUCTUATION RISK.** If Client directs OWCG to enter into any FX transactions: (a) any profit or loss arising as a result of a fluctuation in the exchange rate affecting such FX transactions will be entirely for Client's account and risk; and (b) all initial and subsequent deposits for margin purposes shall be made in United States Dollars, in such amounts as OWCG may in its sole discretion require.

7. **SECURITY AGREEMENT.** All monies, securities, negotiable instruments, foreign currencies, and/or other property on deposit with OWCG or its affiliates, in Client's account, for any purpose, including safekeeping, are hereby pledged with OWCG and shall be subject to a security interest in OWCG's favor for the discharge of all Client's obligations to OWCG, irrespective of the number of accounts Client has with OWCG. Client also grants OWCG the right to use the above described properties and any account credit to offset against any of Client's obligations to OWCG including, but not limited to, transfers for the purpose of margining, or for application to negative balance accounts not promptly paid, as well as delivery costs and charges. All customer funds on deposit with OWCG are further deposited in a registered bank organized and in good standing with the government authorities, agencies and regulators with jurisdiction over each such bank; within each such bank Client funds are placed in safekeeping in accounts organized for the holding of all customer funds together in aggregate and are not under any circumstances commingled with OWCG or other non-Client funds. Client funds are held in such accounts in aggregate according to the market in which they are intended, at the Client's direction, to be traded such that all Client funds to be used in the trading of Futures are held in a "Customer Segregated" account and Client funds to be used in the trading of FX shall similarly be placed in a "Customer Separated" account (n.b., the distinction between "Segregated" and "Separated"). OWCG at its own discretion will choose the bank or banks at which such funds are to be held and may as it deems fit place Client funds in non-U.S. banks as permitted by U.S. law and regulations.

8. **COMMUNICATION DELAYS, ERRORS AND INTERRUPTIONS.** OWCG will not be responsible for delays or interruptions in transmission of orders due to breakdown, excessive call volume or failure of transmission or communication equipment on the Internet or otherwise or facilities, including, but not limited to, computer software or hardware breakdowns, malfunctioning errors, any and all problems or glitches associated with a computer problem or any other technical cause or causes beyond OWCG's reasonable control.

9. **FUTURES MARGIN REQUIREMENTS.** OWCG's standard policy is to require of the customer pre-deposited margin funds equal to or greater than those margins set by the regulated futures exchange ("Exchange") upon which Futures positions are trading. OWCG reserves the right in its sole discretion to require pre-deposited margin amounts in excess of those required by the relevant Exchange as it sees fit given its perception of the market, the existence of a market exigency or client risk. Client agrees at all times relevant to this Agreement to maintain such margin in his/her/its account as OWCG may from time to time in its sole discretion require, and will meet all margin calls in the time required by OWCG, but nothing in this clause shall be taken to mean that OWCG is required by any term of this Agreement to provide any time to respond to a margin call, when in its sole discretion it deems it necessary to take immediate account action. Client acknowledges OWCG's right to limit the number and/or type of open positions that Client may hold, maintain, or acquire. Client agrees when requested, whether by telephone or other communication, to send via electronic transfer any monies required by OWCG, and to furnish OWCG with both the names of bank officers and information necessary for immediate verifications of such wires. Nothing herein, though, shall act to limit OWCG's right to close out any and all open positions in any Client account that may be subject to a margin call. Whether to close out any, all or none of the Futures positions in an under-margined account is in the sole discretion of OWCG. It is the Client's sole responsibility to maintain the proper margin as may from time to time be required by OWCG. Client acknowledges herein that the proper method for determining same is for Client to view margin requirements as posted on OWCG's website and to use the OWCG provided software to obtain access to Client's account information as maintained by OWCG in its financial server. NOTWITHSTANDING THE FOREGOING, OWCG IS NOT REQUIRED TO PROVIDE CLIENT WITH ANY TIME TO MEET MARGIN CALLS BUT WILL ATTEMPT TO AT LEAST PROVIDE A REASONABLE AMOUNT OF TIME TO DO SO. FOR THE PURPOSE OF THIS AGREEMENT, A REASONABLE AMOUNT OF TIME SHALL BE DEEMED TO BE ONE (1) HOUR.

10. **FX MARGIN REQUIREMENTS.** OWCG requires that one percent (1%) margin on the value of all of Client's FX positions be maintained at all times that such positions are open. Nevertheless, OWCG reserves the right in its sole discretion to vary the margin amounts required in excess of one percent (1%) as it sees fit given its perception of the market, the existence of a market exigency or client risk. Client agrees at all times relevant to this Agreement to maintain such margin in his/her/its account as OWCG may from time to time in its sole discretion require, and will meet all margin calls in the time required by OWCG, but nothing in this clause shall be taken to mean that OWCG is required by any term of this Agreement to provide any time to respond to a margin call, when in its sole discretion it deems it necessary to take immediate account action. Client acknowledges OWCG's right to limit the number and/or type of open positions that Client may hold, maintain, or acquire. Client agrees when requested, whether by telephone or other communication, to send via electronic transfer any monies required by OWCG, and to furnish OWCG with both the names of bank officers and information necessary for immediate verifications of such wires. Nothing herein, though, shall act to limit OWCG's right to close out any and all open positions in any Client account that may be subject to a margin call. Whether to close out any, all or none of the FX positions in an under-margined account is in the sole discretion of OWCG. It is the Client's sole responsibility to maintain the proper margin as may from time to time be required by OWCG. Client acknowledges herein that the proper method for determining same is for Client to view margin

requirements as posted on OWCG's website and to use the OWCG provided software to obtain access to Client's account information as maintained by OWCG in its financial server. NOTWITHSTANDING THE FOREGOING, OWCG IS NOT REQUIRED TO PROVIDE CLIENT WITH ANY TIME TO MEET MARGIN CALLS BUT WILL ATTEMPT TO AT LEAST PROVIDE A REASONABLE AMOUNT OF TIME TO DO SO. FOR THE PURPOSE OF THIS AGREEMENT, A REASONABLE AMOUNT OF TIME SHALL BE DEEMED TO BE ONE (1) HOUR.

11. **LIQUIDATION OF FX POSITIONS.** CLIENT FURTHER AGREES THAT, NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT A FX ACCOUNT HAS TWENTY FIVE PERCENT (25%) OF THE NECESSARY EQUITY TO MEET FX MARGIN REQUIREMENTS OR LESS, OR, IN THE SOLE DISCRETION OF OWCG THE ACCOUNT IS IN JEOPARDY OF APPROACHING A TWENTY FIVE PERCENT (25%) OR A LESSER SUM OR NEGATIVE MAINTENANCE MARGIN ACCOUNT BALANCE, OR HAS INSTRUCTED DELIVERY BUT HAS INSUFFICIENT FUNDS ON ACCOUNT WITH OWCG TO ACCOMPLISH SAME OR IS IN ANY OTHER MANNER BECOMING DEFICIENT AT ANY TIME, OR IN THE EVENT THAT OWCG IS UNABLE TO NOTICE CLIENT DUE TO UNFORESEEABLE BREAKDOWN IN ELECTRONIC COMMUNICATIONS, OWCG SHALL HAVE THE RIGHT TO LIQUIDATE ALL OR ANY PART OF CLIENT'S POSITIONS AT THE MARKET PRICE THEN TRADING, WITHOUT PRIOR NOTICE TO THE CLIENT WITHOUT LIABILITY ACCRUING TO OWCG FOR SUCH PROTECTIVE ACTIONS. Further, whenever OWCG deems it necessary or advisable for OWCG's protection, OWCG is authorized, at its sole discretion and without prior notice to Client, to offset any positions in the account and to sell any collateral deposited with OWCG or its affiliates. If not sooner, OWCG may assess each account having open positions and take the action it deems appropriate and authorized in this Agreement, at 15:00 hours (3:00 p.m.) E.S.T. each trading day. Alternatively, and at OWCG's sole discretion, it may elect to impose on a disclosed or undisclosed basis limitations on the maximum number of contracts and/or transactions in aggregate or by specific transaction type, which may be open on the account at any time.

12. **FX NETTING.** All transactions entered into between the Client and OWCG are subject to netting as described in this paragraph. Where an FX transaction is entered into in the same currency for the same Value Date as a pre-existing FX transaction between the Client and OWCG, then immediately upon entering into such FX transaction, each such transaction shall automatically and without further action be individually canceled and simultaneously replaced by a new FX transaction for such Value Date per the following guidelines: the amounts of such foreign currency that would otherwise have been deliverable by the Client and OWCG on such Value Date shall be aggregated and the counterparty with the larger aggregate amount shall have a new obligation to deliver to the other counterparty the amount of such foreign currency by which its aggregate amount exceeds the other counterparty's aggregate amount, provided that if the aggregate amounts are equal, no new delivery obligation arises. Further, if on any Value Date more than one delivery of a particular foreign currency is to be made between the Client and OWCG, then each shall aggregate the amounts of such foreign currency deliverable by it and only the difference between these aggregate amounts shall be delivered by the Client or OWCG, whichever owes the larger aggregate amount, and if the aggregate amounts are equal no delivery of foreign currency shall be made. The provisions of this section shall not apply if a close out of the relevant positions or one of the actions described in the Liquidation section of this Agreement has occurred. Positions will be matched on a first-in, first-out basis.

13. **ACCOUNT STATEMENTS AND ORDER CONFIRMATIONS.** Reports of the execution of orders, statements of account, margin obligations and any other account information and notices shall be deemed to have been provided to the Client once the Client has received from OWCG electronically delivered statements, reports and other related account information; additionally OWCG may provide software to the Client that will similarly enable the Client to access account information at Client's convenience. Client shall be deemed to have accepted and ratified the reported trades and financial information provided by OWCG, to the Client, unless Client notifies OWCG otherwise, not more that forty-eight (48) hours after receipt by Client of such information from OWCG. Receipt shall be deemed to have occurred when such information becomes electronically available, or when the Client should have known pursuant to the normal and customary practices of Exchanges and other derivatives markets, whichever is sooner. FAILURE TO SO NOTIFY OWCG SHALL BE DEEMED RATIFICATION OF ALL ACTIONS TAKEN BY OWCG OR OWCG'S AGENT(S). Client agrees that in the event of a discrepancy in the status of Client's account, Client will take reasonable measures to rectify such discrepancies, including, but not limited to, buying or selling FX at the best available price within a reasonable time from the discovery of such discrepancy. In the event that a discrepancy is due solely to OWCG's error, OWCG agrees to credit Client's account for the discrepancy; provided, however, that Client has taken reasonable measures to correct such discrepancy as set forth above. OWCG shall not be responsible for any amount unrealized or any loss to Client's account due to Client's failure to take reasonable measures to correct any account discrepancy. Client further agrees to contact OWCG by Internet access to his/her/its account to verify the account status within twenty four (24) hours after placing any order to confirm that the order(s) was/were placed and was/were placed properly. Client agrees that his/her/its failure to contact OWCG as provided above shall relieve OWCG of any responsibility arising from the lack of execution or proper execution of such order(s). Client further acknowledges that all orders shall be good only for the day such orders are placed, unless specified by the Client to be open orders or unless OWCG, in its sole discretion, determines otherwise, given account and market occurrences.

14. **CHARGES PAYABLE BY CLIENT.** OWCG reserves the right in its sole discretion to change its commission or fee policy with thirty (30) days notice to the Client. Notwithstanding the foregoing, Client shall pay such charges as OWCG may from time to time charge fees, including, without limitation, commissions (subject to the thirty [30] day rule), account set-up and maintenance fees, markups and markdowns, statement charges, idle account charges, order cancellation charges, account transfer charges, and fees arising out of OWCG's providing services hereunder, or incidental hereto. OWCG may change its fees, but not commissions, without notice. All such fees shall be paid by Client as they are incurred, or as OWCG in its sole

Customer Brokerage Agreement - Futures and Foreign Exchange *continued*

and absolute discretion, may determine, and Client hereby authorizes OWCG to withdraw the amount of any such fees from Client's account(s). All prices quoted to Client by OWCG are inclusive of markups and markdowns, if applicable (i.e., "FX").

15.  **CAPACITY.** Client represents and warrants to OWCG that he/she is of legal age and under no legal incapacity and as to he/she/it, that no one except the Client has an interest in Client's account or accounts with OWCG except those persons indicated to OWCG in this Agreement. If the Client is a business entity it asserts herein that it has been duly authorized to enter into this Agreement. The Client represents and warrants that he/she/it is not: (a) an employee of any of the following: an Exchange, a corporation in which any Exchange owns a majority of the capital stock, a member of any Exchange, a firm registered on any Exchange, a Futures Commission Merchant, a Broker/Dealer, an agent for any regulatory authority, a bank or savings institution; and (b) any way restricted from trading FX contracts by virtue of employment or otherwise. If any of the foregoing becomes inaccurate, Client must promptly notify OWCG.

16.  **RISK ACKNOWLEDGMENT.** Client represents and warrants that he/she/it has read the Disclosure Statement for OWCG in addition to this Client Agreement and that Client understands the risks involved in trading in foreign currency interests. Further, Client acknowledges that it is at the Client's risk and account that OWCG will buy and sell FX for the Client.

17.  **BANKRUPTCY NOTICE.** The transactions you are entering into with OWCG, including, but not limited to, FX transactions, are not traded on an exchange. Therefore under the U.S. Bankruptcy Code, your funds may not receive the same protections as funds used to margin or guarantee futures contracts and options on futures contracts traded on an Exchange, which receive a priority in bankruptcy. Since that same priority has not been given to funds used for off-exchange FX trading, if OWCG becomes insolvent and you have a claim for amounts deposited or profits earned on FX transactions with OWCG, your claim may not receive priority. Without a priority, you are a general creditor and your claim will be paid, along with the claims of other general creditors, from any monies still available after priority claims are paid. Even customer funds that OWCG keeps separated from its own operating funds may not be safe from the claims of other general and priority creditors.

18.  **INFORMATION, THIRD PARTY TRADING PROGRAMS AND TRADING RECOMMENDATIONS.** Client acknowledges that OWCG does not provide market trade recommendations but if any communication provided by OWCG may be interpreted as such, (i) any market trade recommendations and information communicated to Client by OWCG do not constitute an offer to sell or the solicitation of an offer to buy any commodity; (ii) such recommendation and information, although based upon information obtained from sources believed by OWCG to be reliable, may be based solely on OWCG's opinion and such information may be incomplete and may be unverified: and (iii) OWCG makes no representation, warranty or guarantee as to, and shall not be responsible for, the accuracy or completeness of any information or trading recommendation furnished to Client. Client acknowledges that OWCG and/or its officers, directors, affiliates, employees, stockholders or representatives may have a position in or may intend to buy or sell foreign currencies, which are the subject of market recommendations furnished to Client, and that the market position of OWCG or any such officer, director, affiliate, employee, stockholder or representative may not be consistent with the recommendations furnished to Client by OWCG. Client also acknowledges that OWCG makes no representations concerning the tax implications or treatment of FX transactions. Client further acknowledges that should Client grant trading authority or control over Client's account to a third party ("Trading Agent") or should client employ third party reports or software which in some manner assists Client trading of FX, including, but not limited to, specific or general trade recommendations, OWCG shall in no way be responsible for reviewing Client's choice of such Trading Agent or third party reporter or software trading advisor nor make any recommendations with respect thereto. Client understands that OWCG makes no warranties nor representations concerning the Trading Agent or third party reporter or software trading advisors, that OWCG shall not be responsible for any loss to Client occasioned by the actions of the Trading Agent or third party reporter or software trading advisor and that OWCG does not, by implication or otherwise, endorse or approve of the operating methods of the Trading Agent or third party reporter or software trading advisor. If Client gives Trading Agent authority to exercise any of its rights over Client's account(s), Client understands that Client does so at Client's own risk.

19.  **FX THIRD PARTY COUNTERPARTIES AND INDEPENDENT AGENTS.** Client acknowledges and accepts that OWCG or an affiliate of OWCG in the usual trade circumstances will be the counterparty to Client's FX transactions or may place same with a third party counterparty. Client further acknowledges that OWCG's performance hereunder, where it does not act as principal, may result from activities of other counterparties in the foreign currency markets. Client agrees to waive any claims against, and to indemnify, defend, and hold harmless, OWCG for any activities of such counterparties and/or independent agents, and their employees.

20.  **JURISDICTION AND VENUE.** CLIENT AGREES THAT ANY CONTROVERSY BETWEEN OWCG AND CLIENT ARISING OUT OF THIS AGREEMENT, REGARDLESS OF THE MANNER OF RESOLUTION, SHALL BE RESOLVED BY A TRIBUNAL LOCATED IN CHICAGO, ILLINOIS. Client agrees to pay all expenses, including attorney's fees, incurred by OWCG: (a) to defend any unsuccessful claim Client brings against OWCG; or (b) to collect any debit balances in Client account(s). No legal or administrative action may be commenced by either party hereto arising out of this contract more than two (2) years after any claim arises. Client hereby expressly acknowledges that Illinois law shall be the governing law concerning the trading in foreign currencies. Client hereby submits and consents to jurisdiction in the Courts of the State of Illinois and shall be amenable to service of summons and other legal process pursuant to such a suit if brought by OWCG by mailing to the Client's last known address proper notice of such third party dispute resolutions. Client also acknowledges that OWCG, at its sole discretion, may refer any disputed matter to arbitration before the American Arbitration Association.

Customer Brokerage Agreement – Futures and Foreign Exchange *continued*

21. **CLIENT DOCUMENTS.** Client warrants and represents that the information provided herein, or attached hereto, or associated herewith is complete and correct and that Client will promptly notify OWCG of any material changes to the information provided by Client. OWCG is authorized to contact such references as it deems appropriate to verify the information supplied by Client in its Account Application.

22. **DISCLOSURE FOR CLIENTS INTRODUCED BY THIRD PARTIES.** Client understands and agrees that OWCG does not control, and cannot endorse or vouch for the accuracy or completeness of any information or advice Client may have received or may receive in the future from any third party that refers Client to OWCG ("Referring Party") or from any other person not employed by OWCG regarding Futures or FX trading or the risks involved in such trading.

**OWCG provides risk disclosure information to all new Clients when they open accounts. Client should read that information carefully, and should not rely on any information to the contrary from any other source.**

Client acknowledges that no promises have been made by OWCG or any individual associated with OWCG regarding future profits or losses in Client's account. Client understands that Futures and FX trading is very risky, and that many people lose money trading. If Referring Party or any other third party provides Client with information or advice regarding Futures or FX trading, OWCG shall in no way be responsible for any loss to Client resulting from Client's use of such information or advice.

To the extent Client has previously been led to believe or believes that utilizing any third party trading system, course, program, research or recommendations provided by Referring Party or any other third party will result in trading profits, Client hereby acknowledges, agrees and understands that all Futures and FX trading, including trading done pursuant to a system, course, program, research or recommendations of Referring Party or another third party involves a substantial risk of loss. In addition, Client hereby acknowledges, agrees and understands that the use of a trading system, course, program, research or recommendations of Referring Party or another third party will not necessarily result in profits, avoid losses or limit losses.

Client understands that Referring Party and many third party vendors of trading systems, courses, programs, research or recommendations are not regulated by a government agency.

**Because the risk factor is high in Futures and FX transactions trading, only genuine "risk" funds should be used in such trading. If Client does not have extra capital the Client can afford to lose, Client should not trade in the foreign currency markets.**

Client understands and acknowledges that OWCG may compensate Referring Party for introducing Client to OWCG and that such compensation may be on a per-trade basis or other basis. Further, the Client has a right to be informed of the precise nature of such remuneration. Client understands and agrees that if Client's account with OWCG is introduced by a Referring Party, then such Referring Party shall have the right to access Client's OWCG account but shall not have the right to enter into any trades on Client's OWCG account unless authorized by Client under a power of attorney between Client and Referring Party granting such Referring Party the right to trade on Client's account.

23. **DISCLOSURE OF FINANCIAL INFORMATION.** Client warrants and represents that the financial information disclosed in the Account Application is a true and accurate statement of Client's current financial conditions. Further, Client warrants and represents that in estimating his/her/its net worth, Client included the amount of cash and/or cash equivalents, securities, real estate owned, the value of life insurance policies, and other valuable assets owned, and that Client accounted for all outstanding debts, including, but not limited to, notes, secured and unsecured, that are payable to banks and other entities or individuals, liens against property, both real and personal, and all other personal or business debts, but that said sum does not include the value of Client's primary residence. OWCG is authorized to contact such references as it deems appropriate to verify the information supplied by Customer in its Account Application.

24. **NOTIFICATION OF RECORDING.** Client recognizes that both parties are afforded protection by the recording of telephone conversations, and Client authorizes and consents to the recording of its conversations with OWCG, and Client agrees to the use of such recordings as evidence in any disputes between OWCG and Client, subject to proper authentication. This paragraph authorizes both parties to record, but does not require either party to do so. Client acknowledges that any recording that may be made by OWCG, pursuant to this paragraph, will be available for two (2) weeks after the date said recording is originally made.

25. **JOINT ACCOUNT OWNERS.** If this account is held by more than one (1) person, all of the joint holders agree to be jointly and severally liable for the obligations assumed in this Agreement. If this account is held in trust, joint ownership, or partnership, the undersigned hereby agrees to indemnify, defend and hold harmless OWCG for any losses resulting from breach of any fiduciary duty of the undersigned to the other holders of this account. Further, any one or more of the joint owners shall have full authority for the account, and in the name of said group, through Client as broker, to buy, sell, and trade in FX, to deposit with and withdraw currencies, securities, negotiable instruments, and other property, including withdrawals to or for the individual use or account of the party directing the sale or of any other party, to acquiesce in the correctness of notices, confirmations, requests, demands and all other forms of communications, and to settle, compromise, adjust, and give releases with respect to any and all claims, demands, disputes, and controversies. Upon death or legal incapacity of any of the undersigned, OWCG is authorized to take such action in regard to our account, as OWCG may deem advisable to protect itself

Customer Brokerage Agreement - Futures and Foreign Exchange *continued*

against any liability, penalty or loss. We agree to notify OWCG immediately upon the death or legal incapacity of any joint owner. If this account is held by tenants in common, then in the event that the account is closed or of the death or legal incapacity of any of said tenants, the account shall be divided in equal shares unless OWCG is otherwise notified, in writing, signed by all joint owners, of the amounts to be distributed to the individual joint owner. If account is held by the parties as joint tenants with right of survivorship then, upon receipt of a certified document evidencing death or legal incapacity of one of the parties and other documents which may be required in connection with such death or legal incapacity, the remaining party or parties shall continue this account in their or his/her name as sole or joint owners with all the terms and conditions of said account continuing in full force and effect. The authority herein granted is in addition to any other authority given to OWCG by any or all of the undersigned and is a continuing one and shall remain in full force and effect until OWCG shall receive at its offices written notice of revocation or modification hereof. OWCG may terminate this Agreement by written notice to any of the above parties at their given addresses.

26. **BINDING EFFECT.** This Agreement shall be binding upon Client, its principals, officers, agents and successors in interest, and shall inure to the benefit of OWCG and its successors, by merger, assignment, consolidation or otherwise.

27. **ASSIGNMENT.** Any rights that Client may have pursuant to this Agreement shall not be assigned, transferred, sold, or otherwise conveyed. OWCG may, however, assign this Agreement to another foreign currency broker. OWCG, in its sole discretion, in the event that Client is dissolved, in receivership, or subject to an action in bankruptcy, may close Client's account. In the event of any of the foregoing, OWCG is hereby authorized to close Client's account and proceed as it deems appropriate without prior notice to Client, his/her/its administrators, or conservators.

28. **SEVERABILITY.** If any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidation of the remaining provisions of this Agreement.

29. **ACCEPTANCE.** This Agreement becomes effective only upon acceptance by OWCG, which may be manifested by the signature on the executed Agreement received from Client by an authorized employee at OWCG's executive and administrative office in Illinois, or alternatively, by the on-line completion by Client of the process that OWCG may require for account opening, followed by funding of the Client's account and OWCG's execution or attempt to execute a trade for the Client (when Client completes the process on-line, OWCG shall be deemed to accept the Client upon acceptance of the Client's first trade or trade attempt). This Agreement, along with the Trading Regulations and Disclosure Statement are the entire Agreement between OWCG and Client and no provision hereof shall in any respect be waived or modified unless in writing and signed by OWCG.

30. **HEADINGS.** The paragraph headings in this Agreement are inserted for convenience of reference only and are not intended to limit the applicability or affect the meaning of its provisions.

31. **TERMINATION.** This Agreement shall continue in effect until termination, and may be terminated by Client at any time when Client has no open Futures or FX transactions and no liabilities held by or owed to OWCG and upon the actual receipt by OWCG at its home office of written notice of termination, or at any time whatsoever by OWCG. Any transactions previously entered into before the OWCG termination shall remain the obligation of the Client and shall not relieve either party of any obligations set out in this Agreement nor shall it relieve Client of any obligations arising out of any deficit balance.

32. **INDEMNIFICATION.** Client agrees to indemnify and hold OWCG, its affiliates, officers, employees, agents, successors and assigns harmless from and against any and all liabilities, losses, damages, costs and expenses, including attorney's fees, incurred by OWCG arising out of Client's failure to fully and timely perform Client's obligations herein or should any of Client's representations and warranties fail to be true and correct. Client also agrees to pay promptly to OWCG all damages, costs and expenses, including reasonable attorney's fees and expenses, incurred by OWCG in the enforcement of any of the provisions of this Agreement and any other Agreements between OWCG and Client.

33. **TERMS.** The term "OWCG" shall be deemed to include OWCG, its divisions, its successors and assigns; the term "spot foreign currency contract" shall mean a contract in foreign currency where the Value Date is two business days (or one business day where the spot foreign currency contract involves the United States Dollar or the Canadian Dollar) following the trade date, or such later date as may be customary or necessary in respect of any currency unit (subject to and consistent with the rollover provisions set forth in this Agreement), and shall include currency pair and cross currency pair transactions, if applicable; the term "Value Date" shall mean, with respect to any spot contract, the applicable settlement date specified in the confirmation that relates to the particular spot contract (but which must be a business day in each country in which a subject currency of a transaction is the lawful currency); the term "executive and administrative office" is deemed to be 525 Chestnut Street, Second Floor, Winnetka , IL 60093; the term "Client" shall mean the party (or parties) executing the Agreement; and the term "Agreement" shall include all Agreements and authorizations executed by Client in connection with the maintenance of Client's account regardless of when executed.

34. **REFERRING PARTY AUTHORITY ACCESS AND LIMITATIONS.** Client understands and agrees that if Client's account with OWCG is introduced by Referring Party that Referring Party shall have the right to access Client's OWCG account, but the Referring Party shall not have the right to enter into any trades on Client's OWCG account unless authorized by Client under a power of attorney between Client and Referring Party granting such Referring Party the right to trade on Client's account.

Customer Brokerage Agreement – Futures and Foreign Exchange *continued*

CLIENT AGREES THAT BY INITIALING THIS PARAGRAPH CLIENT CONSENTS TO REFERRING PARTY'S ACCESS TO HIS ACCOUNT AS DESCRIBED IN THIS PARAGRAPH.

_____    _____
Initials        Initials (multiple signatories)

AGREED TO:

For Client/Entity: _____

Signature: _____

Print Name and Title: _____

Date: _____

(IF MULTIPLE SIGNATORIES)

Signature: _____

Print Name and Title: _____

Date: _____

For One World Capital Group, LLC

Signature: _____

Print Name & Title _____

Date _____
Revsd. 15Dec2006

# RISK DISCLOSURE FOR FUTURES AND OPTIONS

**This statement is Required to be Furnished to You in Accordance with Rule 1.55, Rule 30.6, and Rule 33.7 of The Commodity Exchange Act. This brief statement does not disclose all of the risks and other significant aspects of trading in futures and options. In light of the risks, you should undertake such transactions only if you understand the nature of the contracts (and contractual relationships) into which you are entering and the extent of your exposure to risk. Trading in futures and options is not suitable for many members of the public. You should carefully consider whether trading is appropriate for you in light of your experience, objectives, financial resources and other relevant circumstances.**

## FUTURES

### 1. EFFECT OF 'LEVERAGE' OR 'GEARING'

Transactions in futures carry a high degree of risk. The amount of initial margin is small relative to the value of the futures contracts so that transactions are 'leveraged' or 'geared'. A relatively small market movement will have a proportionately larger impact on the funds you have deposited or will have to deposit; this may work against you as well as for you. You may sustain a total loss of initial margin funds and any additional funds deposited with the firm to maintain your position. If the market moves against your position or margin levels are increased, you may be called upon to pay substantial additional funds on short notice to maintain your position. If you fail to comply with a request for additional funds within the time prescribed, your position may be liquidated at a loss and you will be liable for any resulting deficit.

### 2. RISK-REDUCING ORDERS OR STRATEGIES

The placing of certain orders (e.g. 'stop-loss' orders, where permitted under local law, or 'stop-limit' orders) which are intended to limit losses to certain amounts may not be effective because market conditions may make it impossible to execute such orders. Strategies using combinations of position, such as 'spread' and 'straddle' positions may be as risky as taking simple 'long' or 'short' positions.

## OPTIONS

### 3. VARIABLE DEGREE OF RISK

Transactions in options carry a high degree of risk. Purchasers and sellers of options should familiarize themselves with the type of option (i.e. put or call) which they contemplate trading and the associated risks. You should calculate the extent to which the value of the options must increase for your position to become profitable, taking into account the premium and all transactions costs.

The purchaser of options may offset or exercise the options or allow the options to expire. The exercise of an option results either in a cash settlement or in the purchaser acquiring or delivering the underlying interest. If the option is on a future, the purchaser will acquire a futures position with associated liabilities for margin (see the section on Futures above). If the purchased options expire worthless, you will suffer a total loss of your investment which will consist of the option premium plus transaction costs. If you are contemplating purchasing deep-out-of-the-money options, you should be aware that the chance of such options becoming profitable ordinarily is remote. Selling ('writing' or 'granting') an option generally entails considerably greater risk than purchasing options. Although the premium received by the seller is fixed, the seller may sustain a loss well in excess of that amount. The seller will be liable for additional margin to maintain the position if the market moves unfavorably. The seller will also be exposed to the risk of the purchaser exercising the option and the seller will be obligated to either settle the option in cash or to acquire or deliver the underlying interest. If the option is on a future the seller will acquire a position in the future with associated liabilities for margin (see the section on Futures above). If the position is 'covered' by the seller holding a corresponding position in the underlying interest or future or another option, the risk may be reduced. If the option is not covered, the risk of loss can be unlimited.

Certain exchanges in some jurisdictions permit deferred payment of the option premium, exposing the purchaser to liability for margin payments not exceeding the amount of the premium. The purchaser is still subject to the risk of losing the premium and transaction costs. When the option is exercised or expires, the purchaser is responsible for any unpaid premium outstanding at that time.

## ADDITIONAL RISKS COMMON TO FUTURES AND OPTIONS

### 4. TERMS AND CONDITIONS OF CONTRACT

You should ask the firm with which you deal about the term and conditions of the specific futures or options which you are trading and associated obligations (e.g. the circumstances under which you may become obligated to make or take delivery of the underlying interest of a futures contract and, in respect of options, expirations dates and restrictions on the time for exercise). Under certain circumstance the specifications of outstanding contracts (including the exercise price of an option) may be modified by the exchange or clearinghouse to reflect the changes in the underlying interest.

### 5. SUSPENSION OR RESTRICTION OF TRADING AND PRICE RELATIONSHIPS

Market conditions (e.g. illiquidity) and/or the operation of the rules of certain markets (e.g. the suspension of trading in any contract or contract month because of price limits or 'circuit breakers') may increase the risk of loss by making it difficult or impossible to effect transactions or liquidate/off-set positions. If you have sold options, this may increase the risk of loss.

Further, normal pricing relationships between the underlying interest and the future, and the underlying interest and the option may not exist. This can occur when, for example, the futures contract underlying the options is subject to price limits while the option is not. The absence of an underlying reference price may make it difficult to judge 'fair' value.

### 6. DEPOSITED CASH AND PROPERTY

You should familiarize yourself with the protections accorded money or other property you deposit for domestic and foreign transactions, particularly in the event of a firm insolvency or bankruptcy. The extent to which you may recover your money or property may be governed by specified legislation or local rules. In some jurisdictions, property which had been specifically identifiable as your own will be prorated in the same manner as cash for purposes of distribution in the event of a shortfall.

### 7. COMMISSION AND OTHER CHARGES

Before you begin to trade, you should obtain a clear explanation of all commission, fees and other charges for which you will be liable. These charges will affect your net profit (if any) or increase your loss.

OWCG-751-03-00026

**8. TRANSACTIONS IN OTHER JURISDICTIONS**

Transactions on markets in other jurisdictions, including markets formally linked to a domestic market, may expose you to additional risk. Such markets may be subject to regulation which may offer different or diminished investor protection. Before you trade should enquire about any rules relevant to your particular transactions. Your local regulatory authority will be unable to compel the enforcement of the rules of regulatory authorities or markets in other jurisdictions where your transactions have been effected. You should ask the firm which you deal for details about the types of redress available in both your home jurisdiction and other relevant jurisdictions before you start to trade.

**9. CURRENCY RISKS**

The profit or loss in transactions in foreign currency-denominated contracts (whether they are traded in your own or another jurisdiction) will be affected by fluctuations in currency rates where there is a need to convert from the currency denomination of the contract to another currency.

**10. TRADING FACILITIES**

Most open-outcry and electronic trading facilities are supported by computer based component systems for order-routing, execution, matching, registration or clearing of trades. As with all facilities and systems, they are vulnerable to temporary disruption or failure. Your ability to recover certain losses may be subject to limits on liability imposed by the system provider, the market, the clearing house and/or member firms. Such limits may vary; you should ask the firm with which you deal for details in this respect.

**11. ELECTRONIC TRADING**

Trading on an electronic trading system may differ not only from trading in an open-outcry market but also from trading on other electronic trading systems. If you undertake transactions on an electronic trading system, you will be exposed to risk associated with the system including the failure of hardware and software. The result of any system failure may be that your order is either not executed according to your instructions or is not executed at all.

**12. OFF-EXCHANGE TRANSACTIONS**

In some jurisdictions, and only then in restricted circumstances, firms are permitted to effect off-exchange transactions. The firm with which you deal may be acting as your counterparty to the transactions. It may be difficult or impossible to liquidate an existing position, to assess the value, to determine a fair price or to assess the exposure to risk. Off-exchange transactions may be less regulated or subject to a separate regulatory regime. Before you undertake such transactions, you should familiarize yourself with applicable rules and attendant risks.

---

## RISK DISCLOSURE ACKNOWLEDGEMENT

**I, the undersigned Customer, received a copy of this Risk Disclosure Statement and I read and understand it. I, also, acknowledge that if I intent to trade options on futures, I read and understand the Options Disclosure Statement and if I intent to trade security futures contracts, I read and understand the Risk Disclosure Statement for Security Futures Contracts and Electronic Trading and Pre-Negotiated Business Disclosure contained on pages ?-? of this account booklet.**

**X**

**Customer Signature**

**Print Name**            **Date**

**X**

**Customer Signature**

**Print Name**            **Date**

(Attach a copy of this page for additional signatures.)

# ONE WORLD CAPITAL GROUP, LLC

READ THIS ENTIRE AGREEMENT BEFORE SIGNING. A signed copy must be returned to One World Capital Group, LLC and one copy should be kept by the customers. This Agreement is for a Non-Discretionary account unless additional documents are signed, submitted and approved by One World Capital Group, LLC, a Futures Commission Merchant ("FCM"). This is an agreement for One World Capital Group, LLC to act as FCM for the Undersigned in the purchase and sale of commodities futures contracts, commodity option contracts, cash commodities forward contracts, spot and foreign exchange transactions, EFP's, foreign currency-denominated financial instruments, and all other transactions related thereto (hereinafter "Commodity Interests"). This agreement shall be continuous and shall cover, individually and collectively, all accounts of Customer at any time opened and/or accounts from time to time closed and then reopened with FCM, irrespective of any change or changes at any time in the personnel of FCM or its successors, assigns, or affiliates, for any cause whatsoever; shall inure to the benefit of FCM and its successors and assigns, whether by merger, consolidation or otherwise; and shall be binding upon Customer and the estate, executors, administrators, legal representatives, successors and assigns of Customer. Customer hereby ratifies all transactions with FCM effected prior to the date of this agreement, and agrees that the rights and obligations of Customer in respect thereto shall be governed by the terms of this agreement, which supersedes all other customer agreements between FCM and Customers. The Undersigned agrees as follows:

1. *Agency*. Customer authorized FCM to purchase and sell Commodity Interests for Customer's account in accordance with Customers' oral or written instructions, or from a third party in the case of "managed or discretionary" accounts, as given to FCM by Customer's Introducing Broker ("IB") or Associated Person ("AP"). Customer authorizes FCM, for the accounts of Customer to make such advances and expend such monies and, whenever possible to borrow and deliver such monies or securities or properties as may be required with respect to such transactions. FCM shall be under no duty or obligation to inquire into the purpose or propriety of any instruction given by any Customer in the case of a joint account and shall be under no obligation to oversee the application of any funds delivered to any Customer or third party in accordance with customers' instructions. All orders to buy or sell Commodity Interests must be complete and contain the following information: (a) Whether such order is a buy or sell order; (b) Customer's Identity and account number; (c) Commodity Interest; (d) Quantity; (e) Price, if applicable; (f) Contract delivery month; (g) Any special instructions.

2. *Risk-reducing orders or strategies*  The placing of certain orders (e.g. 'stop-loss' orders, where permitted under local law, or "stop-limit" orders) which are intended to limit losses to certain amounts may not be effective because market conditions may make it impossible to execute such orders. Strategies using combinations of positions, such as 'spread' and 'straddle' positions may be risky as taking simple long' or 'short' positions.

3. *Margins* Customer shall deposit with FCM sufficient funds to meet the applicable initial and maintenance margin requirements. FCM may reject any order if Customer does not have sufficient margin on deposit and may delay the processing of any order while determining the correct margin status of Customer's account Customer shall, without notice or demand maintain adequate margins at all times so as to continuously meet the margin requirements established by FCM. FCM may establish margin requirements and from time to time, change such margin requirements in its sole and absolute discretion and said requirements may exceed the margin requirements set by any commodity exchange or other regulatory authority. Customer agrees, when requested by FCM, to immediately wire transfer funds to adequately maintain margins and to furnish FCM with the names of bank officers for Immediate confirmation of such transfers. Choosing not to demand WIre transfer of funds or the acceptance of funds by marl shall not constitute a waiver of the right of FCM to demand wire transfer of funds at any time. If at any time Customer's account does not contain the amount of margin required, FCM may, in its sole and absolute discretion, without notice or demand to Customer, close out Customer's open position(s) in whole or in part or take any other action it deems necessary to satisfy such margin requirements. Failure of FCM to close out open position(s) in whole or in part in such circumstances shall not constitute a waiver of its rights to do so at any time thereafter, nor shall FCM be subject to any liability to Customer for its acts or its failure to so act FCM shall not be liable to Customer for the loss of any margin deposits which is the direct or indirect result of the bankruptcy insolvency, liquidation, receivership, custodianship, or assignment for the benefit of any bank, other clearing broker, exchange, clearing organization, or similar entity. Notwithstanding the above, FCM may, in its discretion, refuse to accept an order From the Customer.

4. *Treatment of Funds* Customer opens at least two accounts (2) on the books of the FCM. One designated Regulated where all transactions designated as regulated by the Commodity Futures Trading Commission ("CFTC") will be carried, and the other designated Non-regulated where deliveries and/or transactions on foreign exchanges, if any, will be carried. FCM is hereby authorized to transfer funds as it deems necessary between these accounts. Further, if the Customer has more than one Regulated and/or Non-regulated account or has a joint account, from time to time, FCM, in its sole discretion and without prior notice to Customer, may apply or transfer (including segregated funds or other property) interchangeably between any of the Customer accounts at FCM or an affiliate of FCM as may be necessary for margin or to satisfy or reduce any deficit or debit balance in any Customer account

5. *Indemnification*. Customer agrees to indemnify and hold FCM harmless from and against any and all liabilities, losses, damages, costs and expenses, including accountants' and attorneys' fees, incurred directly or indirectly, by FCM because the Customer's representations and warranties shall not be true and correct in any material respect or the agreements made herein by Customer shall not be fully and timely performed, from any action or omission by Customer with respect to the account(s), including but not limited to, any debit and deficit balances which may occur in Customer's account, interest on any debit and deficit balances calculated from the date hereof at a fluctuating rate per annum equal to the sum of one percent plus the rate of interest then most

# ONE WORLD CAPITAL GROUP, LLC

recently published in *The Wall Street Journal* as the prime rate, taxes that FCM may be required to pay on any commodity interest or other property held in the accounts of the Customer or fine or penalty that FCM may be required to pay because Customer caused FCM to violate any statute, regulation or rule of any exchange or regulatory body. Customer also agrees to pay promptly to FCM all damages, costs and expenses, including attorneys' fees, incurred by FCM in the endorsement of any of the provisions of this agreement

6. *Acknowledgement of Risk* Customer acknowledges that Commodity Interests trading is a highly speculative activity involving highly leveraged and rapidly fluctuating markets and may result in significant losses, which losses may substantially exceed Customer's margin deposits. Despite such risks, Customer is willing and able to assume the financial risks and other hazards of Commodity Interests trading and agrees that Customer will in no manner hold FCM responsible for losses incurred through following IB's or FCM's trading recommendations or suggestions and expressly hereby waives any claims therefore. FCM is not responsible for delays in transmission, delivery or execution of Customer's orders due to malfunctions of communication facilities or other causes. Customer has read and understands the Risk Disclosure Statement

7. *Commission Fee* Customer agrees to pay to FCM commission charges in effect from time to time and any other costs to FCM occasioned by carrying the account of Customer. Customer agrees that FCM may debit Customer's account for customary brokerage and commission charges and for charges for any other services rendered by FCM, including all payments made on behalf of Customer, which charges may vary from time to time, without notice to Customer. Customer agrees to pay any additional fees or commissions charged for taking and/or making deliveries, interest, fees levied by the Regulatory authorities and commissions and fees charged for the transfer of the Customer's account to another FCM.

8. *Interest.* In accordance with Commodity Futures Trading Commission Regulation 1.29, the FCM may receive and retain as its own any increment or interest resulting from the proper investment of the funds held in the Customer's account

9. *Security Interest.* Customer grants FCM a security interest in all monies, securities, negotiable instruments, open positions in Commodity Interests and all receipts of other documents representing underlying commodities, including without limitation warehouse receipts, and all commodities represented by such receipts or other documents or other property now or at any future time held in Customer's account or which may be in FCM's possession for any purpose, including safekeeping, to secure payment of all obligations of Customer to FCM irrespective of the number of accounts Customer may have with FCM. All funds, securities, commodities, futures contracts, and other Property of the Customer which FCM may, at any time, be carrying for Customer (either individually, jointly with others or as a guarantor of the account of another person) or which at any time may be in FCM's possession or control or carried on its books for any purpose including safekeeping, are to be held by FCM as security and subject to the general lien and right of set-off for all liabilities of Customer to FCM or any affiliate of FCM. FCM may at any time, in its sole and absolute discretion, liquidate any of the above-mentioned items in order to satisfy any margin or account deficiencies including but not limited to debit or deficit balances resulting From transactions executed by the FCM for the Customer, interest charges, service charges, expenses incurred by FCM, including court costs and attorney's fees incurred in collecting debit or deficit balances of Customer in any account and may transfer said property or assets to the general ledger account of FCM or pledge, transfer, or lend such items, all without liability on the part of FCM to Customer or any third party. Furthermore, FCM, is also granted a security interest on all proceeds which now or at any time may come into the Customer's account, and the Customer agrees to execute any and all documents including Uniform Commercial Code financing statements, deemed necessary or advisable by FCM to evidence or perfect such security interest FCM shall also have full authority to set off, in addition to other rights set forth in this Agreement, all debts owing to the FCM by the Customer against any and all claims which the Customer may have against the FCM. Customer agrees that all demands for debits owing FCM shall be met within twenty-four (24) hoOfs following either of (i) Customer's receipt of FCM's oral request for payment or (11) FCM's delivery to Customer of FCM's written request for payment (except as payment modified with respect to wire and telephone requests for margin funds as herein set forth).

10. *Failure to Deliver.* Customer agrees to deliver to FCM, at least two business days prior to the delivery date, any security, commodity or property, or documents representing ownership of same (including but not limited to warehouse receipts), previously sold by FCM on Customer's behalf, which FCM in its sole and absolute discretion deems necessary to effect a good delivery pursuant to the rules and delivery procedures of the contract market on which the delivery is contemplated. If at any time Customer shall be unable to deliver to FCM any security, commodity or other property previously sold by FCM on Customer's behalf, Customer authorizes FCM, in FCM's sole discretion, to borrow or buy and deliver the same, and Customer shall immediately pay and indemnify FCM for any costs, interest, losses and damages (including consequential costs, losses and damages) which FCM may sustain from its inability to borrow or buy any such security, commodity or other property. In the event FCM takes delivery of any security, other property or commodity for Customer's account, Customer agrees to indemnify and hold FCM harmless From and against any loss it may suffer resulting, directly or indirectly, From any decline in value of said security, commodity or other property.

# ONE WORLD CAPITAL GROUP, LLC

11. *Market Information*. Customer acknowledges that (a) any market recommendations or information communicated to Customer do not constitute an offer to sell or the solicitation of an offer to buy any Commodity Interest; (b) such recommendations and information, although based upon information obtained from sources believed to be reliable, may be incomplete and unverified; and (c) FCM and the IB make no representation, warranty, or guarantee as to, and shall not be responsible for the accuracy or completeness of, any information or trading recommendation furnished to Customer. Customer understands that FCM, its affiliates or representatives, and/or the IB may have a position in and may intend to buy or sell Commodity Interests which are the subject of market recommendations furnished to Customer, and that the market position of FCM or any such affiliate or representative and/or the IB mayor may not be consistent with the recommendations furnished to Customer by FCM and/or the IB.

12. *Government and Exchange Rule* All transactions under this Agreement shall be subject to the applicable constitution, rules, regulations, customs, usages, rulings and interpretations of the exchanges, clearing house or markets on which such transactions are executed by FCM for Customer's account, the National Futures Associates ("NFA") and, where applicable, to the provisions of the Commodity Exchange Act, as amended, and the rules and regulations promulgated thereunder and to any other applicable government statutes, rules and regulations. FCM shall not be liable to Customer as a result of any action taken by FCM or its agents in compliance with any of the foregoing rules or laws. This paragraph is solely for the protection and benefit of FCM, and any failure by FCM or its agents to comply with any of the foregoing rules or laws does not relieve Customer of any obligations under this agreement nor be construed to create rights under this agreement in favor of Customer against FCM. If any statute, rule, or regulation shall hereafter be adopted by any governmental authority, exchange, board of trade, clearing house, or self regulatory organization, including but not limited to the NFA which shall be binding upon FCM or any exchange clearing member firm selected by FCM and shall affect in any manner or be inconsistent with any of the provisions hereof, the affected provisions of this agreement shall be deemed modified or superseded, as the case may be, by the applicable provisions of such statute, rule, or regulation, and all other provisions of this agreement and provisions so modified shall in all respects continue in full force and effect

13. Clearing. Unless otherwise specified, FCM is authorized to execute such orders upon any exchange or other place which may be deemed by FCM, in its sole discretion, to be most desirable, including another exchange clearing member firm and/or floor broker selected by FCM, in its sole discretion, either on an omnibus clearing arrangement or on a fully disclosed clearing arrangement All rights and obligations extended to FCM pursuant to this agreement, and all other provision of this agreement shall also become those of such exchange clearing member firm

14. Liquidation of Account& In the event (a) of Customer's death or, in the case of a joint account, the death of the last survivor thereof; (b) of a decision to dissolve and/or liquidate by a corporate Customer, which decision shall be immediately communicated to FCM; (c) of the filing of a petition of Bankruptcy by or against Customer; (d) of the institution of any similar state, federal or other insolvency proceedings by or against Customer; (e) of the appointment of a receiver for Customer or for any of the assets of Customer; (I) an attachment is levied against Customer's account (or any of them); (g) a notice of levy with respect to Customer's account (or any of them) is served on FCM by any competent taxing authority; (h) Customer fails to timely meet any margin calls; or (i) FCM, for any reason whatsoever, deems itself insecure or if necessary for FCM's protection, then FCM is hereby authorized, in its sole discretion, to sell any or all of the Commodity Interest or other property of Customer which may be in FCM's possession, or which FCM may be carrying for Customer, or to buy in any Commodity Interests or other property of which the account or accounts of Customer may be short, or cancel any outstanding orders, in order to close out the account or account of Customer in whole or in part or in order to close out any commitment made on behalf of Customer, all without any liability on the part of FCM to Customer, or any thrid party. Such sale, purchase or cancellation may be made according to FCM's judgment and may be made at its sole discretion, on the exchange or other market where such business is usually transacted, including an Exchange for Physicals (EFP) transaction, without notice to Customer or the legal representative of Customer, and FCM may purchase the whole or any part thereof ITee from any right of redemption, and Customer shall remain liable for any deficiency, it being understood that a prior tender, demand or call of any kind, From FCM, or prior notice From FCM, of the time or place of such sale or purchase shall not be considered a waiver of Brokers rights to sell or buy any Commodity Interests or other property held by FCM or owned by Customer, at any time as hereinbefore provided or to be deemed to require any such tender, demand, call or notice on any subsequent transaction. Further, FCM may, at Its option, cause a whole or partial liquidation of Customer's account or the straddling of existing open positions in the event they cannot be satisfactorily liquidated because the market is up or down the limit Any of the above actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice or advertisement to Customer, his personal representatives, licirs, executors, administrators, legatees, or assigns, and regardless of whether the ownership interest shall be solely Customer's account or held jointly with others.

15. Assignment. The FCM may assign the Customer's account or accounts to another registered FCM by notifying the Customer of the date and name of the intended assignee FCM ten (10) days prior to the assignment Unless the Customer objects to the assignment in writing prior to the scheduled date for the assignment, the assignment will be binding on the Customer.

16. Events Beyond Control of FCM. FCM shall not be responsible for any loss or damage caused directly or indirectly,

OWCG-751-03-00030

# ONE WORLD CAPITAL GROUP, LLC

by any events, actions or omissions beyond the control of FCM, including without limitation, loss or damage resulting, directly or indirectly, From any delays or inaccuracies in the transmission of orders or other information due to a breakdown or failure of any transmission or communication facilities.

17. _Notice and Report_ All communications, reports, statements, monies, securities, negotiable instruments, and oilier property, whether by mail, telex, courier, telephone, telegraph, messenger, facsimile, or otherwise (in the case of mailed notices), or communicated (in the case of telephone notices), sent to Customer at Customer's address (or telephone number) as given to FCM from time to time shall constitute personal delivery to Customer whether or not actually received by Customer, and Customer hereby waives all claims resulting from failure to receive such communications. Customer shall make all payments, except with regard to wire transfers discussed above, and deliver all notices and communications to FCM'S ADMINISTRATIVE OFFICE LOCATED AT 2-SOUTH, 525 CHESTNUT STREET, WINNETKA, IL 60093 ATTN: COMPLIANCE DEPT. Customer agrees to immediately open, read and act on all communications sent to Customer by FCM.

Confirmations of trades, statements of account, margin calls, and any oilier written notices shall be binding on Customer for all purposes. Reports of executions and all statements of account rendered by FCM From time to time to Customer shall be conclusively deemed correct and final, unless Customer calls any error therein to FCM's attention in writing (a) prior to the start of business on the next business day following notification, in the case of margin calls and reports of executions and (b) within 5 days of delivery to Customer, in the case of statements of account and any written notices (other than trade confirmations or margin calls) or demands. FAILURE TO SO NOTIFY FCM SHALL BE DEEMED RATIFICATION OF ALL ACTIONS TAKEN BY FCM OR FCM'S AGENT PRIOR TO SAID INFORMATION BEING FURNISHED TO CUSTOMER. Customer agrees that in the event of a discrepancy in the status of Customer's account, Customer will take reasonable measures to rectify such discrepancies, including but not limited to buying or selling contracts, as appropriate at the best available price within a reasonable time From the discovery of such discrepancy. In the event that a discrepancy is due solely to FCM's error, FCM agrees to credit Customer's account for the discrepancy; provided, however, that Customer has taken reasonable measures to correct such discrepancy as set forth above. FCM shall not be responsible for any amount unrealized or any loss to Customer's account due to Customer's failure to take reasonable measures to correct any account discrepancy. Customer further agrees to contact FCM by telephone to verify the account status within two (2) business days after placing any order if Customer has not been advised by telephone of the status of such order by FCM within twenty-four (24) horns after said order(s) was/were placed. CUSTOMER AGREES THAT FAILURE TO CONTACT FCM AS PROVIDED ABOVE SHALL RELIEVE FCM OF ANY RESPONSIBILITY ARISING FROM THE LACK OF EXECUTION OF SUCH ORDER(S). CUSTOMER FURTHER ACKNOWLEDGES THAT ALL ORDERS SHALL BE GOOD FOR THE DAY SUCH ORDERS ARE PLACED ONLY, UNLESS SPECIFIED BY THE CUSTOMER TO BE OPEN ORDERS. None of these provisions, however, will prevent FCM, upon discovery of any error or omission, from correcting it. The parties agree that such errors, whether resulting in profit or loss, will be corrected in Customer's account, will be credited or debited so !bat it is in the same position it would have been in if the error had not occurred. Whenever a correction is made, FCM will promptly make written notification to Customer.

18. _Modification_. This Agreement may be altered, modified or amended by FCM from time to time by written notice to Customer unless Customer shall object within three (3) business days of receipt thereof to such modification, alteration or amendment No oilier modification, amendment or addition to this Agreement shall be effective unless reduced to writing and signed by both Customer and an Executive Officer of the FCM. This instrument embodies the entire Agreement of the parties, superseding any and all prior agreements and there are no terms, conditions or obligations oilier than those contained herein. Customer represents that Customer has not altered, modified or changed this Agreement

19. _Trading Representations_. The Customer understands that on certain trading days, trading in certain commodities, commodity options, leverage contracts and underlying commodities or futures contracts may cease or expire and that, will respect to commodity options and underlying commodities or futures contracts traded outside the United States, trading days and horns may not coincide with domestic trading days or hours and that these may result in financial disadvantage to Customer. The Customer hereby agrees to hold FCM, FCM's officers, partners, and agents including the IB harmless against such loss.

20. _Further Representations_. The Customer represents, warrants and agrees that (a) All of the information contained on the Customer Fact Sheet is true, correct and complete as of the date hereof and since FCM is relying thereon  the undersigned will promptly notify the FCM of any changes herein; (h) The trading in Commodity Interests is within the power of the Customer and such activity will in no matter contravene the provisions of any statutes, rules or regulations, Judgments, orders or decrees or agreements to which the Customer is bound or subject; (c) If Customer IS a corporation. It is duly organized and in good standing under the laws of the state of its incorporation and every state in which it does business; (d) the actions of the authorized person designated on the Customer Fact Sheet to act for the Customer has been authorized by all necessary or appropriate corporate action if applicable, such person has full authority to execute this Customer Agreement and all related documents on behalf of the Customer and to act for Customer in all matters regarding Customer's account(s) and FCM may at all times rely on the fact of such authority without any duty to investigate into either the authenticity or extent thereof; (e) If applicable, Customer will confirm the matters contained in paragraph 22(d) by supplying FCM, within a reasonable time, prior to the commencement of trading with an executed copy of resolutions of the Board of Directors of Customer in a form prescribed by FCM; (f) If Customer is a partnership, the partnership has express authority to speculate in Commodity Interests; and (g) Customer has never been suspended or barred from trading by the Commodity Futures Trading

# ONE WORLD CAPITAL GROUP, LLC

Commission or any predecessor agency or any other federal or state regulatory agency or any exchange or trade association, and Customer undertakes to notify FCM of any change in such status within two (2) business days of any such change. Customer further represents that he is of legal age and sound mind and that, except as disclosed in writing to FCM, no one except Customer has any interest in any account or accounts carried for Customer by FCM. CUSTOMER FURTHER REPRESENTS THAT HE IS NOT AN EMPLOYEE OF ANY EXCHANGE, ANY CORPORATION IN WHICH ANY EXCHANGE OWNS A MAJORITY OF THE CAPITAL STOCK, ANY MEMBER OF AN EXCHANGE, ANY FIRM REGISTERED ON ANY EXCHANGE, ANY FUTURES COMMISSION MERCHANT, AND INTRODUCING BROKER, OR ANY BANK, TRUST, OR INSURANCE COMPANY. IN THE EVENT THAT CUSTOMER BECOMES SO EMPLOYED, HE WILL PROMPTLY NOTIFY FCM IN WRITING OF SUCH EMPLOYMENT.

21. _Verification_. Customer authorizes FCM to contact such banks, financial institutions and credit agencies as FCM shall deem appropriate from time to time to verify the reformation regarding Customer which may be provided by Customer from time to time. Customer understands that an Investigation may be made pertaining to his personal and business credit standing and that Customer may make written request within a reasonable period of time for disclosure of such investigation's nature and scope.

22. _Conversion Rate Risk_. In the event that FCM is directed to enter into any Commodity Interest contract in any exchange or board of trade involving transactions effected in a foreign currency: (a) any profit or loss arising as a result of a fluctuation in the rate of exchange affecting such cogency will be entirely for the Customer's account and risk; (b) be made in U.S. Dollars in such amounts as FCM may, in its sole discretion require, and (c) FCM has the sole discretion to convert funds in Customer's account into and From such foreign currency at a rate of exchange determined by FCM as it deems necessary and proper and on the basis of then prevailing money markets.

23. _Telephone Recording_. Customer acknowledges, authorizes and consents to the recording of Customer's telephone conversations with FCM or any of its agents or associated persons by means of electronic recording devices with or without the use of an automatic tone warning device. Customer understands, authorizes and consents to the use of such recordings, and/or transcripts thereof, as evidence by either party in any action arising out of this Agreement FCM may, but shall not be required, in its normal course of business, to erase such recordings following their production.

24. _Construction and Controversies_. Customer hereby expressly acknowledges that this Agreement is made in the State of New York (upon acceptance by FCM), and further, that by virtue of trading commodity futures or options in the account established hereby, Customer is transacting business in the State of New York; accordingly, Customer hereby submits and consents to jurisdiction of his person in the Courts of the State of New York and, shall be amenable to service of summons and other legal process of, and emanating From, the State of New York. This Agreement's validity, construction and enforcement shall be governed by the laws of the State of New York. Customer hereby submits to the exclusive jurisdiction of such State, and expressly waives the right to the adjudication or enforcement of such controversies by any court or any other tribunal sitting in any other jurisdiction, and further expressly waives the provisions of any statute or administrative ruling defining a commodity or commodity contract to be a security. Wherever possible, each portion of this Agreement shall be interpreted in a manner to be valid and effective under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provisions or the remaining provisions of this Agreement This Agreement shall inure to the benefit of your present organization, and any successor organization, irrespective of any change or changes at any time in the personnel thereof for any cause whatsoever, and the assigns of your present organization. This Agreement shall be binding upon the Customer and/or successors, estates, executors, administrators, and assigns of the Customer. CUSTOMER AGREES THAT ANY CONTROVERSY BETWEEN BROKER AND CUSTOMER ARISING OUT OF THIS AGREEMENT, REGARDLESS OF THE MANNER OF RESOLUTION, SHALL BE ARBITRATED, LITIGATED (TRIED IN A COURT OF LAW), OR OTHERWISE RESOLVED BY A TRIBUNAL LOCATED IN CHICAGO, ILLINOIS. IN ADDITION, CUSTOMER HEREBY WAIVES TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING Customer agrees to pay all expenses, including attorney's fees, incurred by Broker: (a) to defend any unsuccessful claim Customer brings against Broker or; (b) to collect any debit balances Customer account(s). No legal or administrative action arising out of this contract may be commenced by anyone more than ONE (1) year after any claim arises. The headings and titles herein are inserted for the convenience of reference only and are to be ignored in the construction of the provisions hereof

25. _Agreement To Shorten Statutes Of Limitation_. FCM and Customer agree that no action in law, equity, arbitration or administrative proceeding, arising out of this agreement, any transactions effected pursuant to this agreement or the relationship of Customer with FCM, may be commenced more than ONE (1) year after the aggrieved party knew or should have known a cause of action existed. Customer acknowledges that he/she is expressly agreeing to waive the two year statute of limitations provided by the Commodity Exchange Act, including the two year time period for commencing a Commodity Futures Trading Commission reparation proceeding, and any and all other applicable statutes of limitations exceeding one year, including but not limited to, any statutory or common law state or federal

# ONE WORLD CAPITAL GROUP, LLC

statue of limitations, the statute of limitations provided by the National Futures Association for commencing an arbitration action, and the statute of limitations for initiating arbitrations before registered contract markets. Customer understands that the agreement with this paragraph is not necessary to open an account with FCM.

26. *Joint Account*. If this is a joint account, the Customers agree, jointly and severally, that the foregoing Agreement and all matters contained herein are the joint and several rights and obligations of the Customer. Each of the Customers has the authority to act on behalf of the joint account as if (s)he alone were interested therein all without notice to the others interested in said account, including but not limited to conferral or revocation of authority hereunder. All property of anyone or more of the Customers held or carried by FCM shall be as collateral security and with a general lien thereon for the payment of all debits, losses or expenses incurred in the joint account and vice versa, however arising. In the event of death or legal incapacity of any of the customers, the survivor(s) immediately shall give FCM notice and FCM may, before or after receiving such notice, take such action, require such documents, retain such assets and/or restrict transactions as FCM deems advisable to protect FCM. Liability of the Customer hereunder shall pass to any estate or personal representative of the Customer. This joint account can be with or without the right of survivorship. "Without rights of survivorship" means upon death of any of the Customers the FCM will divide the joint account into separate, equal accounts in each of the Customers' respective names, but Customers shall continue to be liable on the joint account hereunder until FCM has received actual notice of such death or incapacity. "With full rights of survivorship" means upon death of any of the Customers, the survivor(s) shall be vested with this joint account_ subject to notice and ability as aforesaid. If no instruction is given on Page 7(b) of this Agreement, the Customers shall be deemed Joint Tenants with Full Rights of Survivorship.

27. *Purpose of Lending Agreement and Lending Agreement*. Should Customer take delivery of commodities through futures contracts, FCM is obligated to make full payment for the delivery on 24 hours notice. If the balance in Customer's account is not adequate to pay for the delivery, the warehouse receipts representing the delivery become property carried on margin in Customer's account, since they are not fully paid for by Customer. The purpose of the lending agreement is to allow FCM to use the warehouse receipts as collateral for a bank loan, the proceeds of which are used to pay for the warehouse receipts until re-delivery of the commodity and/or payment in full by Customer. Customer hereby authorizes FCM From time to time to lend, separately or together with the property of others, either to itself or to others, any property which FCM may be carrying for the undersigned on margin. This authorization shall apply to all accounts carried by FCM for the undersigned and shall remain in full force until written notice of revocation is received by FCM at FCM's principal office.

28. *Trading Limitation*. FCM, at any time, in its sole discretion may limit the number of contracts of positions and/or the margin in use which the Customer may maintain or acquire through FCM. Customer agrees not to exceed the positions limits established by the CFTC or any contract market and/or limits of the number of contracts or positions and/or the margin in use set by FCM, whether acting alone or with others.

29. *Binding Effect*. This Agreement, including all authorizations, shall inure to the benefit of FCM, its successors and assigns and shall be binding upon Customer and Customer's personal representatives, executors, trustees, administrators, successors and assigns.

30. *Printed Media Storage*. Customer acknowledges and agrees that FCM may reduce all documentation evidencing Customer's account, including the original signed documents executed by Customer in the opening of such Customer's account with FCM, utilizing a printed media storage device such as micro-fiche or optical disc imaging. Customer agrees to permit the records stored by such printed media storage method to serve as a complete, true and genuine record of such Customer's account documents and signatures.

31. *Options Trading*. Customer understands that some exchanges and clearing houses have established cut-off times for the tender of exercise instructions and that an option will become worthless if instructions are not delivered before such expiration time. Customer also understands that certain exchanges and clearing houses automatically will exercise some "in-the-money" options unless instructed otherwise. Customer acknowledges full responsibility for taking action either to exercise or to prevent the exercise of an option contract, as the case may be, and FCM is not required to take any action with respect to an option contract, including without limitation any action to exercise a valuable option prior to its expiration date or to prevent the automatic exercise option, except upon Customer's express instructions. Customer further understands the FCM has established exercise cut-off times which may be different from the times established by exchanges and clearing houses. Further, Customer understands that (i) all short option positions are subject to assignment anytime including positions established on the same day that exercises are assigned, and (ii) exercise assignment notices are allocated randomly from among all FCM Customers' short options positions which are subject to exercise. A more detailed description of FCM's allocation procedure is available upon request

32. *Terms and Headings*. The term "FCM" shall be deemed to include One World Capital Group, LLC its successors and assigns; the term "Customer" shall be deemed to refer to the party or parties executing this agreement All pronouns shall be deemed to refer to the feminine or the masculine as the gender of Customer requires. If this is a joint account, the singular shall mean, where appropriate, all owners of an account and the statements, agreements, representations and warranties set forth herein shall be deemed to have been made by each owner of the account The paragraph headings in this agreement are inserted for convenience of reference only and not intended to limit the applicability of

# ONE WORLD CAPITAL GROUP, LLC

affect the meaning of any of its provisions.

33. _Disclosure Statement for Non-Cash Margin_. This statement is furnished to you because rule 190.1O(C) of the Commodity Futures Trading Commission requires it for reasons of fair notice unrelated to this Company's current financial condition.

1.　You should know that in the unlikely event of this Company's bankruptcy, property, including property specifically traceable to you, will be returned, transferred or distributed to you, or on your behalf, only to the extent of your pro rata share of all property available for distribution to customers.

2.　Notice concerning the terms for the return of specifically identifiable property will be by publication in the newspaper of general circulation.

3.　The commission's regulations concerning bankruptcies of commodity brokers can be found at 17 Code of Federal Regulations Part 190.

34. Electronic Trading and Order Routing Systems. Customer acknowledges that electronic trading and order routing systems differ from traditional open outcry pit trading and manual order routing methods. Transactions using an electronic system are subject to the rules and regulations of the exchange(s) offering the system and/or listing the contract that may change From time to time. Customer further acknowledges that trading or routing orders through electronic systems varies widely among the different electronic systems which may present different risk factors with respect to trading on or using a particular system including, but not limited to, system access, varying response times, and security. In the case of Internet-based systems, there may be additional types of risks related to system access, varying response times, security, as well as risks related to service providers and the receipt and monitoring of electronic mail. CUSTOMER AGREES TO INDEMNIFY FCM AND HOLD FCM HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, COSTS AND EXPENSES, INCURRED DIRECTLY OR INDIRECTLY, BY CUSTOMER BECAUSE OF FAILURE OF SYSTEM ACCESS, VARYING RESPONSE TIMES, SECURITY, SYSTEM OR COMPONENT FAILURE, THE INABILITY TO ENTER NEW ORDERS, EXECUTE EXISTING ORDERS, OR MODIFY OR CANCEL ORDERS THAT WERE PREVIOUSLY ENTERED _AND/OR_ LOSS OF ORDERS OR ORDER PRIORITY.

ACCOUNT AUTHORIZATION AND TREATMENT OF FUNDS

Customer authorizes at least two accounts (2) on the books of the FCM. One designated Regulated where all transactions designated as regulated by the Commodity Futures Trading Commission ("CFTC") will be carried, and the other designated Non-regulated where deliveries and/or transactions on foreign exchanges, if any, will be carried. FCM is hereby authorized to transfer funds as it deems necessary between these accounts. Father, if the Customer has more than one Regulated and/or Nonregulated account or has a Joint account, from time to time, FCM, in its sole discretion and without prior notice to Customer, may apply or transfer (including segregated funds or other property) interchangeably between any of the Customer accounts at FCM or an affiliate of FCM as may be necessary for margin or to satisfy or reduce any deficit or debit balance in any Customer account

_____

Name of Corporation

_____　　_____

By　　　　　　　　　　　　　　　　　Title

_____　　_____

Signature　　　　　　　　　　　　　　Date

_____　　_____

By　　　　　　　　　　　　　　　　　Title

_____　　_____

Signature　　　　　　　　　　　　　　Date

# ONE WORLD CAPITAL GROUP, LLC

## Authorization for Delivery of Statements by Electronic Media

This is your authorization to deliver the confirmations and purchase-and-loss statements (collectively "Statements") generated for this account with your firm by electronic media and not by U.S. mail. I/We understand that until such time as this authorization is revoked, which must be done in writing and which I/we have the right to do at any time, the Statements will be sent to me, at no additional cost, to this e-mail or fax address:

Written revocation of this authorization must be directed to the Compliance Officer at the One World Capital Group, LLC location where all other account documents have been submitted:

One World Capital Group, LLC Compliance Officer 525 Chestnut Street 2 – South Winnetka, IL 60093

| | |
|---|---|
| Signature | Date |
| Printed Name | Account Number |
| Signature 2 | Date |
| Printed Name 2 | Account Number |

OWCG-751-03-00035

# ONE WORLD CAPITAL GROUP, LLC

## ELECTRONIC TRADING AND ORDER ROUTING SYSTEMS DISCLOSURE STATEMENT

Electronic trading and order routing systems differ from traditional open outcry pit trading and manual order routing methods. Transactions using an electronic system are subject to the rules and regulations of the exchange(s) offering the system and/or listing the contract before you engage in transactions using an electronic system, you should carefully review the rules and regulations of the exchange(s) offering the system and/or listing contracts you intend to trade.

## DIFFERENCES AMONG ELECTRONIC TRADING SYSTEMS

Trading or routing orders through electronic systems varies widely among the different electronic systems. You should consult the rules and regulations of the exchange offering the electronic system and/or listing the contract traded or order routed to understand, among other things, in the case of trading systems, the system's order matching procedure, opening and closing procedures and prices, error trade policies, and trading limitations or requirements; and in the case of all systems, qualifications for access and grounds for termination and limitations on the types of orders that may be entered into the system. Each of these matters may present different risk factors with respect to trading on or using a particular system. Each system may also present risks related to system access, varying response times and security. In the case of internet-based systems, there may be additional types of risks related to system access, varying response times and security, as well as risks related to service providers and the receipt and monitoring of electronic mail.

## RISKS ASSOCIATED WITH SYSTEM FAILURE

Trading through an electronic trading or order routing system exposes you to risks associated with system or component failure. In the event of system or component failure, it is possible that, for a certain time period, you may not be able to enter new orders, execute existing orders, or modify or cancel orders that were previously entered. System or component failure may also result in loss of orders or order priority.

## SIMULTANEOUS OPEN OUTCRY PIT AND ELECTRONIC TRADING

Some contracts offered on an electronic trading system may be traded electronically and through open outcry during the same trading hours. You should review the rules and regulations of the exchange offering the system and/or listing the contract to determine how orders that do not designate a particular process will beexecuted.

## LIMITATION OF LIABILITY

Exchanges offering an electronic trading or order routing system and/or listing the contract may have adopted rules to limit their liability, the liability of FCMs, and software and communication system vendors and the amount of damages you may collect for system failure and delays. These limitations of liability provisions vary among the exchanges. You should consult the rules and regulations of the relevant exchange(s) in order to understand these liability limitations.

Account Number _____    Date _____

Signature _____    Printed Name _____

Signature #2 _____    Printed Name _____

OWCG-751-03-00036

# ONE WORLD CAPITAL GROUP, LLC

## ARBITRATION AGREEMENT

Account Number: _____

Any controversy or claim arising out of or relating to your accounts shall be settled by arbitration, either (1) under the Code of Arbitration of the National Futures Association, or (2) upon the contract market on which the disputed transaction was executed or could have been executed. Any award rendered thereon by the arbitrators shall be final and binding on each and all of the parties thereto and their personal representatives and judgment may be entered in any court having jurisdiction thereof. At the time you notify One World Capital Group, LLC (the "Futures Commission Merchant") or ("Introducing Broker") of your intent to submit a claim to arbitration, or at such time as you are notified of an intent by the Futures Commission Merchant or the Introducing Broker to submit a claim to arbitration, you will have an opportunity to elect a qualified forum for conducting the proceedings, and will be supplied with a list of qualified organizations.

Notice of your intent to arbitrate shall be sent by certified mail to the Futures Commission Merchant and the Introducing Broker at their respective addresses, and the Secretary of the National Futures Association.

THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION ("CFTC") AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION.

THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT YOUR CONSENT TO THIS ARBITRATION AGREEMENT BE VOLUNTARY

BY SIGNING THIS AGREEMENT, YOU (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU, THE FUTURES COMMISSION MERCHANT, OR THE INTRODUCING BROKER MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE WHICH MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF THE FUTURES COMMISSION MERCHANT OR THE INTRODUCING BROKER INTENDS TO SUBMITTHE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND IF YOU PREFER TO REQUEST A SECTION 14, "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION.

IF YOU SEEK REPARATION PROCEEDINGS BEFORE THE CFTC AND THE CFTC DECLINES TO INSTITUTE THOSE PROCEEDINGS, OR IF CERTAIN ASPECTS OF THE CLAIM OR GRIEVANCE ARE NOT SUBJECT TO THE REPARATION PROCEEDINGS, THE CLAIM OR GRIEVANCE, OR PART THEREOF, WILL BE SUBJECT TO THIS ARBITRATION AGREEMENT.

YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH THE FUTURES COMMISSION MERCHANT AND THE INTRODUCING BROKER SEE 17 CFR 180.1-180.5.

Dated:

Signature of Customer

Signature of Customer

| Form **W-9** | | **Request for Taxpayer Identification Number and Certification** | **Give form to the requester. Do not send to the IRS.** |
|---|---|---|---|
| (Rev. October 2004)<br>Department of the Treasury<br>Internal Revenue Service | | | |

**See Specific Instructions on page 2.** | **Print or type**

Name (as reported on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/ Sole proprietor   ☐ Corporation   ☐ Partnership   ☐ Other ▶ _____   ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** *If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.*

Social security number

or

Employer identification number

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here** | Signature of U.S. person ▶ | Date ▶

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

**Note.** *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

For federal tax purposes you are considered a person if you are:

● an individual who is a citizen or resident of the United States,

● a partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● any estate (other than a foreign estate) or trust. See Regulation section 301.7701-6(a) for additional information.

**Foreign person.** If you are a foreign person, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

Cat. No. 10231X

Form **W-9** (Rev. 10-2004)

OWCG-751-03-00038

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments (after December 31, 2002). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester, or

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details), or

3. The IRS tells the requester that you furnished an incorrect TIN, or

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

## Name

If you are an individual, you must generally enter the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your social security card on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line. Check the appropriate box for your filing status (sole proprietor, corporation, etc.), then check the box for "Other" and enter "LLC" in the space provided.

**Other entities.** Enter your business name as shown on required Federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note.** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

## Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

**Exempt payees.** Backup withholding is not required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission,

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt recipients except for 9 |
| Broker transactions | Exempt recipients 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt recipients 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a Federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see *Limited liability company (LLC)* on page 2), enter your SSN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form on-line at *www.socialsecurity.gov/online/ss-5.pdf*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses/* and clicking on Employer ID Numbers under Related Topics. You can get Forms W-7 and SS-4 from the IRS by visiting *www.irs.gov* or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

          

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see *Exempt From Backup Withholding* on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
|     b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the second name line. You may use either your SSN or EIN (if you have one). If you are a sole proprietor, IRS encourages you to use your SSN.

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA, or Archer MSA or HSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, and the District of Columbia to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, or to Federal and state agencies to enforce Federal nontax criminal laws and to combat terrorism. The authority to disclose information to combat terrorism expired on December 31, 2003. Legislation is pending that would reinstate this authority.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

# One World Capital Group

590 Madison Avenue - 31stFloor -New York, NY 10022
525 Chestnut Street – 2 South – Winnetka, IL 60093

## Limited Power of Attorney Revocation Form

**Directions: To revoke Limited Power of Attorney privileges, read, fill out, and sign the following form and fax to One World Capital Group, LLC at 847-446-8136.**

I HEREBY REVOKE effective upon the acceptance and confirmation by an unauthorized One World Capital Group Representative, the Limited Power of Attorney privileges from the Trading Agent listed below with respect to my foreign exchange trading Account(s) with One World Capital Group, LLC.

Customer's Name:_____ Customers Telephone Number:_____

Customer's Fax Number:_____Trading Agent:_____

List Account Numbers over which Agent has Limited Power of Attorney Authority:

_____

### Please check one (1) of the four (4) options below:

1. Keep my account and current positions open                ☐

2. Keep my account open but close out all my positions        ☐

| | |
|---|---|
| **IF THE ACCOUNT IS TO REMAIN OPEN, THE PASSWORD NEEDS TO BE CHANGED. PLEASE CHANGE THE PASSWORD TO:**<br><br>_____<br><br>_____ | 3. Close my account and funds send via wire transfer *  ☐<br><br>4. Close my account and send funds via the mail *  ☐<br><br>*To close account Customers need to fill out and send or Fax the OWCG Redemption Form |

**BY SIGNING BELOW THE UNDERSIGNED UNDERSTANDS AND CERTIFIES THAT BY REVOKING LIMITED POWER OF ATTORNEY, THE TRADING AGENT'S RIGHT TO TRADE THE ACCOUNT WILL BE TERMINATED**

OWCG-751-03-00042

 **One World Capital Group**

590 Madison Avenue - 31stFloor -New York, NY 10022
525 Chestnut Street – 2 South – Winnetka, IL 60093

## Limited Power of Attorney Revocation Form

AGREED TO:

Client: _____

Signature:_____
_____

Print Name and Title:_____
_____

Date: _____

Client: _____

Signature:_____
_____

Print Name and Title:_____
_____

Date: _____

For One World Capital Group, LLC

Signature:_____

Print Name & Title _____

Date _____

OWCG-751-03-00043



# ONE WORLD
## CAPITAL GROUP
### Leadership, Excellence, Professionalism.

477 Madison Avenue - 24th Floor - New York, NY 10022
525 Chestnut Street – Winnetka, IL 60093

## OTC and Futures LPOA

## LIMITED POWER OF ATTORNEY

The undersigned Account holder authorizes the Funds Manager to manage his account through the purchase and sale of over the counter (OTC) currencies, interest rate products, and exchange regulated futures contracts on a margin basis.

### Account holder details:                    Funds Manager details:

Family/Company name: _____

First name:       _____

1.       _____ is authorized to follow the instructions of the aforesaid Attorney in every respect concerning the undersigned Account holder's account with _____, except that said Attorney is not authorized to withdraw funds either in the name of the Account holder, introducing broker or otherwise. The Attorney shall be legally authorized to represent the Account holder regarding any and all present and future dealings with _____, in particular with respect to all assets deposited in the Account holder's account(s) with _____, and to give orders to _____ to buy and sell spot and forward foreign exchange, spot interest rate, and futures contracts, for the account(s) of the Account holder. The Account holder releases _____, from any responsibility whatsoever for all acts or omissions on the part of the Attorney.

2.       The Attorney shall be authorized to accept, check and approve statements of account and other correspondence intended for the Account holder. Additionally, the Account holder authorizes the attorney to substitute himself by appointing a third party to act in his stead. The attorney must present _____, LLC with documentation identifying the third party.

3.       The attorney represents that he has all of the applicable required government approvals, licenses and permits in order to buy and sell spot and forward foreign exchange, spot interest rate, or futures contracts for the account(s) of the Account holder in his country.

4.       This Power of attorney shall remain valid towards _____, until revoked in writing by the Account holder. This Power of Attorney shall not expire upon the death, bankruptcy or the loss of legal capacity of the Account holder or the Attorney.

5.       Account holders signing this power of attorney should be aware that a difference between the exchange rate offered to the customer and that which _____, can obtain, may be accepted by the attorney as a premium.

6.       _____, will provide the Account holder with a profit and loss statement showing the financial results of transactions. In lieu of sending a trade confirmation and equity run via postal mail, _____, will provide the Account holder with electronic access to his account normally via the internet. Since the Account holder has appointed an attorney, he will be unable to trade on his own account as long as the power of attorney remains in force.

7.       Because the risk associated with trading foreign exchange is high, only risk capital should be used when establishing and/or adding funds to the Account holder's account. Moreover, the account holder reiterates here that past performance is never a reliable indication of future results and further the account holder understands that the only certainty is that the trading in the account contemplated here indeed possesses high risk.

8.     The applicable law and jurisdiction shall be that of the State of New York as prescribed within the general conditions of the contract between _____ and the account holder, which are known to and accepted by the Account holder. The terms of the General Conditions apply fully to this Agreement.

**Fee disclosure:**

The undersigned Account holder hereby authorizes _____ to deduct and pay the attorney the totality of the following fee amounts:

1.     _____ % Setup fee on account deposits (collected on deposit)

2.     _____ % annual management fee on account equity (collected quarterly at 25% of total percentage indicated)

3.     _____ % Performance Incentive fee on new profits (collected monthly, based on month closing equity)

   a) Should a loss exist from preceding months, it must be recovered in full before any additional Performance Incentive fee is debited from the Account holder's account(s) at _____ and paid to the agent.

   b) The attorney shall be responsible for calculating the above stipulated fees to be deducted on a monthly basis and will instruct _____ directly to debit the Account holder's account in accordance with this agreement.

**Account holder signatures:**                          **Funds Manager signature:**

1: _____          _____
                               DATE                                              DATE

Print Name: _____              _____

2: _____
                               DATE

Print Name: _____

Company Name (optional):

_____

**One World Capital Group**

Administrative Offices:
525 Chestnut Street
2nd Floor
Winnetka, IL 60093

New York Head Office:
590 Madison Avenue
Suite 3100
New York, NY 10022

# ADMINISTRATION and FUNDS TRANSFER INFORMATION and INSTRUCTIONS

## Account Forms, Compliance and Administration Requests and Forms to be sent to:

> One World Capital Group, LLC
> 525 Chestnut Street
> Second Floor
> Winnetka, IL 60093

## Bank Wire Transfers for FOREX Accounts:

> Citibank N.A. (New York)
> ABA Routing Number:        021 0000 89
> Customer Forex Account
> Account Number:            9970177713
> Swift Code:                citius33

## Bank Wire Transfers for Futures Accounts:

> Citibank N.A. (New York)
> ABA Routing Number:        021 0000 89
> Customer Segregated Account
> Account Number:            9970177713
> Swift Code:                citius33

OWCG-751-03-00046

# Exhibit 2
# Declaration of Sharon Pendleton

## DECLARATION OF SHARON PENDLETON
## PURSUANT TO 28 U.S.C. § 1746

I, Sharon Pendleton, hereby make the following declaration based upon my personal knowledge:

1. I am over 21 years if age. I reside in Chicago, Illinois. I am making this declaration voluntarily, and I authorize its use by the United States Commodity Futures Trading Commission ("Commission") or its representatives in any proceeding pertaining to the matters described herein.

2. I am currently employed by National Futures Association ("NFA") as a Director of Audits in NFA's Compliance Department. I have been employed by NFA since 1986. NFA is a non-profit organization authorized by Congress with certain authority delegated to it by the Commission to regulate the commodities and futures industry, including, among other matters, the regulation of NFA Members that engage in the handling of customer accounts trading in off-exchange foreign currency transactions ("forex").

3. My responsibilities at NFA include, among other things, initiating, staffing, supervising and reviewing audits of NFA Members that are conducted by teams of individuals who work under my direction.

4. One World Capital Group LLC ("One World") is a futures commission merchant ("FCM") and Forex Dealer Member of NFA located in Winnetka, Illinois.  One World has been registered as an FCM and has been an NFA Member since December 6, 2005.  Although it has opened a limited number of customer accounts that trade in exchange traded futures related products, its principal business is in forex. One World has maintained at least five forex related internet websites at various times during its registration as an FCM and its NFA Membership. On or about May 6, 2006, NFA noted that the firm was using www.1worldfcm.com.  On or about April 20, 2006, NFA noted that the firm was using www.1world-forex.com. NFA also noted that the firm was using www.1wfx.com during 2006.  In addition, NFA noted that One World was using www.1worldchina.com on or about May 16, 2007 and www.owforex.com on or about August 14, 2007.

5. John Walsh ("Walsh") has been registered with NFA in some capacity at most times since February 1997. He was registered as an associated person ("AP") of One World from December 6, 2005 through November 30, 2007 and was listed in One World's registration filings as a principal of One World from September 21, 2005 through November 30, 2007.

Ex. 2
Pendleton Decl.

6. On June 4, 2007, NFA's Business Conduct Committee issued a Complaint charging One World with failing to maintain required books and records, failing to meet its minimum ANC requirement and failing to notify NFA that its books and records were not current. The Complaint also charged One World with using misleading promotional material and failing to adopt and enforce written procedures to supervise its associates and employees in the use of promotional material. Finally, the Complaint charged One World and Walsh with providing false and misleading information to NFA. On November 14, 2007, a designated panel of NFA's Hearing Committee accepted a settlement offer from One World and Walsh in which they agreed to pay a $100,000 and meet various undertakings described in the Decision. Copies of the Complaint and Decision are attached as Exhibits A and B, respectively, to this Declaration.

7. Registration filings submitted on behalf of One World identify Walsh as the Managing Member of the firm through November 30, 2007. In addition, Walsh has identified himself in correspondence with NFA as One World's president. Walsh communicates with NFA on behalf of the firm and other individuals at the firm from whom NFA has sought information have directed NFA to speak with Walsh. Walsh is a signatory on all of One World's bank accounts. Walsh holds ultimate supervisory authority over One World's employees. For example, former employees at One World's branch office in New York City, which closed in November 2007, represented to NFA that Walsh was in charge of major decisions at that office. In addition, One World employees at its Winnetka, Illinois main office represented to NFA that they reported to Walsh and they refused to answer several of NFA's requests for information without Walsh's specific permission to do so.

8. Walsh has represented to NFA that One World has approximately 3000 forex customer accounts of which approximately 2000 are funded. He has represented further that the vast majority of these accounts trade on a forex trading platform known as Metatrader that One World leases from a company named Moneytec. One World is the counterparty or offers to be the counterparty to the forex transactions of its customers.

9. Beginning on November 28, 2007, I dispatched an NFA audit team comprised of Joshua Stahl ("Stahl") and Joseph Bata ("Bata") to One World after NFA had received complaints from individuals who alleged that One World was not honoring their requests to withdraw funds from forex accounts.

10. Pursuant to NFA Financial Requirements Section 11, One World is required to maintain adjusted net capital ("ANC") in an amount of at least $1 million.

11. At my direction, Stahl and Bata endeavored to determine, among other issues, if One World was in compliance with its ANC obligation under NFA Financial Requirements Section 11.

12. Stahl and Bata have made numerous and repeated inquiries to One World and Walsh for documentation and other records verifying One World's liabilities to customers and the location and value of assets pertinent to One World's ANC. Although One World and Walsh have provided some of the requested material, their responses have been slow and incomplete and have been marked by a number of questionable excuses by Walsh as to why the responses have been unsatisfactory. For example, between November 28th and November 30, 2007, Walsh repeatedly told Stahl and Bata that he was unable to identify One World's customers and the firm's liabilities to those customers. He represented to NFA that Moneytec has barred One World from access to customer account information on the Metatrader trading platform due to a dispute over the payment of a November liability owed to Moneytec by One World. However, on December 5, 2007, Stahl was told by Moneytec representative Kyle Cottrell ("Cottrell") that, despite Moneytec's payment dispute with One World, Walsh still had access to customer account information on the Metatrader trading platform as of that time. In addition, following Stahl's conversation with Cottrell, Stahl spoke with Dan Colgan ("Colgan"), a former principal of One World who was at One World's office on December 5th. At that time Colgan represented to Stahl that One World did indeed have access to the customer information on Metatrader that NFA had requested but that he had been told by Walsh not to provide anything to NFA until Walsh approved.

13. To date, One World has failed to provide NFA with information and a number of documents which NFA has requested and which are required in order to conclusively determine if One World is in compliance with its ANC requirement and other NFA Financial Requirements. Documents and information that have been requested of One World by NFA that have not been provided by the firm include: One World's November 27, 2007 Net Capital Computation; a list of all of One World's customers and the balances in their accounts as of November 27, 2007; most of the bank statements and bank account activity reports for One World's bank accounts from April 2007 through December 3, 2007; and documentation of all balances in One World's bank accounts as of December 4, 2007.

14. On Monday morning, December 10, 2007, Stahl and Bata went to One World's office in Winnetka, Illinois and determined that no one appeared to be on the premises. Stahl and Bata remained in the area until 1:00pm that afternoon and checked periodically to determine if there was any one in attendance at One World's office. As no one had opened the office by 1:00, Stahl and Bata returned to NFA. No representative of NFA has physically seen Walsh or been able to reach him on the telephone since

3

Tuesday, December 4, despite the fact that NFA investigators have spent extensive time the firm's office since that time. NFA has had some email correspondence with an individual who is believed to be Walsh since December 4th.

15. During the course of NFA's recent investigation of One World it has been contacted by a number of individuals and/or their representatives who allege that they have active forex accounts at One World. Due to One World's unwillingness or inability to provide NFA with appropriate records, NFA is unable to verify the veracity or accuracy of these allegations. However, the information that NFA has received through these contacts so far indicates that One World has at least 400 customer accounts and that the customers who have contacted NFA have cumulatively claimed that One World currently owes them more than $4.2 million.

16. Due to One World's failure to cooperate promptly and fully with NFA in an NFA audit by its failure to produce adequate and complete support for certain material asset and liability balances and NFA's consequent inability to verify that One World is in full compliance with NFA's capital requirements and other Financial Requirements, NFA issued a Member Responsibility Action ("MRA") against One World on November 30, 2007. The MRA, which is attached as Exhibit C to this Declaration, places significant obligations and restrictions on One World until One World demonstrates compliance with all of the requirements set out in the MRA and has demonstrated to the satisfaction of NFA that it is in complete compliance with all NFA Requirements.

17. To date, One World has failed to produce adequate and verifiable support to establish its material asset and liability balances. In fact, it has credibly demonstrated the existence of only $554,422 in assets as of November 23, 2007, which is far short of its $1 million ANC requirement even without taking into account whatever the amount of the firm's liabilities to customers are. Therefore NFA is unable to verify that One World is in full compliance with NFA's capital and other Financial Requirements and is consequently concerned that One World is not in compliance with its net capital requirements.

On this 10th day of December 2007, I declare under penalty of perjury that the foregoing is true and correct.

Sharon Pendleton

M:/pmr.Affidavits.One World.Pendleton-CFTC.docx

4

**Exhibit A to the Declaration of Sharon Pendleton**

**FILED**

### NATIONAL FUTURES ASSOCIATION
### BEFORE THE
### BUSINESS CONDUCT COMMITTEE

**JUN - 4 2007**

NATIONAL FUTURES ASSOCIATION
LEGAL DOCKETING

|  |  |  |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| ONE WORLD CAPITAL GROUP LLC | ) | |
| (NFA ID #359973), | ) | |
| | ) | |
| and | ) | NFA Case No. 07-BCC-017 |
| | ) | |
| JOHN E. WALSH | ) | |
| (NFA ID #277351), | ) | |
| | ) | |
| Respondents. | ) | |

### COMPLAINT

Having reviewed the investigative report submitted by the Compliance Department of National Futures Association ("NFA"), and having found reason to believe that NFA Requirements are being, have been or are about to be violated and that the matter should be adjudicated, NFA's Business Conduct Committee ("Committee") issues this Complaint against One World Capital Group LLC ("One World") and John E. Walsh ("Walsh").

### ALLEGATIONS

### JURISDICTION

1.    At all times relevant to this Complaint, One World was a futures commission merchant ("FCM") and Forex Dealer Member ("FDM") of National Futures Association. The firm's main office is located in Winnetka, Illinois and it maintains a branch office in New York City, New York.

Pendleton Decl.
Ex. A

2.    At all times relevant to this Complaint, John E. Walsh ("Walsh") was a principal and a registered associated person ("AP") of One World and an NFA Associate.

## BACKGROUND

3.    One World has been registered as an FCM since December 2005 and conducts retail forex and exchange traded futures business.

4.    Walsh has a 10% or more ownership interest in the firm and he, along with Timothy W. Furey ("Furey") and Daniel M. Colgan ("Colgan"), are the sole listed principals of the firm. Furey and Colgan are also registered APs of the firm and NFA Associates. Besides Walsh, Furey, and Colgan, the firm has three other APs.

5.    In early 2006, several months after One World commenced business, NFA commenced audits of One World's main office and its New York City branch office.

6.    From the beginning of NFA's audit, it was evident that One World lacked an understanding of, or was inattentive to, regulatory requirements and was ill prepared to accept customer business as either an FDM or an FCM. The firm had not established adequate systems to enable it to handle customer funds or comply with customer reporting requirements.

7.    While One World had an equity system in place for its forex customers, the firm was unable to properly account for its liabilities to its forex customers. Additionally, when the firm began accepting customer funds for exchange traded futures and options, it did so without having an equity system established to handle this type of trading. In fact, the firm initially reported account activity to

2

clients on an excel spreadsheet prepared manually based on the omnibus account activity statements received from its clearing FCM, Dorman Trading ("Dorman").

8.   NFA's audit found that One World failed to maintain required books and records, failed to prepare and file accurate financial statements, and used misleading promotional material.

9.   In addition, NFA's audit found that One World and Walsh provided false and misleading information to NFA auditors concerning an individual named Charles Martin ("Martin") and his role at One World.  Walsh claimed that Martin was not involved in the operations of One World.  However, NFA subsequently learned that Walsh's claim was untrue and that Martin was, in fact, heavily involved in the operations of One World and solicited customers on its behalf.

**APPLICABLE RULES**

10.   NFA Compliance Rule 2-10 requires that each member shall maintain adequate books and records necessary and appropriate to conduct its business including, without limitation, the records required to be kept under Commodity Futures Trading Commission ("CFTC") Regulations 1.18 and 1.32 through 1.37 for the period required under CFTC Regulation 1.31.

11.   NFA Financial Requirements Section 1, in pertinent part, requires FCM Members to file monthly financial reports, no later than seventeen business days after the date for which the report is made and an annual certified financial statement no later than ninety days after the close of each year.

3

12.   NFA Financial Requirements Section 4 requires that any Member FCM who violates any of CFTC Regulations 1.10, 1.12, 1.16, 1.17 or 1.20 through 1.30 shall be deemed to have violated an NFA requirement.

13.   NFA Compliance Rules 2-36(b)(1) provides that no FDM or Associate of an FDM engaging in any foreign currency futures or options transaction shall cheat, defraud or deceive, or attempt to cheat, defraud or deceive any other person.

14.   NFA Compliance Rule 2-36(c) provides that FDMs and their Associates shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of their foreign currency futures and options business.

15.   NFA Compliance Rule 2-36(e) provides that each FDM shall diligently supervise its employees and agents in the conduct of their foreign currency futures and options activities for or on behalf of the FDM.  Each Associate of an FDM who has supervisory duties shall diligently exercise such duties in the conduct of that Associate's foreign currency futures and options activities for or on behalf of the FDM.

16.   NFA Compliance Rule 2-2(f) provides that no Member or Associate shall willfully submit materially false or misleading information to NFA or its agents.

17.   NFA Compliance Rule 2-36(b)(5) provides that no FDM or Associate of an FDM engaging in any foreign currency futures or options transaction shall willfully submit materially false or misleading information to NFA or its agents with respect to foreign currency futures or options transactions.

## COUNT I

**VIOLATIONS OF NFA COMPLIANCE RULE 2-10 AND NFA FINANCIAL REQUIREMENTS SECTIONS 1 AND 4: FAILING TO MAINTAIN REQUIRED BOOKS AND RECORDS, FAILING TO MEET ITS MINIMUM ADJUSTED NET CAPITAL REQUIREMENT, AND FAILING TO NOTIFY NFA THAT ITS BOOKS AND RECORDS WERE NOT CURRENT.**

18.   The allegations contained in paragraphs 1, 3 through 8 and 10 through 12, are realleged as paragraph 18.

19.   One World failed to properly maintain required books and records, including a sufficient general ledger or support for payments to certain vendors.  One World also failed to maintain acknowledgements from certain depositories that were holding customer segregated funds and the statements for these accounts failed to indicate they were segregated accounts.  Furthermore, daily confirmation statements lacked customer account numbers and a complete description of the underlying futures positions including strike prices for option contracts.  Moreover, One World failed to give NFA telephonic notice of its failure to maintain current books and records.  In addition, the firm failed to maintain sufficient supporting documents for its Forex Reports.

20.   One World's December 31, 2005 certified financial statement and its January 31, 2006 unaudited financial statement, which were submitted to NFA, were seriously deficient in that they only reported One World's capital and included no entries for customer liabilities, corresponding assets or income -- even though the firm had been doing business since December 2005 and had accepted in excess of $1 million in customer funds.

21.   One World resubmitted its January 31, 2006 unaudited financial statement to NFA but failed therein to take a concentration charge against open positions with an unregistered forex dealer, FXDirectDealer.  After adjusting for the concentration charge, One World was below its minimum adjusted net capital requirement as of January 31, 2006.

22.   By reason of the foregoing acts and omissions, One World is charged with violations of NFA Compliance Rule 2-10 and NFA Financial Requirements Sections 1 and 4.

## COUNT II

**VIOLATION OF NFA COMPLIANCE RULES 2-36(b)(1), 2-36(c) AND 2-36(e): USING MISLEADING PROMOTIONAL MATERIAL AND FAILING TO ADOPT AND ENFORCE WRITTEN PROCEDURES TO SUPERVISE ITS ASSOCIATES AND EMPLOYEES IN THE USE OF PROMOTIONAL MATERIAL.**

23.   The allegations contained in paragraphs 1, 3 through 8 and 13 through 15 are re-alleged as paragraph 23.

24.   As part of the audit, NFA reviewed One World's promotional websites, "www.1worldfcm.com," "www.1world-forex.com," and "www.1worldfx.com."

25.   The website, www.1worldfcm.com, included the following statement: "Commission Free – Simply put: no commissions, no clearing fee, no exchange fee, no government fee, and no brokerage fee.  Sure there may be different names of different fees at different places, but in spot currencies no commissions means just that – NO COMMISSIONS."

26.   The website, www.1world-forex.com, claimed that forex trading had "Low costs (no commissions and tight spreads in major markets)."

27. Neither of the above statements was accompanied by a disclosure of how One World would be compensated as required by the NFA Interpretive Notice relating to Forex Transactions ("Forex Interpretive Notice"), which provides that any claims that the FDM does not charge commissions must include a disclosure of how it is compensated in near proximity to this claim. Failure to include such disclosure caused the above statements to be misleading.

28. The Forex Interpretive Notice also provides that an NFA Member may not represent that forex funds deposited with an FDM are given special protection under bankruptcy. Notwithstanding this prohibition, One World's website, www.1world-forex.com, included the claim that "all client funds are held in segregated accounts, where clients have sole deposit/withdrawal rights."

29. One World's websites also included statements that emphasized the profit potential of trading forex and the purported advantages of leverage. For example, the website, www.1world-forex.com, included the statements: "Trade off your profits – Ever been up on a stock and wish you could leverage that profit and get in a little more of the issue? In spot currency trading you can. Use your open profits to add to your positions" and "100:1 Leverage – 100:1 leverage is commonly available from online One World Capital Group, which substantially exceeds the common 2:1 margin offered by equity brokers. At 100:1, traders post $1000 margin for a $100,000 position, or 1%. While certainly not for everyone, the substantial leverage available from online currency trading firms is a powerful, moneymaking tool."

7

30. The website, www.1world-forex.com, also included claims hyping the profit potential of forex trading and the benefits of leverage. For example, this website claimed that forex trading gives customers the "[a]bility to use leverage to maximize profits," and "allows for leverage of up to 100 to 1, <u>sometimes more</u>, so that a $100,000 contract may be secured with only $1,000 of capital at risk."

31. The above statements touting the profit potential of forex trading and the benefits of leverage were misleading and unbalanced in that they failed to include adequate risk disclosure concerning the risks of trading forex and the increased risks associated with increased leverage.

32. In addition, the website, www.1world-forex.com, included the claim that "the mini's small contract size allows you to familiarize yourself with our platform features and learn to trade with less risk." This statement was misleading in that it suggested that the likelihood of loss was less with the mini contract as opposed to the regular contract when, in fact, the likelihood of loss was essentially the same with both the mini and the regular contract as they both trade the same markets.

33. The website, www.1worldfx.com, included profitable performance information for which One World and Walsh had no support.

34. In addition, One World failed to adopt and enforce written procedures to supervise its associates and employees in the use of promotional material. Had it done so, the promotional material deficiencies cited above might have been prevented.

35. By reason of the foregoing acts and omissions, One World is charged with violations of NFA Compliance Rules 2-36(b)(1), 2-36(c), and 2-36(e).

8

### COUNT III

## VIOLATION OF NFA COMPLIANCE RULES 2-2(f) AND 2-36(b)(5): PROVIDING FALSE AND MISLEADING INFORMATION TO NFA.

36.    The allegations contained in paragraphs 1 through 9, 16 and 17 are realleged as paragraph 36.

37.    Charles Martin ("Martin") applied for registration as an AP and NFA Associate, in February 2002. At that time, NFA denied Martin's application for AP registration based on a felony drug conviction and a misdemeanor theft conviction. Thus, Martin was and is prohibited from acting as a principal or AP of an NFA Member.

38.    During NFA's audit of One World, NFA received information that Martin was in charge of One World's entire operation and was acting as an undisclosed principal of the firm. Based on this information, NFA asked Walsh about Martin's involvement with One World. Walsh provided NFA with a written representation in which Walsh stated, "Charles Martin is not involved in the operations of [One World] and did not directly or indirectly contribute capital to [One World]."

39.    The information provided by Walsh was contradicted by several customers of One World, viz., the Wall Street Fund Corp., the Khym Foundation, and Young Man Kim. These three customers filed CFTC reparations complaints against One World in which they allege that Martin played a significant role in the operations of One World.

40.    Dr. Max Gwon ("Dr. Gwon") is the operator of the Wall Street Fund Corp., and the individual who introduced the Khym Foundation and Young Man Kim to Walsh and Martin. According to Dr. Gwon, he had monthly meetings with both Walsh

9

and Martin before and after Wall Street Fund Corp. opened a forex account at One World in December 2005.

41.   Also, according to Dr. Gwon, he was informed by Walsh and Martin that Martin was a managing member of One World and the firm's trading strategist and that Walsh handled the administrative and operational end of the business. Walsh and Martin gave Dr. Gwon a business card that listed Martin's name and One World.

42.   In addition, according to Dr. Gwon, Martin solicited him to open an exchange traded futures account for the Wall Street Fund Corp., which he agreed to do in 2006. (This account was in addition to the forex account that Wall Street Fund Corp. opened in 2005). Dr. Gwon's decision to initially invest was influenced by performance information that appeared on the website, www.1worldfx.com. According to Dr. Gwon, Walsh and Martin had directed him to this performance information. Yet, Walsh told NFA that he knew of no one who had relied on this performance information in opening an account, and made no mention of Dr. Gwon or the Wall Street Fund Corp.

43.   Based on the foregoing, it is alleged that Walsh provided false information to NFA concerning Martin's role at One World and customers' reliance on the performance information on the website, www.1worldfx.com.

44.   By reason of the foregoing acts and omissions, One World and Walsh are charged with violations of NFA Compliance Rules 2-2(f) and 2-36(b)(5).

## PROCEDURAL REQUIREMENTS

### ANSWER

You must file a written Answer to the Complaint with NFA within thirty days of the date of the Complaint. The Answer shall respond to each allegation in the Complaint by admitting, denying or averring that you lack sufficient knowledge or information to admit or deny the allegation. An averment of insufficient knowledge or information may only be made after a diligent effort has been made to ascertain the relevant facts and shall be deemed to be a denial of the pertinent allegation.

The place for filing an Answer shall be:

> National Futures Association
> 200 West Madison Street
> Suite 1600
> Chicago, Illinois 60606-3447
> Attn: Legal Department-Docketing

Failure to file an Answer as provided above shall be deemed an admission of the facts and legal conclusions contained in the Complaint. Failure to respond to any allegation shall be deemed an admission of that allegation. Failure to file an Answer as provided above shall be deemed a waiver of hearing.

## POTENTIAL PENALTIES, DISQUALIFICATION AND INELIGIBILITY

At the conclusion of the proceedings conducted as a result of or in connection with the issuance of this Complaint, NFA may impose one or more of the following penalties:

(a)   expulsion or suspension for a specified period from NFA membership;

(b)   bar or suspension for a specified period from association with an NFA Member;

11

(c)     censure or reprimand;

(d)     a monetary fine not to exceed $250,000 for each violation found; and

(e)     order to cease and desist or any other fitting penalty or remedial action not
inconsistent with these penalties.

The allegations in this Complaint may constitute a statutory disqualification

from registration under Section 8a(3)(M) of the Commodity Exchange Act. Respon-

dents in this matter who apply for registration in any new capacity, including as an

associated person with a new sponsor, may be denied registration based on the

pendency of this proceeding.

Pursuant to the provisions of CFTC Regulation 1.63 penalties imposed in

connection with this Complaint may temporarily or permanently render Respondents

who are individuals ineligible to serve on disciplinary committees, arbitration panels and

governing boards of a self-regulatory organization, as that term is defined in CFTC

Regulation 1.63.

NATIONAL FUTURES ASSOCIATION
BUSINESS CONDUCT COMMITTEE

Dated: _OCe|04|07_          By: _____
                                 Chairperson

/jac(Complaints\One World & Walsh)

12

## AFFIDAVIT OF SERVICE

I, Nancy Miskovich-Paschen, on oath state that on June 4, 2007, I served

copies of the attached Complaint, by sending such copies in the United States mail,

first-class delivery, and by overnight mail, in envelopes addressed as follows:

One World Capital Group LLC
525 Chestnut Street, 2nd Floor
Winnetka, IL 60093
Attn: John E. Walsh, President

John E. Walsh
608 Wharton Drive
Lake Forest, IL 60045

_Nancy Miskovich-Paschen_
Nancy Miskovich-Paschen

Subscribed and sworn to before me
on this 4th day of June 2007.

_Margaret A. Vandermyde_
Notary Public

OFFICIAL SEAL
Margaret A. Vandermyde
Notary Public, State of Illinois
MY COMMISSION EXPIRES 03-15-10

**Exhibit B to the Declaration of Sharon Pendleton**

**FILED**

### NATIONAL FUTURES ASSOCIATION
### BEFORE THE HEARING PANEL

NOV 1 4 2007

NATIONAL FUTURES ASSOCIATION
LEGAL DOCKETING

|  |  |
|---|---|
| In the Matter of: | ) |
| | ) |
| ONE WORLD CAPITAL GROUP LLC | ) |
| (NFA ID #359973), | ) |
| | ) |
| and | ) |
| | ) |
| JOHN E. WALSH | ) |
| (NFA ID #277351), | ) |
| | ) |
| Respondents. | ) |

NFA Case No. 07-BCC-017

### DECISION

Having reviewed all matters relevant to the Complaint issued by the

Business Conduct Committee ("BCC") of National Futures Association ("NFA") against

One World Capital Group LLC ("One World") and John E. Walsh ("Walsh") in the above-

captioned matter, and the Offer of Settlement ("Offer") submitted by One World and

Walsh and having accepted the Offer, the Hearing Panel ("Panel") issues the following

Decision.

I

### ALLEGED VIOLATIONS OF NFA REQUIRMENTS

In June 2007, NFA's BCC issued a Complaint against One World, a

futures commission merchant ("FCM") and Forex Dealer Member ("FDM") of NFA, and

One World's president, Walsh.  The Complaint alleged that One World violated NFA

Compliance Rule 2-10 and NFA Financial Requirements Sections 1 and 4, by failing to

maintain current financial books and records, failing to meet its minimum adjusted net

1

Pendleton Decl.
Ex. B

capital requirement, and failing to notify NFA that its books and records were not current. The Complaint also alleged that One World violated NFA Compliance Rules 2-36(b)(1), 2-36(c), and 2-36(e), by using deficient promotional material, and failing to adopt and enforce written procedures to supervise the use of promotional material. In addition, the Complaint alleged that One World and Walsh violated NFA Compliance Rules 2-2(f) and 2-36(b)(5), by providing inaccurate information to NFA concerning a particular individual's role at One World.

II

## OFFER OF SETTLEMENT

One World and Walsh submitted an Offer in which they proposed to settle the charges against them on the following terms:

A. They consented to findings that One World committed the violations alleged against it in the Complaint; NFA agreed that there would be no adverse findings, or findings of liability, with respect to the allegation that they provided inaccurate information to NFA concerning a particular individual's role at One World;

B. They stipulated and agreed that One World shall pay a fine of $100,000, on or before December 31, 2007, and that One World shall pay an additional fine of $50,000, on or before February 1, 2008, unless certain conditions are met, as described in the Offer;

C. They agreed that Walsh shall guarantee payment of these fines, in the event that One World fails to pay them;

D. They acknowledged and agreed that, if their Offer of Settlement was accepted by the Hearing Panel, the settlement of this case would not relieve One World of its obligation to comply with all NFA Requirements, including capital requirements for FDMs and the increased capital requirements for FDMs which go into effect on December 21, 2007;

E. They agreed that they would not permit Charles Martin to act for or on behalf of One World in connection with its futures business or off-exchange forex business, including as an employee, solicitor of accounts, manager of accounts, consultant, independent contractor, agent, or

2

unpaid volunteer. In addition, absent extraordinary circumstances, they agreed not to permit Charles Martin to be physically present in One World's offices;

F. Within thirty days of a Decision accepting their Offer, they agreed that One World would adopt and implement written compliance procedures – acceptable to NFA – which are of a corrective nature and address the deficiencies cited in the Complaint, including the adoption and implementation of adequate systems to enable One World to handle customer funds, comply with customer reporting requirements, and properly account for its liabilities to its forex customers; the preparation and/or maintenance of required books and records and accurate and complete financial statements, including a sufficient general ledger, support for payments to vendors, acknowledgements from depositories that were holding customer segregated funds, daily confirmation statements that include customer account numbers and a complete description of the underlying futures positions including strike prices for option contracts, and sufficient supporting documents for its Forex Reports; and the preparation, use, and review of promotional material to ensure that it complies with NFA promotional material requirements; and

G. Within forth-five days of a Decision accepting their Offer, they agreed to employ experienced and competent staff to prepare and maintain One World's books and records and financial statements, and oversee One World's compliance program and activities, including the specific areas outlined in the preceding paragraph.

III

## FINDINGS

Having considered the matter and having accepted the Offer submitted by One World and Walsh, the Hearing Panel finds that One World violated NFA Compliance Rules 2-10, 2-36(b)(1), 2-36(c), and 2-36(e), and NFA Financial Requirements Sections 1 and 4, as alleged in the Complaint and described in Section I above.

IV

## PENALTY

Having considered the matter and having accepted the Offer submitted by

One World and Walsh, the Hearing Panel orders as follows:

A.   One World shall pay a fine of $100,000, on or before December 31, 2007, and shall pay an additional fine of $50,000, on or before February 1, 2008, unless the conditions described in the Offer are met;

B.   Walsh shall guarantee payment of these fines, in the event that One World fails to pay them;

C.   The settlement of this case and this Decision does not relieve One World of its obligation to comply with all NFA Requirements, including capital requirements for FDMs and the increased capital requirements for FDMs which go into effect on December 21, 2007;

D.   One World and Walsh shall not permit Charles Martin to act for or on behalf of One World in connection with its futures business or off-exchange forex business, including as an employee, solicitor of accounts, manager of accounts, consultant, independent contractor, agent, or unpaid volunteer. In addition, absent extraordinary circumstances, One World shall not permit Charles Martin to be physically present in One World's offices;

E.   Within thirty days of this Decision, One World and Walsh shall adopt and implement written compliance procedures – acceptable to NFA – which are of a corrective nature and address the deficiencies cited in the Complaint, including the adoption and implementation of adequate systems to enable One World to handle customer funds, comply with customer reporting requirements, and properly account for its liabilities to its forex customers; the preparation and/or maintenance of required books and records and accurate and complete financial statements, including a sufficient general ledger, support for payments to vendors, acknowledgements from depositories that were holding customer segregated funds, daily confirmation statements that include customer account numbers and a complete description of the underlying futures positions including strike prices for option contracts, and sufficient supporting documents for its Forex Reports; and the preparation, use, and review of promotional material to ensure that it complies with NFA promotional material requirements; and

4

F.    Within forth-five days of this Decision, One World and Walsh shall employ experienced and competent staff to prepare and maintain One World's books and records and financial statements, and oversee One World's compliance program and activities, including the specific areas outlined in the preceding paragraph.

G.    The Hearing Panel's acceptance of One World and Walsh's Offer of Settlement shall operate to 1) bar any future MRA or BCC Complaints against them for any conduct occurring prior to the date of their Offer of Settlement, of which NFA had corporate knowledge; and 2) resolve and terminate all complaints, investigations and audits relating to One World and Walsh, which were pending as of the date of their Offer of Settlement; in addition, One World and Walsh's Offer of Settlement and this Decision accepting their Offer of Settlement shall not be used as a sole basis for any other action or proceeding by NFA against One World and/or Walsh, including any registration matter, except their Offer of Settlement and this Decision may be used in an action to enforce their terms or in a subsequent disciplinary action or regulatory action against One World or Walsh, where they may be considered as disciplinary history and evidence in aggravation on the issue of sanctions.

**NATIONAL FUTURES ASSOCIATION**
**HEARING PANEL**

Date: 11-14-07          By _____
                              Chairperson

m/rvh/One World Decision

5

## AFFIDAVIT OF SERVICE

I, Nancy Miskovich-Paschen, on oath state that on November 14, 2007, I served copies of the attached Decision, by sending such copies in the United States mail, postage prepaid, certified mail, return receipt requested, and by regular mail, first-class delivery, in envelopes addressed as follows:

David Stawick
Office of the Secretariat
Commodity Futures Trading
 Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC  20581

Lawrence B. Patent
Associate Chief Counsel
Commodity Futures Trading
 Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Thomas K. Anderson, Esq.
John Landis, Esq.
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, IL 60610-4764

And by hand delivery to:

Ronald V. Hirst, Esq.
National Futures Association
200 West Madison Street
Suite 1600
Chicago, IL 60606

Richard Foelber
Deputy Chief
Division of Enforcement
Commodity Futures Trading
 Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Tempest Thomas
Proceedings Clerk
Commodity Futures Trading
 Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Nancy Miskovich-Paschen

Subscribed and sworn to before me
on this 14th day of November 2007.

Notary Public

OFFICIAL SEAL
Mary A. Patton
Notary Public, State of Illinois
MY COMMISSION EXPIRES 7-17-09

6

**Exhibit C to the Declaration of Sharon Pendleton**

## BEFORE THE
## NATIONAL FUTURES ASSOCIATION

In the Matter of:                    )
                                     )
ONE WORLD CAPITAL GROUP              )    NFA Case No. 07-MRA-012
(NFA ID #359973),                    )
                                     )

## NOTICE OF MEMBER RESPONSIBILITY ACTION
## UNDER NFA COMPLIANCE RULE 3-15

　　　　National Futures Association ("NFA") hereby gives notice to One World Capital Group LLC ("One World"), a futures commission merchant ("FCM") and Forex Dealer NFA Member ("FDM") that, pursuant to NFA Compliance Rule 3-15, the President of NFA, with the concurrence of NFA's Executive Committee, has taken a Member Responsibility Action ("MRA") against One World whereby:

1. One World is prohibited from soliciting or accepting any additional customer accounts or customer funds, except as security deposits for existing positions.

2. One World is prohibited from accepting or placing trades for any customer accounts except for the rollover of currently existing customer positions and/or liquidation of existing customer positions. In taking any action to rollover or liquidate customer positions, One World must act in the best interest of its customers.

3. One World is required to liquidate all positions held in any account for One World or for any One World principal and, further, is prohibited from initiating any additional positions in such accounts.

4. One World is prohibited from distributing, disbursing or transferring any funds without the prior approval of NFA.

5. One World is required to produce to NFA financial statements including net capital computations as of November 27 and November 30, 2007. The financial statement must properly reflect all assets and liabilities and the firm's current capital position as well as a listing of all current assets and provide third party documentation supporting the existence and location of those assets.

Pendleton Decl.
Ex. C

6.  The MRA will remain in effect until such time as One World has demonstrated to the satisfaction of NFA that it is in complete compliance with all NFA Requirements. In making such a demonstration One World must provide NFA with an internal control report and certified financial statements which are prepared by an independent public accountant who has demonstrated experience and competence in auditing matters required under Section 404 of the Sarbanes-Oxley Act.

The internal control report shall contain, at a minimum, a detailed explanation of the examination performed by the accountant and a representation by the accountant that it has examined and tested One World's system of internal controls to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ("GAAP"), including those policies and procedures that:

> (a) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of One World;

> (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are being made only in accordance with authorizations of management and directors of One World; and

> (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of One World's assets that could have a material effect on the financial statements.

The internal control report must contain a representation by the public accountant that it has found that One World's system of internal controls has no material weaknesses and that it is adequate for establishing and maintaining internal control over financial reporting by One World.

This action is effective immediately and is deemed necessary to protect customers because One World has failed to cooperate promptly and fully with NFA in an NFA audit in that it has failed to produce adequate and complete support for certain

material asset and liability balances.  Therefore NFA is unable to verify that One World is in full compliance with NFA's capital and other Financial Requirements.

In support of these actions, NFA attaches the affidavit of May Will, who is a Manager in NFA's Compliance Department, and based thereon alleges as follows:

1. One World is an FCM and FDM Member of NFA located in Winnetka, Illinois.  One World has been registered as an FCM and has been an NFA Member since December 6, 2005.  Its principal business is the handling of customer accounts trading in off-exchange foreign currency transactions ("forex").  Registration filings submitted on behalf of the firm reflect that its principal is John Walsh ("Walsh") who is identified as the Managing Member.

2. One World is required to maintain adjusted net capital in an amount of at least $1 million.  The firm's latest form 1-FR-FCM reported that, as of October 31, 2007, the firm's total current assets were $2,387,427, its total liabilities were $1,160,200 and that its excess net capital was $227,227.  One World filed a weekly forex report as of November 23, 2007 with NFA that reflected that it had liabilities to forex customers of $538,515 and held customer assets of the same amount.

3. Beginning on or about November 2, 2007, NFA began receiving complaints from One World forex customers who told NFA that they were experiencing difficulty in withdrawing funds from their One World trading accounts.  For example, one customer told NFA that he had e-mailed a withdrawal form to One World on October 21, 2007.  One World did not confirm receipt of the form until October 29th, when it represented that the customer would receive the requested funds within 48 hours.  The customer complained to NFA that the funds had still not been provided to him by November 4th.  Another customer complained to NFA in late October that he had recently requested a withdrawal from One World but had not received his funds.  Both customers subsequently represented to NFA on November 30, 2007 that they still had not received their requested withdrawals.

4. During November, NFA made inquiry with Walsh regarding complaints from customers who reported that they were having difficulty withdrawing funds from One World.  Walsh told NFA that he was investigating anti-money laundering concerns with regard to one of the customers and he failed to make any response to NFA's inquiry about a second customer's problems.

3

5.  NFA visited One World to further investigate concerns raised by One World's failure to honor the customers' withdrawal requests. NFA investigators arrived at One World at approximately 7:45 a.m. on November 28, 2007. Walsh was not present at that time. NFA contacted Walsh by telephone and informed him that NFA was in the office to test the balances in One World's Forex Weekly Report and to examine the firm's asset situation. In addition, NFA required Walsh to produce a November 27, 2007 net capital computation for the firm by 4:00 p.m. that afternoon.

6.  Walsh arrived at the firm approximately an hour later and NFA provided him with a document request list. This list specified items requested along with times that the items were expected. NFA discussed the list with Walsh personally and pointed out to him that some of the documents were required to be produced by noon of that day.

7.  Almost all of One World's forex customers trade on an electronic trading platform named Metatrader. Walsh represented that the firm had approximately 3000 accounts trading through Metatrader and that approximately one-third of them had zero balances.

8.  NFA asked Walsh to provide it with information as to the amount of One World's liabilities to customers who traded on Metatrader. He responded that Metatrader was very unreliable because it double counted and included demo accounts so it was not accurate. At first Walsh said that he did not know the amount of customer balances on Metatrader, but he later told investigators that the Metatrader balance was probably hundreds of thousands of dollars. He added that he did not know for sure and could not stand by that number. He told NFA that he would wait until the margin equity report was finished before giving NFA any numbers. NFA requested Walsh to provide the margin equity report from Metatrader and Walsh represented that it would take an hour to obtain. However, after an hour had passed, Walsh told NFA that he had been interrupted and that it would take another couple of hours for him to get the margin equity report. To date, neither Walsh nor anyone else acting on behalf of One World have provided the required margin equity report to NFA despite several requests for the information.

9.  Walsh represented that One World had six bank accounts— four of which are at Bank of America and two of which are at

4

Harris Bank. NFA asked Walsh to provide statements from all of One World's bank accounts for the months of August through October 2007 and statements showing activity through November 27th. Walsh provided NFA with only the October 2007 month-end statements for the four Bank of America accounts, two printouts of online statements showing the November 27th balances in the Harris Bank accounts and a printout of an online statement showing the November 23rd balance in one of the Bank of America accounts. He and One World have failed to provide NFA with any of the other bank records that NFA has requested. At the end of the day on November 28, 2007 Walsh did provide NFA with internal documents which he said represented One World's bank balances.

10. NFA returned to One World on November 29th. Investigators were unable to gain entry to the firm's office at first and called Walsh in that regard. He told NFA that the Metatrader platform had crashed overnight and that he was working at home and dealing with a number of customer calls. When Walsh arrived later that day, NFA investigators requested him to provide support for the November activity in One World's Bank of America accounts and Walsh responded that he did not have online access to all of One World's accounts. NFA told him that it wanted to see the activity to verify the assets of the firm including a "percentage in points" ("PIP") receivable balance which was included on One World's October 31, 2007 Form 1-FR.

11. In addition to discussions that NFA's on-site investigators had with Walsh during their visit on November 29th, NFA Compliance Department Director, Sharon Pendleton ("Pendleton"), sent an e-mail to Walsh that afternoon stating that all of NFA's document requests were required to be complied with by 5:00 p.m. on that day. Walsh replied to Pendleton's e-mail shortly thereafter and represented that he needed more time to respond due to a failure experienced by the Metatrader trading platform on the previous evening.

12. During their November 29, 2007 visit, NFA investigators requested Walsh to contact either Metatrader or his service provider so NFA could obtain a copy of the customer confirmations sent out on November 27, 2007 confirming the customer balances. Walsh told NFA that he had contacted his service provider and informed NFA that he should be able to

get a CD copy of the customer confirmations by the end of the day.

13. NFA also informed Walsh that he needed to sign bank confirmations so that NFA could send them to his banks to verify balances on deposit. Walsh left the One World offices without signing the required bank confirmations. One World's receptionist, Julie Leahy ("Leahy"), told NFA that Walsh had gone to lunch and she was unsure of when he would return. NFA left One World at that point and returned later that afternoon intending to discuss open issues with Walsh; however, Leahy informed NFA that Walsh had gone to the hospital and said that she did not believe that he would be returning that day. Ultimately, Walsh returned at approximately 4:55 p.m. that afternoon.

14. As Walsh was not present at the firm during most of the afternoon of November 29th, NFA asked an individual named Dan Colgan ("Colgan"), who is a former principal of One World and who was present in One World's office if he had any supporting documentation to show that the Metatrader platform did crash the previous night. Colgan responded that all questions must be directed to Walsh. Colgan did represent that One World went through a firm named Moneytec when contacting Metatrader and that One World leases Metatrader through Moneytec. Colgan stated further that he thought he had received an e-mail from Moneytec regarding the trading platform failure but added that he would not provide it to NFA without approval from Walsh. When NFA asked Colgan for contact information for persons who One World speaks with at Moneytec, Colgan refused to provide the information without specific approval from Walsh.

15. When Walsh arrived at the firm at 4:55 p.m. on November 29th, 2007 he informed NFA that he did not have any of the documents that One World was required by NFA to produce, but said that he would hopefully be able to provide them the following day by 5:00 p.m.

16. When NFA asked Walsh about the state of One World's assets which were required for the firm to meet its $1 million dollar capital requirement, Walsh responded that it was all listed in the firm's Form 1-FR-FCM report. When NFA pointed out to Walsh that the firm had not provided external support for the balances, he said that would discuss those issues with Pendleton in the morning (November 30, 2007). NFA

6

specifically discussed the fact that one of the major assets that One World reflected on its Form 1-FR-FCM report was a PIP receivable for which the firm had not provided any support, but Walsh again stated that he would discuss this issue with Pendleton. NFA also asked Walsh if he knew what One World's Metatrader liability balance was and he said that he did not know with certainty.

17. Before NFA left One World's offices on November 29th investigators asked Walsh to sign the bank confirmations so NFA could confirm the balances on file with the firm's banks and Walsh refused to sign the confirmations saying that he would not do anything before speaking with Pendleton.

18. NFA returned to One World's office on the morning of November 30, 2007 and telephoned Leahy to seek admission. Leahy told NFA's investigators that no one was available to let them in to One World's office. Consequently, NFA's investigators were not able to gain entry on November 30th.

19. To date, One World has failed to cooperate promptly and fully with NFA in an NFA audit in that it has failed to produce adequate and complete support for certain material asset and liability balances. Therefore NFA is unable to verify that One World is in full compliance with NFA's capital and other Financial Requirements.

The MRA will remain in effect until such time as One World has demonstrated compliance with all of the requirements set out in this MRA and has demonstrated to the satisfaction of NFA that it is in complete compliance with all NFA Requirements. One World is required to provide copies of this MRA, by overnight courier, to all of its customers and to all banks and other financial institutions with which it has money on deposit.

NFA Members receiving notice of this MRA by service or otherwise who carry accounts in the name of, controlled by, or advised by One World or any of its affiliates are prohibited from disbursing or transferring funds to One World or any entity or account controlled by them for any reason without prior approval of NFA.

One World is entitled to a prompt hearing on this matter before NFA's Hearing Committee if it so requests. The request for a hearing shall be made in writing to:

National Futures Association
200 West Madison Street
Suite 1600
Chicago, IL 60606-3447
Attn: Legal Docketing Department

7

Aggrieved parties may petition the Commodity Futures Trading Commission ("CFTC") for a stay of this MRA pending a hearing pursuant to and in conformity with the terms set forth in CFTC Regulation 171.41.

**NATIONAL FUTURES ASSOCIATION**

Date:  November 30, 2007                By: _____

Daniel J. Roth, President

ml:pmr.MRA.One World 11-29-07.docx

8

**AFFIDAVIT**

THE AFFIANT, MAY WILL, BEING DULY SWORN AND UNDER OATH STATES THAT:

1.  My name is May Will, and I am employed by National Futures Association ("NFA") as a Manager in the Compliance Department. In my capacity as a Manager, I caused NFA Investigators Joshua Stahl ("Stahl") and Joe Bata ("Bata") to conduct a visit to One World Capital Group LLC ("One World").

2.  One World is a futures commission merchant ("FCM") and Forex Dealer Member ("FDM") Member of NFA located in Winnetka, Illinois. One World has been registered as an FCM and has been an NFA Member since December 6, 2005. Its principal business is the handling of customer accounts trading in off-exchange foreign currency transactions ("forex"). Registration filings submitted on behalf of the firm reflect that its principal is John Walsh ("Walsh") who is identified as the Managing Member.

3.  One World is required to maintain adjusted net capital in an amount of at least $1 million. The firm's latest Form 1-FR-FCM reported that, as of October 31, 2007, the firm's total current assets were $2,387,427, its total liabilities were $1,160,200 and that its excess net capital was $227,227. One World filed a weekly forex report as of November 23, 2007 with NFA that reflected that it had liabilities to forex customers of $538,515 and held customer assets of the same amount.

4.  Beginning on or about November 2, 2007, NFA began receiving complaints from One World forex customers who told NFA that they were experiencing difficulty in withdrawing funds from their One World trading accounts. For example, one customer told NFA that he had e-mailed a withdrawal form to One World on October 21, 2007. One World did not confirm receipt of the form until October 29th, when it represented that the customer would receive the requested funds within 48 hours. The customer complained to NFA that the funds had still not been provided to him by November 4th. Another customer complained to NFA in late October that he had recently requested a withdrawal from One World but had not received his funds. Both customers subsequently represented to NFA on November 30, 2007 that they still had not received their requested withdrawals.

5.  During November, NFA made inquiry with Walsh regarding
    complaints from customers who reported that they were having
    difficulty withdrawing funds from One World. Walsh told NFA that
    he was investigating anti-money laundering concerns with regard
    to one of the customers and he failed to make any response to
    NFA's inquiry about a second customer's problems.

6.  NFA's investigators visited One World to further investigate
    concerns raised by One World's failure to honor the
    customers' withdrawal requests. They arrived at One World at
    approximately 7:45 a.m. on November 28, 2007. Walsh was
    not present at that time. They contacted Walsh by telephone
    and informed him that NFA was in the office to test the
    balances in One World's Forex Weekly Report and to examine
    the firm's asset situation. In addition, NFA required Walsh to
    produce a November 27, 2007 net capital computation for the
    firm by 4:00 p.m. that afternoon.

7.  Walsh arrived at the firm approximately an hour later and NFA
    provided him with a document request list. This list specified
    items requested along with times that the items were
    expected. They discussed the list with Walsh personally and
    pointed out to him that some of the documents were required
    to be produced by noon of that day.

8.  Almost all of One World's forex customers trade on an
    electronic trading platform named Metatrader. Walsh
    represented to us that the firm had approximately 3000
    accounts trading through Metatrader and that approximately
    one-third of them had zero balances.

9.  NFA asked Walsh to provide information as to the amount of
    One World's liabilities to customers who traded on Metatrader.
    He responded that Metatrader was very unreliable because it
    double counted and included demo accounts so it was not
    accurate. At first Walsh said that he did not know the amount
    of customer balances on Metatrader, but he later told NFA that
    the Metatrader balance was probably hundreds of thousands
    of dollars. He added that he did not know for sure and could
    not stand by that number. He told NFA that he would wait until
    the margin equity report was finished before giving NFA any
    numbers. The investigators requested Walsh to provide the
    margin equity report from Metatrader and Walsh represented
    that it would take an hour to obtain. However, after an hour
    had passed, Walsh told them that he had been interrupted and
    that it would take another couple of hours for him to get the

2

margin equity report. To date, neither Walsh nor anyone else acting on behalf of One World have provided the required margin equity report to NFA despite several requests for the information.

10. Walsh represented that One World had six bank accounts— four of which are at Bank of America and two of which are at Harris Bank. NFA asked Walsh to provide statements from all of One World's bank accounts for the months of August through October 2007 and statements showing activity through November 27th. Walsh provided NFA with only the October 2007 month-end statements for the four Bank of America accounts, two printouts of online statement showing the November 27th balances in the Harris Bank accounts and a printout of an online statement showing the November 23rd balance in one of the Bank of America accounts. He and One World have failed to provide NFA with any of the other bank records that NFA has requested. At the end of the day on November 28, 2007 Walsh did provide NFA with internal documents which he said represented One World's bank balances.

11. Bata and Stahl returned to One World on November 29th. They were unable to gain entry to the firm's office at first and called Walsh in that regard. He told them that the Metatrader platform had crashed overnight and that he was working at home and dealing with a number of customer calls. When Walsh arrived later that day, NFA requested him to provide support for the November activity in One World's Bank of America accounts and Walsh responded that he did not have online access to all of One World's accounts. NFA told him that we wanted to see the activity to verify the assets of the firm including a "percentage in points" ("PIP") receivable balance which was included on One World's October 31, 2007 Form 1-FR.

12. In addition to discussions that NFA had with Walsh during the investigators' visit on November 29th, NFA Compliance Department Director, Sharon Pendleton ("Pendleton") sent an e-mail to Walsh that afternoon stating that all of NFA's document requests were required to be complied with by 5:00 p.m. on that day. Walsh replied to Pendleton's e-mail shortly thereafter and represented that he needed more time to respond due to a failure experienced by the Metatrader trading platform on the previous evening.

3

13. During NFA's November 29, 2007 visit, NFA requested Walsh to contact either Metatrader or his service provider so NFA could obtain a copy of the customer confirmations sent out on November 27, 2007 confirming the customer balances. Walsh told NFA that he had contacted his service provider and informed NFA that he should be able to get a CD copy of the customer confirmations by the end of the day.

14. NFA also informed Walsh that he needed to sign bank confirmations so that NFA could send them to his banks to verify balances on deposit. Walsh left the One World offices without signing the required bank confirmations. One World's receptionist, Julie Leahy ("Leahy"), told NFA that Walsh had gone to lunch and she was unsure of when he would return. The investigators left One World at that point and returned later that afternoon intending to discuss open issues with Walsh; however, Leahy informed NFA that Walsh had gone to the hospital and said that she did not believe that he would be returning that day. Ultimately, Walsh returned at approximately 4:55 p.m. that afternoon.

15. As Walsh was not present at the firm during most of the afternoon of November 29th, NFA asked an individual named Dan Colgan ("Colgan"), who is a former principal of One World and who was present in One World's office if he had any supporting documentation to show that the Metatrader platform did crash the previous night. Colgan responded that all questions must be directed to Walsh. Colgan did represent that One World went through Moneytec when contacting Metatrader and that One World leases Metatrader through Moneytec. Colgan stated further that he thought he had received an e-mail from Moneytec regarding the trading platform failure but added that he would not provide it to NFA without approval from Walsh. When NFA asked Colgan for contact information for persons who One World speaks with at Moneytec, Colgan refused to provide the information without specific approval from Walsh.

16. When Walsh arrived at the firm at 4:55 p.m. on November 29th, 2007 he informed NFA that he did not have any of the documents that One World was required by NFA to produce, but said that he would hopefully be able to provide them the following day by 5:00 p.m.

17. When NFA asked Walsh about the state of One World's assets which were required for the firm to meet its $1 million

4

dollar capital requirement, Walsh responded that it was all listed in the firm's Form 1-FR-FCM report. When NFA pointed out to Walsh that the firm had not provided external support for the balances, he said that would discuss those issues with Pendleton in the morning (November 30, 2007). NFA specifically discussed the fact that one of the major assets that One World reflected on its Form 1-FR-FCM report was a PIP receivable for which the firm had not provided any support, but Walsh again stated that he would discuss this issue with Pendleton. NFA also asked Walsh if he knew what One World's Metatrader liability balance was and he said that he did not know with certainty.

18.  Before NFA's investigators left One World's offices on November 29th they asked Walsh to sign the bank confirmations so NFA could confirm the balances on file with the firm's banks and Walsh refused to sign the confirmations saying that he would not do anything before speaking with Pendleton.

19.  Bata and Stahl returned to One World's office on the morning of November 30, 2007 and telephoned Leahy to seek admission. Leahy told them that no one was available to let them in to One World's office. Consequently, they were not able to gain entry on November 30th.

20.  To date, One World has failed to cooperate promptly and fully with NFA in an NFA audit in that it has failed to produce adequate and complete support for certain material asset and liability balances. Therefore NFA is unable to verify that One World is in full compliance with NFA's capital and other Financial Requirements.

Further Affiant sayeth not.

_____
May Will

Subscribed and sworn to before me
on this 30th day of November 2007.

_____
Notary Public

OFFICIAL SEAL
DIANE JENKINS-THOMAS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/09/10

m:\pmr.Affidavits.One World .Josh Stahl 11-30-07.docx

5

## AFFIDAVIT OF SERVICE

I, Myra Lewis, on oath state that on November 30, 2007, I served copies of the

attached Notice of Member Responsibility Action by sending such copies by facsimile and

overnight mail in envelopes addressed as follows:

David Stawick, Secretariat
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Facsimile No.: 202/418-5521

Lawrence B. Patent
Deputy Director, Compliance and Registration
Division of Clearing and Intermediary Oversight
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Facsimile:  202/418-5536

and by also sending a copy by facsimile and regular and overnight mail in envelopes

addressed as follows:

John R. Landis, Esq.
Foley & Lardner LLP
321 North Clark
Suite #2800
Chicago, IL 60610
Facsimile No.: 312/832-4700

and by sending a copy by e-mail and regular and overnight mail in envelopes addressed as

follows:

John Walsh
President
One World Capital Group
818 Elm Street
Winnetka, IL 60093
E-mail:  jwalsh@1worldfcm.com

John Walsh
608 Wharton Drive
Lake Forest, IL 60045


_Myra Lewis_
Myra Lewis

Subscribed and sworn to before
me on this 30th day of November, 2007.

_Diane Jenkins Thomas_
Notary Public

OFFICIAL SEAL
DIANE JENKINS-THOMAS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/05/10

m:\myr\affd\one world capital group MRA affd 11 30 07.pmr

**Exhibit 3**
**Declaration of H. Frank Zimmerle**

## DECLARATION OF H. Frank Zimmerle

I, H. Frank Zimmerle, hereby make the following declaration:

1. Since July 2002, I have been the Branch Chief of the Audit and Financial Review Section of the Division of Clearing and Intermediary Oversight in the Central Regional Office of the Commodity Futures Trading Commission ("CFTC"),. In 1972, I received a Bachelor of Science degree in accounting from Illinois State University in Normal, Illinois. I have been employed as an Auditor in the Chicago office of the CFTC, Financial Audit and Review Branch, Division of Trading and Markets, or its predecessor agency, The Commodity Exchange Authority, since November 1974.

2. From July 1985 to July 2002, I was a Supervisory Auditor at the CFTC, and prior, from November 1974 to July 1985, I was a staff auditor. My responsibilities at the CFTC have included conducting direct audits of registrants, including Futures Commission Merchants ("FCMs"). I also review the work of, and supervise DCIO audit staff who conduct direct oversight audits, and who conduct reviews of registrants, self-regulatory organizations, Designated Contract Markets, and Derivatives Clearing Organizations. Audits, reviews and other oversight activity are done to ensure compliance with and enforcement of the Commodity Exchange Act, and the rules and regulations promulgated thereunder.

3. My current duties include overseeing audits and investigations of individuals and entities that are, or should be, registered with the CFTC to determine compliance with the segregation, net capital, disclosure, and related recordkeeping and reporting requirements under the Commodity Exchange Act. In that regard, I am responsible for monitoring and evaluating the gathering and analyzing of financial data and any other information related to commodity futures and options activity or compliance with recordkeeping or with financial requirements or procedures for complying with rules requiring segregation of customers' funds.

4. One World Capital Group, LLC ("One World") is registered with the CFTC as a futures commission merchant and must meet minimum financial requirements established in Commission regulation 1.17 and Section 4(f) of the Commodity Exchange Act.

Ex. 3
Zimmerle Decl.

5.  On December 3, 2007, I sent a letter to Mr. John Walsh, President, One World (copy attached as Exhibit A).

6.  My letter stated that the NFA issued a Member Responsibility Action against One World; and that based on the facts and representations contained in NFA's MRA, DCIO is concerned that One World may not be in compliance with the net capital requirements of Commission regulation 1.17, or with the requirements to segregate regulated customers' funds, as required by Section 4d of the Commodity Exchange Act and regulation 1.20.

7.  I told Mr. Walsh in the letter that pursuant to provisions of regulation 1.10(b)(4), I was requesting that One World immediately provide to me a daily net capital computation and a daily segregation record, each record prepared for each business day starting with November 27, 2007, and for each subsequent business day until I notify him that further submission of these reports is no longer required.

8.  I asked Mr. Walsh to submit the daily pro-forma net capital computations and daily segregation records for November 27 through December 3, to me no later than noon on December 4, 2007.  Each subsequent daily set of records (pro-format net capital and daily segregation record) must be submitted no later than noon of the following business day.

9.  One World submitted daily segregation records to me on the afternoon of December 4, 2007.  It has not submitted any segregation records since this submission.

10. To date, One World has not filed with me any net capital computations.

11. CFTC regulation 1.17(a)(4) provides that a futures commission merchant who is not in compliance with 1.17, or is unable to demonstrate such compliance, must transfer all customer accounts and immediately cease doing business as a futures commission merchant until such time as the firm is able to demonstrate such compliance.

2

12. I spoke by telephone with John Walsh on December 4, 2007. I told Walsh he was overdue in filing his net capital computations.

13. During that telephone conversation, Mr. Walsh told me that he cannot determine what he owes to Forex customers, nor can he say whether he has sufficient funds with which to pay those Forex customers.

14. Based on One World's failure to provide net capital computations as I had asked for in my letter to John Walsh, dated December 3, 2007, One World has not demonstrated that it is in compliance with the CFTC's minimum net capital requirements.

15. On November 27, 2007, One World filed its required monthly financial report known as a Form 1-FR-FCM ("1-FR") with the CFTC, reporting assets and liabilities, as of October 31, 2007. The 1-FR shows that, as of the end of October, the firm's total current assets were $2,387,427, its total liabilities were $1,160,200, including $357,053 attributable to liabilities to forex customers, and its excess net capital was $227,227 (after adjustment for an incorrectly reported minimum net capital requirement- the firm reported the minimum as $14,208, the minimum requirement should have been reported as $1 million). The firm also reported that it owed $733,252 to segregated customers who trade on U.S. Commodity Exchanges (attached as Exhibit B).

I declare under penalty of perjury that the foregoing is true and accurate. Executed on the 12th day of December 2007.

H. Frank Zimmerle

Attachments

3

**Exhibit A to the Declaration of H. Frank Zimmerle**

**U.S. COMMODITY FUTURES TRADING COMMISSION**
525 West Monroe Street
Suite 1100
Chicago, Illinois 60661
Telephone: (312) 596-0700
Facsimile: (312) 596-0713

Division of Clearing and
Intermediary Oversight

H. Frank Zimmerle
Branch Chief
Audit and Financial Review

December 3, 2007

**Via Facsimile and e-mail**

Mr. John E. Walsh, President
One World Capital Group, LLC
525 Chestnut St., 2nd Floor
Winnetka, IL 60093

Re: Request for daily computations of net capital and segregation of customer funds

Dear Mr. Walsh:

On November 30, 2007, the National Futures Association ("NFA") issued a Member Responsibility Action ("MRA") against One World Capital Group, LLC ("One World"). One World is registered with the Commission as a futures commission merchant and commodity trading advisor. NFA is One World's designated self-regulatory organization.

Based on facts and representations contained in NFA's MRA, the Division of Clearing and Intermediary Oversight ("DCIO") is concerned that One World may not be in compliance with the net capital requirements of Commission regulation 1.17, or with the requirements to segregate regulated customers' funds, as required by Section 4d of the Commodity Exchange Act and regulation 1.20.

Therefore, pursuant to provisions of regulation 1.10(b)(4), I am requesting that One World immediately provide to me at the above address, a daily net capital computation and a daily segregation record, each record prepared for each business day starting with November 27, 2007, and for each subsequent business day until I notify you that further submission of these reports is no longer required.

Please submit the daily pro-forma net capital computations and daily segregation records for November 27 through December 3, to me no later than noon on December 4, 2007. Each subsequent daily set of records (pro-format net capital and daily segregation record) must be submitted no later than noon of the following business day.

You should be aware that regulation 1.17 provides that any FCM who is not in compliance with capital requirements of 1.17, or who is unable to demonstrate such compliance as required by paragraph (a)(3) of that section, must immediately transfer all customer accounts and immediately cease doing business as an FCM.

Zimmerle Decl.
Ex. A

- 2 -

If you have any questions concerning this matter, please contact me at 312/596-0575, or Margaret Gal of my staff, at 312-596-0573.

Sincerely,

H. Frank Zimmerle
Branch Chief, Central Region

cc:     Regina Thoele, Vice President, Compliance
        National Futures Association

        Tom Smith, Deputy Director,
        Audit and Financial Review
        Division of Clearing and Intermediary Oversight
        Washington, D.C.

- 2 -

**Exhibit B to the Declaration of H. Frank Zimmerle**

**CFTC FORM 1-FR-FCM** | 0005 |

| Name of Company: One World Capital Group, LLC | 0010 | Employer ID No: 203419350 | 0020 | NFA ID No: 0359973 | 0030 |

Address of Principal Place of Business:

818 Elm Street

Winnetka, IL 60093

| 0050 |

Person to Contact Concerning This Report:

Name:    John E. Walsh | 0040 |

Telephone No:  847.446.8100 | 0060 |

E-Mail: | 0065 |

1. Report for the period beginning    10/01/2007 | 0070 |  and ending    10/31/2007 | 0080 |

2. Type of report   | 0090 |  ☐ Certified          ☐ Regular quarterly/semiannual          ☒ Monthly 1.12(b)

☐ Special call by: _____          ☐ Other -- Identify: _____

| 0095 |  ☒ Initial filing          ☐ Amended filing

4. Name of FCM's Designated Self-Regulatory Organization:          NFA          | 0100 |

5. Name(s) of consolidated subsidiaries and affiliated companies:

| Name | Percent Ownership | Line of Business |
|---|---|---|
| 0110 | 0120 | 0130 |

The futures commission merchant, or applicant for registration therefor, submitting this Form and its attachments and the person whose signature appears below represent that, to the best of their knowledge, all information contained therein is true, correct and complete. It is understood that all required items, statements and schedules are integral parts of this Form and that the submission of any amendment represents that all unamended items, statements and schedules remain true, correct and complete as previously submitted. It is further understood that any intentional misstatements or omissions of facts constitute Federal Criminal Violations (see 18 U.S.C. 1001).

Signed this _____ day of _____

Manual signature _____

Type or print name _____

☐ Chief Executive Officer          ☐ Chief Financial Officer          Corporate Title _____

☐ General Partner          ☐ Sole Proprietor

AUTHORITY: Sections 4c, 4d, 4f, 4g, 5a, 8a, and 17 of the Commodity Exchange Act (7 U.S.C. 6c, 6d, 6f 6g, 7a, 12a and 21)

- 1 -

Zimmerle Decl.
Ex. B

| Name of Company:<br>One World Capital Group, LLC | Employer ID No:<br>203419350 | NFA ID No:<br>0359973 |
|---|---|---|

CFTC FORM 1-FR-FCM
STATEMENT OF FINANCIAL CONDITION
AS OF 10/31/2007

<u>Assets</u>

| | <u>Current</u> | | <u>Non-Current</u> | | <u>Total</u> | |
|---|---|---|---|---|---|---|
| 1. Funds segregated or in separate accounts<br>pursuant to the CEAct and the Regulations | | | | | | |
| A. U.S. exchanges (page 11, line 13) | $ 786,145 | 1000 | | | $ 786,145 | 1005 |
| B. Dealer options (page 12, line 2.C.) | 0 | 1010 | | | 0 | 1015 |
| C. Foreign exchanges (page 14, line 8) | 0 | 1020 | $ 0 | 1025 | 0 | 1030 |
| (Do not Duplicate line 1. assets below) | | | | | | |
| 2. Cash | 765,224 | 1040 | 0 | 1045 | 765,224 | 1050 |
| 3. Securities, at market value | | | | | | |
| A. Firm owned | 0 | 1055 | 0 | 1060 | 0 | 1065 |
| B. Noncustomer-owned | 0 | 1070 | | | 0 | 1075 |
| C. Individual partners' and members' security accounts | 0 | 1090 | | | 0 | 1095 |
| D. Stock in clearing organizations | 0 | 1100 | 0 | 1105 | 0 | 1110 |
| 4. Securities purchased under resale agreements | 0 | 1115 | 0 | 1120 | 0 | 1125 |
| 5. Receivables from and deposits with U.S.<br>derivatives clearing organizations | | | | | | |
| A. Margins | 0 | 1130 | | | 0 | 1135 |
| B. Settlement receivable | 0 | 1140 | | | 0 | 1145 |
| C. Guarantee deposits | 0 | 1150 | | | 0 | 1155 |
| D. Net long options value | 0 | 1157 | | | 0 | 1158 |
| 6. Receivables from and deposits with foreign<br>commodity clearing organizations | | | | | | |
| A. Margins | 0 | 1160 | 0 | 1165 | 0 | 1170 |
| B. Settlement receivable | 0 | 1175 | | | 0 | 1180 |
| C. Guarantee deposits | 0 | 1182 | 0 | 1185 | 0 | 1190 |
| D. Net long options value | 0 | 1191 | 0 | 1192 | 0 | 1193 |
| 7. Receivables from registered FCMs | | | | | | |
| A. Net liquidating equity | 11,981 | 1195 | 0 | 1200 | 11,981 | 1205 |
| B. Security deposits | | 1210 | 0 | 1210 | 0 | 1215 |
| C. Other | 0 | 1220 | 0 | 1225 | 0 | 1230 |
| 8. Receivables from foreign commodity brokers | | | | | | |
| A. Net liquidating equity | 0 | 1235 | 0 | 1240 | 0 | 1245 |
| B. Security deposits | | | 0 | 1250 | 0 | 1255 |
| C. Other | 0 | 1260 | 0 | 1265 | 0 | 1270 |

9.  Receivables from traders on U.S.
    commodity exchanges

| | | | | | |
|---|---|---|---|---|---|
| A. Customer debit and deficit accounts | 0 | 1275 | 0 | 1280 | 0 | 1285 |
| B. Noncustomer and proprietary accounts | 0 | 1290 | 0 | 1295 | 0 | 1300 |
| C. Other | 0 | 1305 | 0 | 1310 | 0 | 1315 |
| D. Allowance for doubtful accounts | | | 0 | 1320 | 0 | 1325 |

10. Receivables from traders on foreign
    boards of trade

| | | | | | |
|---|---|---|---|---|---|
| A. Customer debit and deficit accounts | 0 | 1330 | 0 | 1335 | 0 | 1340 |
| B. Noncustomer and proprietary accounts | 0 | 1345 | 0 | 1350 | 0 | 1355 |
| C. Other | 0 | 1360 | 0 | 1365 | 0 | 1370 |
| D. Allowance for doubtful accounts | | | 0 | 1375 | 0 | 1380 |

11. Inventories of cash commodities, raw materials,
    work in progress and finished goods

| | | | | | |
|---|---|---|---|---|---|
| A. Covered | 0 | 1385 | 0 | 1390 | 0 | 1395 |
| B. Not covered | 0 | 1400 | 0 | 1405 | 0 | 1410 |

12. Secured demand notes

| | | | | | |
|---|---|---|---|---|---|
| Value of collateral $ | 0 | 1415 | | | |
| Safety factor $ | 0 | 1420 | 0 | 1425 | 0 | 1430 | 0 | 1435 |

13. Other receivables and advances

| | | | | | |
|---|---|---|---|---|---|
| A. Merchandising accounts receivable | 0 | 1440 | 0 | 1445 | 0 | 1450 |
| B. Notes receivable | 0 | 1455 | 0 | 1460 | 0 | 1465 |
| C. Commissions and brokerage receivable | 0 | 1470 | 0 | 1475 | 0 | 1480 |
| D. Receivables from employees and associated persons | 0 | 1485 | 0 | 1490 | 0 | 1495 |
| E. Advances on cash commodities | 0 | 1500 | 0 | 1505 | 0 | 1510 |
| F. Dividends and interest | 0 | 1515 | 0 | 1520 | 0 | 1525 |
| G. Taxes receivable | 0 | 1530 | 0 | 1535 | 0 | 1540 |
| H. Receivables from subsidiaries and affiliates | 0 | 1545 | 0 | 1550 | 0 | 1555 |
| I. Other (Itemize on a separate page) | 0 | 1560 | 0 | 1565 | 0 | 1570 |
| J. Allowance for doubtful accounts | | | 0 | 1575 | 0 | 1580 |

14. Unrealized gains on forward contracts
    and commitments

| | | | | | |
|---|---|---|---|---|---|
| | 0 | 1585 | 0 | 1590 | 0 | 1595 |

15. Exchange memberships at cost

| | | | | | |
|---|---|---|---|---|---|
| Market value $ | 0 | 1600 | 0 | 1605 | 0 | 1610 |

16. Investments in subsidiaries

| | | | | | |
|---|---|---|---|---|---|
| | 0 | 1612 | 0 | 1615 | 0 | 1620 |

17. Plant, property, equipment and capitalized leases
    cost net of accumulated depreciation

| | | | | | |
|---|---|---|---|---|---|
| and amortization of $ | 0 | 1625 | 0 | 1630 | 0 | 1635 | 0 | 1640 |

18. Prepaid expenses and deferred charges

| | | | | | |
|---|---|---|---|---|---|
| | | | 0 | 1645 | 0 | 1650 |

19. Other assets (itemize on separate page)

| | | | | | |
|---|---|---|---|---|---|
| | 824,077 | 1655 | 2,174,769 | 1660 | 2,998,846 | 1665 |

20. Total Assets

| | | | | | |
|---|---|---|---|---|---|
| $ | 2,387,427 | 1670 | $ 2,174,769 | 1675 | $ 4,562,196 | 1680 |

- 3 -

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| One World Capital Group, LLC | 203419350 | 0359973 |

CFTC FORM 1-FR-FCM
STATEMENT OF FINANCIAL CONDITION
AS OF 10/31/2007

<u>Liabilities & Ownership Equity</u>

Liabilities

| | | | | |
|---|---|---|---|---|
| 21. | Payables to banks | | | |
| | A. | Secured loans | $   0 | 2000 |
| | B. | Unsecured loans | 0 | 2010 |
| | C. | Overdrafts | 0 | 2020 |
| | | | | |
| 22. | Equities in commodity accounts | | | |
| | A. | Customers trading on U.S. commodity exchanges | 733,252 | 2030 |
| | B. | Customers trading on foreign exchanges | 0 | 2040 |
| | C. | Customers' dealer option accounts | 0 | 2050 |
| | D. | Noncustomers' accounts | 0 | 2060 |
| | E. | General partners' and members' trading accounts (not included in capital) | 0 | 2070 |
| | | | | |
| 23. | Payable to U.S. derivatives clearing organizations Including short option value $   0 | | 0 | 2080 |
| 24. | Payable to foreign commodity clearing organizations Including short option value $   0 | | 0 | 2090 |
| 25. | Payable to registered futures commission merchants | | 0 | 2100 |
| | | | | |
| 26. | Payable to foreign commodity brokers | | 0 | 2110 |
| | | | | |
| 27. | Accounts payable, accrued expenses and other payables | | | |
| | A. | Accounts payable and accrued expenses | 69,895 | 2120 |
| | B. | Salaries, wages, commissions and bonuses payable | 0 | 2130 |
| | C. | Taxes payable | 0 | 2140 |
| | D. | Deferred income taxes | 0 | 2150 |
| | E. | Security deposits held | 0 | 2160 |
| | F. | Advances against commodities | 0 | 2170 |
| | G. | Unrealized losses on forward contracts and commitments | 0 | 2180 |
| | H. | Due to subsidiaries and affiliates | 0 | 2190 |
| | I. | Notes, mortgages and other payables due within twelve months | 0 | 2200 |
| | J. | Other (itemize on a separate page) | 357,053 | 2210 |
| | | | | |
| 28. | Notes, mortgages and other payables not due within twelve months of the date of this statement | | | |
| | A. | Unsecured | 0 | 2220 |
| | B. | Secured | 0 | 2230 |

| | | | |
|---|---|---|---|
| 29. Securities sold under agreement to repurchase | | 0 | 2240 |
| 30. Securities sold not yet purchased, at market value | | 0 | 2250 |
| 31. Liabilities subordinated to claims of general creditors | | | |
|     A. Subject to a satisfactory subordination agreement | | 0 | 2260 |
|     B. Not subject to a satisfactory subordination agreement | | 0 | 2270 |
| 32. Total liabilities | $ | 1,160,200 | 2280 |

Ownership Equity

| | | | |
|---|---|---|---|
| 33. Sole proprietorship | $ | 3,401,996 | 2500 |
| 34. Partnership or Limited Liability Company | | | |
|     A. Partnership or LLC contributed and retained Capital | $ | 0 | 2510 |
|     B. Additional capital per partnership or membership agreement (equities in partners' or members' trading accounts, etc.) | | | |
|     C. Total | | 0 | 2515 |
| | $ | 0 | 2520 |
| 35. Corporation | | | |
|     A. Preferred stock | $ | 0 | 2530 |
|     B. Common stock | | 0 | 2535 |
|     C. Additional paid in capital | | 0 | 2540 |
|     D. Retained earnings | | 0 | 2545 |
|     E. Subtotal | $ | 0 | 2550 |
|     F. Less: capital stock in treasury | | 0 | 2555 |
|     G. Total | $ | 0 | 2560 |
| 36. Total ownership equity (line 33, 34.C. or 35.6) | $ | 3,401,996 | 2570 |
| 37. Total liabilities and ownership equity (add lines 32 and 36) | $ | 4,562,196 | 2580 |

| Name of Company: One World Capital Group, LLC | Employer ID No: 203419350 | NFA ID No: 0359973 |
|---|---|---|

CFTC FORM 1-FR-FCM
STATEMENT OF THE COMPUTATION OF THE MINIMUM CAPITAL REQUIREMENTS
AS OF 10/31/2007

<u>Net Capital</u>

1.  Current assets (page 3, line 20)      $ 2,387,427 [3000]

2.  Increase/(decrease) to U.S. clearing organization stock to reflect margin value      0 [3010]

3.  Net current assets      $ 2,387,427 [3020]

4.  Total liabilities (page 5, line 32)      $ 1,160,200 [3030]

5.  Deductions from total liabilities
    A.  Liabilities subject to satisfactory subordination agreements ( page 5, line 31.A)    $ 0 [3040]
    B.  Certain deferred income tax liability (see regulation 1.17(c)(4)(iv))    0 [3050]
    C.  Certain current income tax liability (see regulation 1.17(c)(4)(v))    0 [3060]
    D.  Long term debt pursuant to regulation 1.17(c)(4)(vi)    0 [3070]
    E.  Total deductions (add lines 5.A. - 5.D.)    0 [3080]
    F.  Adjusted liabilities (subtract line 5.E from line 4)    1,160,200 [3090]

6.  Net capital (subtract line 5.F. from line 3)    $ 1,227,227 [3100]

<u>Charges Against Net Capital (see regulation 1.17(c)(5))</u>

7.  Excess of advances paid on cash commodity contracts over 95% of the market value of commodities covered by such contracts    $ 0 [3110]

8.  Five percent (5%) of the market value of inventories covered by open futures contracts or commodity options (no charges applicable to inventories registered as deliverable on a contract market and which are covered by futures contracts)    0 [3120]

9.  Twenty percent (20%) of the market value of uncovered inventories or lesser percentage charge for uncovered balances in specified foreign currencies    0 [3130]

10.  Ten percent (10%) of the market value of commodities underlying fixed price commitments and forward contracts which are covered by open futures contracts or commodity options    0 [3140]

11.  Twenty percent (20%) of the market value of commodities underlying fixed price commitments and forward contracts which are not covered by open futures contracts or commodity options    0 [3150]

12. Charges as specified in section 240.15c3-1(c)(2)(vi) and (vii)
    against securities owned by firm, including securities representing
    investments of domestic and foreign customers' funds:

| | | Market Value | | Charge | |
|---|---|---|---|---|---|
| A. | U.S. and Canadian government obligations | $ 0 | 3160 | $ 0 | 3170 |
| B. | State and Municipal government obligations | 0 | 3180 | 0 | 3190 |
| C. | Certificates of deposit, commercial paper and bankers' acceptances | 0 | 3200 | 0 | 3210 |
| D. | Corporate obligations | 0 | 3220 | 0 | 3230 |
| E. | Stocks and warrants | 0 | 3240 | 0 | 3250 |
| F. | Other securities | 0 | 3260 | 0 | 3270 |
| G. | Total charges (add lines 12.A. - 12.F.) | | | 0 | 3280 |

13. Charges as specified in section 240.15c3-1(c)(2)(iv)(F)      0 | 3290
    A. Against securities purchased under agreements to resell      0 | 3300
    B. Against securities sold under agreements to repurchase

14. Charges on securities options as specified in section 240.15c3-1, Appendix A      0 | 3310

15. Undermargined commodity futures and options accounts -
    amount in each account required to meet maintenance margin requirements, less the amount of
    current margin calls in that account and the amount of any noncurrent deficit in the account
    A. Customer accounts      0 | 3320
    B. Noncustomer accounts      0 | 3330
    C. Omnibus accounts      0 | 3340

16. Charges against open commodity positions in proprietary accounts
    A. Uncovered exchange-traded futures and granted options contracts
       i   percentage of margin requirements applicable to such contracts      $ 0 | 3350
       ii   Less: equity in proprietary accounts included in liabilities      0 | 3360      0 | 3370

    B. Ten percent (10%) of the market value of commodities which
       underlie commodity options not traded on a contract market
       carried long by the applicant or registrant which has value
       and such value increased adjusted net capital (this charge
       is limited to the value attributed to such options)      0 | 3380

    C. Commodity options which are traded on contract markets and
       carried long in proprietary accounts. Charge is the same as
       would be applied if applicant or registrant was the grantor
       of the options (this charge is limited to the value attributed
       to such options)      0 | 3390

17. Five percent (5%) of all unsecured receivables from foreign brokers      0 | 3410

18. Deficiency in collateral for secured demand notes      0 | 3420

19. Adjustment to eliminate benefits of consolidation (explain on separate page)      0 | 3430

20. Total charges (add lines 7 through 19)      $ 0 | 3440

Net Capital Computation

21. Adjusted net capital (subtract line 20 from line 6)　　　　　　　　　　　　　　　$ 1,227,227 | 3500

22. Net capital required

    A.　Risk Based Requirement

        i　Amount of Customer Risk Maintenance Margin　　$ 177,606 | 3515

        ii　Enter 8% of line 22.A.i　　　　　　　　　　　　　　　$ 14,208 | 3525

        iii　Amount of Non-Customer Risk Maintenance Margin　$ 0 | 3535

        iv　Enter 4% of line 22.A.iii　　　　　　　　　　　　　　$ 0 | 3545

        v　Enter the sum of 22.A.ii and 22.A.iv　　　　　　　　$ 14,208 | 3555

    B.　Minimum Dollar Amount Requirement (Enter $500,000 if a member of NFA)　$ 0 | 3565

    C.　Other NFA Requirement　　　　　　　　　　　　　　　$ 0 | 3575

    D.　Enter the greater of lines 22.A.v or 22.B. or 22.C.　　　　　　　　　　$ 14,208 | 3600

23. Excess net capital (line 21 less line 22.D.)　　　　　　　　　　　　　　　　$ 1,213,018 | 3610

Computation of Early Warning Level

24. Enter the greatest of 110% of line 22.A.v or 150% of 22.B. or 150% of 22.C.　　$ 15,629 | 3620

    This is your early warning capital level. If this amount is greater that the amount on line 21,
    you must immediately notify your DSRO and the Commission pursuant to section 1.12 of the regulations.

Guaranteed Introducing Brokers

25. List all IBs with which guarantee agreements have been entered into by the FCM and which are currently in effect　　3650

| Name of Company: One World Capital Group, LLC | Employer ID No: 203419350 | NFA ID No: 0359973 |

CFTC FORM 1-FR-FCM
STATEMENT OF INCOME (LOSS)
FOR THE PERIOD FROM 10/01/2007 THROUGH 10/31/2007

Revenues

1. Commissions and brokerage
   A. Commodity transactions on U.S. commodity exchanges $ 20,641 4000
   B. Commodity transactions on foreign commodity exchanges 0 4010
   C. Securities transactions 0 4020
   D. Other brokerage activities (describe on a separate page) 0 4030

2. Firm trading accounts
   A. Commodity transactions 0 4040
   B. Securities transactions 0 4050
   C. Other firm trading (describe on a separate page) 0 4060

3. Income from advisory services 0 4070

4. Interest and dividends
   A. Interest earned on investments of customers' funds 0 4080
   B. Interest earned on investments of other than customers' funds 1,246 4090
   C. Dividends 0 4100

5. Other income (itemize on a separate page) 220,000 4110

6. Total revenue $ 241,887 4120

Expenses

7. Sales personnel commissions $ 0 4200
8. Floor brokerage 0 4210
9. Clerical and administrative employees' expenses 63,705 4220
10. Commission to other FCMs 0 4230
11. Exchange clearance fees 0 4240
12. Occupancy and equipment costs 48,052 4250
13. Promotional costs 156,156 4260
14. Communications 3,470 4270
15. Data processing 35,911 4280
16. Bad debt expense 0 4290
17. Trade Errors
    A. Customers' accounts 0 4300
    B. Other 0 4310
18. Interest 0 4320
19. Other expenses (itemize on a separate page) 393,724 4330

20. Total expenses $ 701,018 4340

21. Income (loss) before income taxes and items below ($ 459,131) 4400
22. Provision for income taxes 0 4410
23. Equity in earnings (losses) of unconsolidated subsidiaries, less applicable tax 0 4420
24. Extraordinary gains (losses), less applicable tax 0 4430
25. Cumulative effect of changes in accounting principles, less applicable tax 0 4440
26. Net income (loss) ($ 459,131) 4450

- 9 -

| Name of Company: One World Capital Group, LLC | Employer ID No: 203419350 | NFA ID No: 0359973 |
|---|---|---|

CFTC FORM 1-FR-FCM
STATEMENT OF THE CHANGES IN OWNERSHIP EQUITY
FOR THE PERIOD FROM 10/01/2007 THROUGH 10/31/2007

| | | | |
|---|---|---|---|
| 1. | Total ownership equity as previously reported | $ 3,611,127 | 4500 |
| 2. | Net income (loss) for period | (459,131) | 4510 |
| 3. | Other additions to capital (explain below) | 250,000 | 4520 |
| 4. | Dividends | 0 | 4530 |
| 5. | Other deductions from capital (including partner and proprietary withdrawals) ( Explain below) | 0 | 4540 |
| 6. | Balance (page 5, line 36) | $ 3,401,996 | 4550 |

See attached for date, explanation and amount.

STATEMENT OF CHANGES IN LIABILITIES
SUBORDINATED TO THE CLAIMS OF GENERAL CREDITORS
PURSUANT TO A SATISFACTORY SUBORDINATION AGREEMENT
FOR THE PERIOD FROM 10/01/2007 THROUGH 10/31/2007

| | | All Satisfactory Subordinated Debt | | Debt that Qualifies as Equity Capital * | |
|---|---|---|---|---|---|
| 1. | Total subordinated borrowings as previously reported | $ 0 | 4600 | $ 0 | 4605 |
| 2. | Increases (explain below) | 0 | 4610 | 0 | 4615 |
| 3. | Decreases (explain below) | 0 | 4620 | 0 | 4625 |
| 4. | Balance (page 5, line 31.A) | $ 0 | 4630 | $ 0 | 4635 |

    * Equity capital is defined in regulation 1.17(d)

See attached for date, explanation and amount.

| Name of Company: One World Capital Group, LLC | Employer ID No: 203419350 | NFA ID No: 0359973 |
|---|---|---|

## CFTC FORM 1-FR-FCM
### STATEMENT OF SEGREGATION REQUIREMENTS AND FUNDS IN SEGREGATION
### FOR CUSTOMERS TRADING ON U.S. COMMODITY EXCHANGES
### AS OF 10/31/2007

SEGREGATION REQUIREMENTS (Section 4d(2) of the CEAct)

| | | | |
|---|---|---:|---|
| 1. | Net ledger balance | | |
| | A. Cash | $ 887,425 | 5000 |
| | B. Securities (at market) | 0 | 5010 |
| 2. | Net unrealized profit (loss) in open futures contracts traded on a contract market | 0 | 5020 |
| 3. | Exchange traded options | | |
| | A. Market value of open option contracts purchased on a contract market | 0 | 5030 |
| | B. Market value of open option contracts granted (sold) on a contract market | (154,173) | 5040 |
| 4. | Net equity (deficit) (add lines 1, 2, and 3) | $ 733,252 | 5050 |
| 5. | Accounts liquidating to a deficit and accounts with debit balances - gross amount $ 0 [5060] | | |
| | Less: amount offset by customer owned securities 0 [5070] | 0 | 5080 |
| 6. | Amount required to be segregated (add lines 4 and 5) | $ 733,252 | 5090 |

FUNDS IN SEGREGATED ACCOUNTS

| | | | |
|---|---|---:|---|
| 7. | Deposited in segregated funds bank accounts | | |
| | A. Cash | $ 52,893 | 5100 |
| | B. Securities representing investment of customers' funds (at market) | 0 | 5110 |
| | C. Securities held for particular customers or option customers in lieu of cash (at market) | 0 | 5120 |
| 8. | Margins on deposit with derivatives clearing organizations of contract markets | | |
| | A. Cash | 0 | 5130 |
| | B. Securities representing investments of customers' funds (at market) | 0 | 5140 |
| | C. Securities held for particular customers or option customers in lieu of cash (at market) | 0 | 5150 |
| 9. | Net settlement from (to) derivatives clearing organizations of contract markets | 0 | 5160 |
| 10. | Exchange traded options | | |
| | A. Value of open long option contracts | 0 | 5170 |
| | B. Value of open short option contracts | 0 | 5180 |
| 11. | Net equities with other FCMs | | |
| | A. Net liquidating equity | 733,252 | 5190 |
| | B. Securities representing investments of customers' funds (at market) | 0 | 5200 |
| | C. Securities held for particular customers or option customers in lieu of cash (at market) | 0 | 5210 |
| 12. | Segregated funds on hand (describe: _____ ) | 0 | 5215 |
| 13. | Total amount in segregation (add lines 7 through 12) | $ 786,145 | 5220 |
| 14. | Excess (deficiency) funds in segregation (subtract line 6 from line 13) | $ 52,893 | 5230 |

| Name of Company:<br>One World Capital Group, LLC | Employer ID No:<br>203419350 | NFA ID No:<br>0359973 |
|---|---|---|

### CFTC FORM 1-FR-FCM
### STATEMENT OF SEGREGATION REQUIREMENTS AND FUNDS
### IN SEGREGATION FOR CUSTOMERS' DEALER OPTIONS ACCOUNTS
### AS OF 10/31/2007

1. Amount required to be segregated in accordance with Commission regulation 32.6     $    0   5400

2. Funds in segregated accounts

    A.   Cash      $    0   5410

    B.   Securities (at market)      0   5420

    C.   Total      0   5430

3. Excess (deficiency) funds in segregation (subtract line 2.C from line 1)     $    0   5440

| Name of Company:<br>One World Capital Group, LLC | Employer ID No:<br>203419350 | NFA ID No:<br>0359973 |
|---|---|---|

CFTC FORM 1-FR-FCM
STATEMENT OF SECURED AMOUNTS AND FUNDS HELD IN SEPARATE ACCOUNTS
FOR FOREIGN FUTURES AND FOREIGN OPTIONS CUSTOMERS
PURSUANT TO COMMISSION REGULATION 30.7
AS OF 10/31/2007

FOREIGN FUTURES AND FOREIGN OPTIONS SECURED AMOUNTS SUMMARY

I.　Check the appropriate box to identify the amount shown on line 1. below:

☐ 5600　Secured amounts in only U.S.-domiciled customers' accounts

☐ 5610　Secured amount in U.S. and foreign-domiciled customers' accounts

☐ 5620　Net liquidating equities in all accounts of customers
　　　　　trading on foreign boards of trade

☐ 5630　Amount required to be set aside pursuant to law, rule or regulation
　　　　　of a foreign government or a rule of a self-regulatory organization
　　　　　authorized thereunder

II.　Has the FCM changed the method of calculating the amount to be set aside in separate
　　accounts since the last financial report it filed?

☐ Yes　☒ No　5640　If yes explain the change below.

| | | | |
|---|---|---|---|
| 1. | Amount to be set aside in separate section 30.7 accounts | $　　　0 | 5660 |
| 2. | Total funds in separate section 30.7 accounts (page 14, line 8) | 　　　0 | 5670 |
| 3. | Excess (deficiency) - (subtract line 1 from line 2) | $　　　0 | 5680 |

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| One World Capital Group, LLC | 203419350 | 0359973 |

CFTC FORM 1-FR-FCM
STATEMENT OF SECURED AMOUNTS AND FUNDS HELD IN SEPARATE ACCOUNTS
FOR FOREIGN FUTURES AND FOREIGN OPTIONS CUSTOMERS
PURSUANT TO COMMISSION REGULATION 30.7
AS OF 10/31/2007

### FUNDS DEPOSITED IN SEPARATE REGULATION 30.7 ACCOUNTS

1. Cash in Banks
   A. Banks located in the United States ........... $ 0 | 5700
   B. Other Banks designated by the Commission
   Name(s): _____ 5710 ........... 0 | 5720    $ 0 | 5730

2. Securities
A. In safekeeping with banks located in the United States ........... $ 0 | 5740
B. In safekeeping with other banks designated by the Commission
   Name(s): _____ 5750 ........... 0 | 5760    0 | 5770

3. Equities with registered futures commission merchants
   A. Cash ........... $ 0 | 5780
   B. Securities ........... 0 | 5790
C. Unrealized gain (loss) on open futures contracts ........... 0 | 5800
D. Value of long option contracts ........... 0 | 5810
E. Value of short option contracts ........... 0 | 5815    0 | 5820

4. Amounts held by clearing organizations of foreign boards of trade
   Name(s): _____ 5830
   A. Cash ........... $ 0 | 5840
   B. Securities ........... 0 | 5850
   C. Amount due to (from) clearing organization - daily variation ........... 0 | 5860
   D. Value of long option contracts ........... 0 | 5870
   E. Value of short option contracts ........... 0 | 5875    0 | 5880

5. Amounts held by members of foreign boards of trade
   Name(s): _____ 5890
   A. Cash ........... $ 0 | 5900
   B. Securities ........... 0 | 5910
   C. Unrealized gain (loss) on open futures contracts ........... 0 | 5920
   D. Value of long option contracts ........... 0 | 5930
   E. Value of short option contracts ........... 0 | 5935    0 | 5940

6. Amounts with other depositories designated by a foreign board of trade
   Name(s): _____ 5950    0 | 5960

7. Segregated funds on hand (describe: _____ )    0 | 5965

8. Total funds in separate section 30.7 accounts (to page 13, line 2)    $ 0 | 5970

A. If any securities shown above are other than the types of securities referred to in Commission regulation 1.25, attach a separate schedule detailing the obligations shown on each such line.

| Name of Company: One World Capital Group, LLC | Employer ID No: 203419350 | NFA ID No: 0359973 |
|---|---|---|

**CFTC FORM 1-FR-FCM**
**EXCHANGE SUPPLEMENTARY INFORMATION**

1.  Capital to be withdrawn within 6 months                                               $            0    [8000]

2.  Subordinated Debt maturing within 6 months                                                        0    [8010]

3.  Subordinated Debt due to mature within 6 months that you plan to renew                            0    [8020]

**If Adjusted Net Capital is less than $2,000,000 please complete lines 4 through 7:**

4.  Number of Associated Persons                                                          $            9    [8100]

5.  Number of Branch Offices                                                              $            2    [8110]

6.  Number of Guaranteed Introducing Brokers                                              $            0    [8120]

7.  Number of Guaranteed Introducing Broker Branch Offices                                $            0    [8130]

Futures Commission Merchants offering off-exchange foreign currency futures and options ("forex") to retail customers

8.  Gross revenue from forex transactions with retail customers                                  220,000    [8140]

9.  Total net aggregate notional value of all open forex transactions in retail
    customer and non-customer (not proprietary) accounts                                           0    [8150]

**General Comments:**

| Name of Company:<br>One World Capital Group, LLC | Employer ID No:<br>203419350 | NFA ID No:<br>0359973 |
|---|---|---|

CFTC FORM 1-FR-FCM
STATEMENT DETAILS
AS OF 10/31/2007

**Box 1655**   Other Assets - Current

| | |
|---|---|
| GAIN Capital | 1,309 |
| ODL Securities | 18,171 |
| PFG Forex | 464,665 |
| House Balance at Dealers (FXSOL) | 645 |
| B of A Forex Cust | -60,713 |
| PIP Receivable | 400,000 |
| **Total** | **$ 824,077** |

**Box 1660**   Other Assets - Non-Current

| | |
|---|---|
| Security Deposits | 101,700 |
| Suspense | 30,806 |
| Plane Program | 560,379 |
| Automobile | 63,955 |
| Prepaid Rent | 355,117 |
| Non-Allowable Receivable FX Customer DRs | 1,062,812 |
| **Total** | **$ 2,174,769** |

**Box 2210**   Accounts Payable, Other

| | |
|---|---|
| Customer Deposits/Redemptions | 357,053 |
| **Total** | **$ 357,053** |

**Box 4110**   Other Income

| | |
|---|---|
| PIP Rebates/Fees | 220,000 |
| **Total** | **$ 220,000** |

**Box 4330**   Other Expenses

| | |
|---|---|
| Bank Service Charges | -5,565 |
| Commission Expense | 328,931 |
| Office Expense | -36,616 |
| Paychex Fees | 223 |
| Postage and Delivery | 607 |
| Professional Fees | 105,259 |
| Regulatory Expense | 885 |
| **Total** | **$ 393,724** |

**Box 4520**   Other Additions to Capital

| | | |
|---|---|---|
| 10/30/20 | Jack Walsh Sole Member Contribution | 250,000 |
| | **Total** | **$ 250,000** |

**General Comments:**

Details Page   2                                          12/12/07     10:21:23 AM

| Name of Company: | Employer ID No: | NFA ID No: |
|---|---|---|
| One World Capital Group, LLC | 203419350 | 0359973 |

CFTC FORM 1-FR-FCM
LISTING OF GUARANTEED INTRODUCING BROKERS
AS OF 10/31/2007

# Exhibit 4



## <u>CERTIFICATION</u>

With respect to: One World Capital Group

1.    I, Sandra A. Guard, am employed by National Futures Association ("NFA") as Document Research Supervisor. I also have served as Deputy Record Custodian since May 6, 1996. NFA is a futures association registered with the Commodity Futures Trading Commission ("CFTC") under Section 17 of the Commodity Exchange Act ("Act"). 7 U.S.C. § 21 (1994).

2.    Under Sections 4f, 4k, 4n, 8a and 19 of the Act, the CFTC is authorized to collect and maintain registration records for each category of registration under the Act. 7 U.S.C. §§ 6f, 6k, 6n, 12a and 23 (1994). Under Sections 8a(10) and 17o of the Act, 7 U.S.C. §§ 12a(10) and 21o (1994), the CFTC has delegated to NFA the responsibility and authority to process and act as custodian of the official CFTC registration records for all categories of registration under the Act.

3.    Pursuant to the CFTC's delegation of responsibility and authority, NFA receives, processes, stores and records all official CFTC registration records in the normal, ordinary and regular course of NFA's business. NFA has adopted Registration Rules, which the CFTC has reviewed and approved, governing access to and certification of the official CFTC registration records.

4.    As Deputy Record Custodian, I am responsible for NFA's receipt, processing, storage and recording of all official CFTC registration records. As such, I am familiar with these records and the system that NFA uses to maintain these records.

5.    Under my supervision, I have caused to be conducted a review of these official CFTC records from September 2005 to the present, which disclosed the following information:

> One World Capital Group ("OWC") was granted registration as a Futures Commission Merchant ("FCM") effective December 6, 2005. OWC was granted registration as a Commodity Trading Advisor ("CTA") effective December 12, 2006. OWC remained registered as a CTA from December 12, 2006 until April 19, 2007 when OWC's CTA registration was withdrawn. OWC was again granted registration as a CTA effective May 17, 2007. OWC has remained registered as a CTA since that date and

Ex. 4

OWCG-001-01-00218

- 2 -

OWC will remain so registered until such registration is revoked or withdrawn. OWC has remained registered as an FCM since December 6, 2005 and OWC will remain so registered until such registration is revoked or withdrawn.

The attached one hundred and ninety-five (195) pages are true, correct and accurate copies of registration records for One World Capital Group. The originals are on file with National Futures Association, 200 West Madison Street, Chicago, Illinois 60606-3447.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:   December 6, 2007

_____
Deputy Record Custodian

National Futures Association
200 West Madison Street
Chicago, Illinois 60606-3447

Attachments

OWCG-001-01-00219

# National Futures Association

Business Locations (3R)                                    Page  1

| | | | |
|---|---|---|---|
| **Filed** | October 01, 2007 | **OMB No.** | 3038-0023 |
| **Registrant** | ONE WORLD CAPITAL GROUP | **NFA ID** | 0359973 |
| **Submitted By** | JOHN WALSH | **User ID** | WALSHJ4 |

## Business Information

| | |
|---|---|
| **Business Address** | 818 ELM STREET<br>WINNETKA, ILLINOIS  60093<br>UNITED STATES |
| **Phone Number** | 847-501-4340 |
| **Fax Number** | Not provided. |
| **E-mail Address** | JWALSH@1WORLDFCM.COM |

# National Futures Association

Business Locations (3R)                                    Page  2

| | | | |
|---|---|---|---|
| **Filed** | October 01, 2007 | **OMB No.** | 3038-0023 |
| **Registrant** | ONE WORLD CAPITAL GROUP | **NFA ID** | 0359973 |
| **Submitted By** | JOHN WALSH | **User ID** | WALSHJ4 |

## Location of Business Records

**Business Records Address**

818 ELM STREET
WINNETKA, IL  60093
UNITED STATES

OWCG-001-01-00253

# National Futures Association

Business Locations (3R)                                    Page 3

| | | | |
|---|---|---|---|
| **Filed** | October 01, 2007 | **OMB No.** | 3038-0023 |
| **Registrant** | ONE WORLD CAPITAL GROUP | **NFA ID** | 0359973 |
| **Submitted By** | JOHN WALSH | **User ID** | WALSHJ4 |

## Contact Information

### Registration Contact

JOHN WALSH
PRESIDENT
818 ELM STREET
WINNETKA, IL 60093
UNITED STATES
Phone: 847-501-4340
E-mail: JWALSH@1WORLDFCM.COM

### Membership Contact

JOHN WALSH
PRESIDENT
818 ELM STREET
WINNETKA, IL 60093
UNITED STATES
Phone: 847-501-4340
E-mail: JWALSH@1WORLDFCM.COM

### Accounting Contact

JOHN WALSH
PRESIDENT
818 ELM STREET
WINNETKA, IL 60093
UNITED STATES
Phone: 847-501-4340
E-mail: JWALSH@1WORLDFCM.COM

# National Futures Association

Business Locations (3R)                                              Page  4

| **Filed** | October 01, 2007 | **OMB No.** | 3038-0023 |
| **Registrant** | ONE WORLD CAPITAL GROUP | **NFA ID** | 0359973 |
| **Submitted By** | JOHN WALSH | **User ID** | WALSHJ4 |

### Arbitration Contact

JOHN WALSH
PRESIDENT
818 ELM STREET
WINNETKA, IL  60093
UNITED STATES
Phone: 847-501-4340
E-mail: JWALSH@1WORLDFCM.COM

### Compliance Contact

JOHN WALSH
PRESIDENT
818 ELM STREET
WINNETKA, IL  60093
UNITED STATES
Phone: 847-501-4340
E-mail: JWALSH@1WORLDFCM.COM

### Assessment Fee Contact

JOHN WALSH
PRESIDENT
818 ELM STREET
WINNETKA, IL  60093
UNITED STATES
Phone: 847-501-4340
E-mail: JWALSH@1WORLDFCM.COM

# National Futures Association

Business Locations (3R)                                    Page  5

| | | | |
|---|---|---|---|
| **Filed** | October 01, 2007 | **OMB No.** | 3038-0023 |
| **Registrant** | ONE WORLD CAPITAL GROUP | **NFA ID** | 0359973 |
| **Submitted By** | JOHN WALSH | **User ID** | WALSHJ4 |

**Enforcement/Compliance Communication Contact**

JOHN WALSH
PRESIDENT
525 CHESTNUT ST
2ND FLOOR
WINNETKA, IL  60093
UNITED STATES
Phone: 847-446-8100
E-mail: JWALSH@1WORLDFCM.COM

OWCG-001-01-00256

# National Futures Association

Business Locations (3R)                                    Page 6

**Filed**          October 01, 2007              **OMB No.** 3038-0023
**Registrant**     ONE WORLD CAPITAL GROUP       **NFA ID** 0359973
**Submitted By**   JOHN WALSH                    **User ID** WALSHJ4

## Registrant Certification Statement

BY FILING THIS FORM 3-R, THE APPLICANT, REGISTRANT OR SPONSOR AGREES THAT
SUCH FILING CONSTITUTES THE APPLICANT'S, REGISTRANT'S OR SPONSOR'S

certification that the answers and the information provided in the Form 3-R are true, complete
and accurate and that in the light of the circumstances under which the applicant, registrant or
sponsor has given them, the answers and statements in the Form 3-R are not misleading in any
material respect; certification that the person who electronically files the Form 3-R on behalf of
the applicant, registrant or sponsor is authorized by the applicant, registrant or sponsor to file
the Form 3-R on behalf of the applicant, registrant or sponsor and to make all required
certifications and acknowledgements; and acknowledgement that the applicant, registrant or
sponsor is subject to the imposition of criminal penalties under Section 9(a) of the Act and 18
U.S.C. §1001 for any false statements or omissions made in the Form 3-R.

OWCG-001-01-00257

Case 1:07-cv-07002    Document 10    Filed 12/13/2007    Page 142 of 146
NFA Online Registration - Registration Information Change

Page 1 of 1

OMB No. 3038-0023

# Registration Information Change

NFA ID  0359973    ONE WORLD CAPITAL GROUP

**ENFORCEMENT/COMPLIANCE COMMUNICATION CONTACT INFORMATION DELETED**

| | |
|---|---|
| **FIRST NAME:** | DANIEL |
| **LAST NAME:** | COLGAN |
| **TITLE:** | CHIEF OPERATING OFFICER |
| **STREET ADDRESS 1:** | 525 CHESTNUT STREET |
| **STREET ADDRESS 2:** | 2ND FLOOR |
| **STREET ADDRESS 3:** | |
| **CITY:** | WINNETKA |
| **STATE:** | ILLINOIS |
| **PROVINCE:** | |
| **COUNTRY:** | UNITED STATES |
| **ZIP CODE:** | 60093 |
| **PHONE NUMBER:** | 847-446-8100 |
| **FAX NUMBER:** | |
| **E-MAIL ADDRESS:** | DCOLGAN@1WORLDFCM.COM |
| **FILED BY:** | NFICCDM |
| **FILED ON:** | 9/19/2007 1:14:46 PM |

BY FILING THIS FORM 3-R, THE APPLICANT, REGISTRANT OR SPONSOR
AGREES THAT SUCH FILING CONSTITUTES THE APPLICANT'S,
REGISTRANT'S OR SPONSOR'S

certification that the answers and the information provided in the Form 3-R are true, complete and accurate and that in the light of the circumstances under which the applicant, registrant or sponsor has given them, the answers and statements in the Form 3-R are not misleading in any material respect; certification that the person who electronically files the Form 3-R on behalf of the applicant, registrant or sponsor is authorized by the applicant, registrant or sponsor to file the Form 3-R on behalf of the applicant, registrant or sponsor and to make all required certifications and acknowledgements; and acknowledgement that the applicant, registrant or sponsor is subject to the imposition of criminal penalties under Section 9(a) of the Act and 18 U.S.C. §1001 for any false statements or omissions made in the Form 3-R.

© 2002-2007 National Futures Association

OWCG-001-01-00258

**Exhibit 5**



## <u>CERTIFICATION</u>

With respect to: John Edward Walsh

1.  I, Sandra A. Guard, am employed by National Futures Association ("NFA") as Document Research Supervisor. I also have served as Deputy Record Custodian since May 6, 1996. NFA is a futures association registered with the Commodity Futures Trading Commission ("CFTC") under Section 17 of the Commodity Exchange Act ("Act"). 7 U.S.C. § 21 (1994).

2.  Under Sections 4f, 4k, 4n, 8a and 19 of the Act, the CFTC is authorized to collect and maintain registration records for each category of registration under the Act. 7 U.S.C. §§ 6f, 6k, 6n, 12a and 23 (1994). Under Sections 8a(10) and 17o of the Act, 7 U.S.C. §§ 12a(10) and 21o (1994), the CFTC has delegated to NFA the responsibility and authority to process and act as custodian of the official CFTC registration records for all categories of registration under the Act.

3.  Pursuant to the CFTC's delegation of responsibility and authority, NFA receives, processes, stores and records all official CFTC registration records in the normal, ordinary and regular course of NFA's business. NFA has adopted Registration Rules, which the CFTC has reviewed and approved, governing access to and certification of the official CFTC registration records.

4.  As Deputy Record Custodian, I am responsible for NFA's receipt, processing, storage and recording of all official CFTC registration records. As such, I am familiar with these records and the system that NFA uses to maintain these records.

5.  Under my supervision, I have caused to be conducted a review of these official CFTC records from February 1997 to the present, which disclosed the following information:

    John Edward Walsh ("Walsh") was granted registration as an Associated Person ("AP") with Commerz Futures LLC ("CF"), formerly Commerz Futures Corporation, effective May 22, 1997. Walsh remained registered as an AP with CF from that date until October 31, 2000 when his AP registration with CF was withdrawn.

Ex. 5

- 2 -

Walsh was granted a Temporary License ("TL") to act in the capacity of an AP with Citigroup Global Markets, Inc. ("CGM"); formerly Salomon Smith Barney, Inc.; effective July 25, 2001. This TL converted to a full AP registration effective August 30, 2001. Walsh remained registered as an AP with CGM from that date until March 8, 2002 when his AP registration with CGM was withdrawn.

Walsh was granted a TL to act in the capacity of an AP with FCStone LLC ("FCStone") effective November 1, 2002. This TL converted to a full AP registration effective December 18, 2002. Walsh remained registered as an AP with FCStone from that date until December 3, 2004 when his AP registration with FCStone was withdrawn.

In August 2004, Walsh filed an application for registration as a Commodity Trading Advisor ("CTA"). Walsh remained pending registration as an CTA from August 19, 2004 until December 29, 2004 when his pending application for registration as a CTA was withdrawn for failure to respond.

Walsh was granted registration as an AP with John E. Walsh LLC ("John E. Walsh") effective January 6, 2005. Walsh remained registered as an AP with John E. Walsh from that date until May 2, 2007 when his AP registration with John E. Walsh was withdrawn in conjunction with the withdrawal of John E. Walsh's registration as a CTA.

Walsh was granted registration as an AP with Rosenthal Collins Group LLC ("RCG") effective February 22, 2005. Walsh remained registered as an AP with RCG from that date until August 16, 2005 when his AP registration with RCG was withdrawn.

Walsh was granted registration as an AP with One World Capital Group ("OWC") effective December 6, 2005. Walsh remained registered as an AP with OWC from that date until November 30, 2007 when his AP registration with OWC was withdrawn.

There is no record of a registration or application for registration in any capacity for Walsh after November 30, 2007.

- 3 -

The attached two-hundred thirteen (213) pages are true, correct and accurate copies of registration records for John Edward Walsh. The originals are on file with National Futures Association, 200 West Madison Street, Chicago, Illinois 60606-3447.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:   December 6, 2007

Deputy Record Custodian

National Futures Association
200 West Madison Street
Chicago, Illinois 60606-3447

Attachments